# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA, for the use and benefit of AMERICAN CIVIL CONSTRUCTION, LLC,

      Plaintiff,

        v.

HIRANI ENGINEERING & LAND SURVEYING, P.C., et al.,

      Defendants.

_____

Case No. 14-cv-00745 (APM)

## MEMORANDUM OPINION

Plaintiff American Civil Construction, LLC, has filed suit against Defendants Hirani Engineering & Land Surveying, PC ("Hirani"), and Colonial Surety Company ("Colonial") in connection with its work as a subcontractor on a federal government project. Plaintiff brings a state law claim against Hirani for breach of contract and, separately, seeks relief in the name of the United States against Colonial under the terms of the Miller Act, 40 U.S.C. § 3133, for Hirani's failure to pay Plaintiff. Plaintiff alleges that it is entitled to recover more than $2 million in damages. Colonial has filed multiple counterclaims in response. Now before the court are Defendants' motions for summary judgment and to strike Plaintiff's jury demand.

After thorough review of the record, the court denies Defendants' Motion for Summary Judgment but grants Defendants' Motion to Strike Plaintiff's Jury Demand.

# I.     BACKGROUND

## A.     The Prime Contract and Subcontract

On or about September 16, 2010, Defendant Hirani Engineering & Land Surveying, PC ("Hirani"), entered into Contract No. W912DR-10-C-0093 (the "Prime Contract") with the United States of America, through the United States Army Corps of Engineers ("the USACE"), to construct the "Washington D.C. Local Flood Protection Project, 17th Street Closure Structure, Washington D.C." ("the Project"). *See* Defs.' Mot. for Summ. J., ECF No. 44 [hereinafter Defs.' Mot. for Summ. J.], Defs.' Stmt. of Material Facts, ECF No. 44-1 [hereinafter Defs.' Stmt. of Facts], ¶ 1 (citing Pl.'s Second Am. Compl., ECF No. 26 [hereinafter Second Am. Compl.], ¶ 5). To fulfill its obligations under the Prime Contract, Hirani entered into a written contract on April 4, 2011, ("the Subcontract") with Plaintiff American Civil Construction, LLC, under which Plaintiff would perform specified work ("the Work") on the Project. *See* Defs.' Mot. for Summ. J., Attach. 3, ECF No. 44-3 [hereinafter Moldovan Decl.], at 7–17 (Ex. B) [hereinafter Subcontract].[1]  Consistent with the requirements of the Miller Act, Hirani obtained a payment bond from Defendant Colonial Surety Company ("Colonial") to secure payment to Plaintiff under the Subcontract. *See* 40 U.S.C. § 3131(b)(2); Moldovan Decl. at 4–6 (Ex. A).

The Subcontract outlines each party's obligations under the agreement, including, but not limited to, a description of the Work; when the Work should begin; and the amount owed Plaintiff for completing the Work. The first clause of the Subcontract states that Plaintiff

> shall provide the entire scope of work to construct and manage the 17th Street closure structure except for the Project Manager and the misc. metal structures/panels as required by Hirani under the base bid to the USACE and related work required (hereinafter the "Work") for the Local Flood Protection Project @ 17th Street

---

[1] All pin citations to Defendants' Exhibits reference the original pagination of each Exhibit.

Closure Structure (hereinafter the "Project") located at 17th Street (hereinafter the "Premises").

Subcontract at 1 (Art. I, § 1.1). Schedules A and B of the Subcontract define the Work more specifically. *See id.* (Art. I, §§ 1.2, 1.3). For example, Schedule B states that Plaintiff must "[p]rovide project supervision (Superintendent, Site Safety Officer, Traffic Control Officer) except for a project manager to act on behalf of [Hirani]"; "[p]rovide an on-site field office as per the specifications for the USACE"; and "remove, store[,] and reinstall pedestrian light poles throughout construction." *Id.* at 9 (Sch. B, Pts. 2, 6, 16). Hirani retained the right to change, add, or eliminate portions of the Work "at any time whatsoever, whether the Work or any part thereof shall or shall not have been completed," by written order submitted to Plaintiff, and Plaintiff agreed not to seek "extra or additional compensation on account of any such work, unless same [sic] shall have been done pursuant to a written order signed by" a designated Hirani representative. *Id.* at 2 (Art. IV, § 4.1). The Subcontract also specifies that:

> The scheduling of all construction operations at the Project, including the Schedule, shall be as mutually agreed with [Hirani], and [Plaintiff] shall, if requested, furnish all scheduling information in such form and detail as required by [Hirani], to the satisfaction [Hirani] [sic], and [Plaintiff] shall furnish such information within seven (7) days of request. [Plaintiff] shall also update and/or revise such information as requested by [Hirani] at any time, either prior to or during the performance of its Work.

*Id.* at 1–2 (Art. II, § 2.2). Additionally, of relevance here, the Subcontract requires Plaintiff, at Plaintiff's own expense, to clean up the worksite. Plaintiff agreed to

> [o]n a daily basis or less frequently, and at [Plaintiff's] own cost and expense, (1) keep the area of the premises in which the Work is being performed free at all times from all waste materials, packaging materials[,] and other rubbish accumulated in connection with the execution of the Work by collecting and depositing daily said material and rubbish into dumpsters provided on grade by [Hirani], (2) clean and remove from its own work and from all contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt

3

> caused by the execution of the Work and make good all defects resulting therefrom, (3) at the completion of its work in each area, perform such cleaning as may be required to leave the area "broom clean" and (4) upon the completion of the Work, remove all of its tools, equipment, scaffolds, shanties, trailers, and surplus materials.

*Id.* at 3 (Art. VII, § 7.1).

Hirani and Plaintiff's agreement also set out explicit terms for payment and what to do in the event of a dispute concerning the agreement. The Subcontract states Plaintiff will be paid a fixed sum of $2,845,600.00 for "all labor services, materials, equipment or other items acquired, performed, furnished or used with respect to the Work," which includes all applicable federal, state, and local taxes. *Id.* at 2 (Art. III, § 3.1). Additionally, Plaintiff agreed not to stop or delay performance of the Work or delivery of labor or materials simply because a "dispute, controversy[,] or question" arose in the interpretation of the Subcontract, but rather, to continue working "pending the determination of such dispute or controversy." *Id.* at 6 (Art. XIV, § 14.1).

Lastly, the parties contemplated the grounds for contract termination. The Subcontract calls for a different outcome when the agreement is terminated for default than when it is terminated for convenience.

> Termination for Default: Should [Plaintiff] fail to timely provide labor, services, and/or materials for the Project in accordance with the terms of this Subcontract, then Hirani shall have the right at any time upon 7 days written cure notice to [Plaintiff] to terminate this Subcontract and require [Plaintiff] to cease work hereunder.

> Termination for Convenience: Should the [Government] choose to terminate Hirani for the convenience of the [Government], then [Plaintiff] shall be similarly terminated, and the obligations and rights of the parties shall be in accordance with the provisions of the prime contract for such termination for convenience.

*Id.* at 6 (Art. XV, § 15.1).

**B.    Events Arising in the Course of Plaintiff's Performance**

The Project was plagued with delays and disputes, the timeline and substance of which underlie the present litigation. The record begins, for all intents and purposes, when the USACE, by letter dated February 12, 2013, first gave Hirani notice of its intent to terminate the Prime Contract in light of Hirani's purported failure to perform in the agreed upon timeframe and required Hirani to show cause why the Prime Contract should not be terminated. *See* Defs.' Stmt. of Facts ¶ 7; Moldovan Decl. at 18–19 (Ex. C).

After receiving the Show Cause Notice, Hirani wrote to Plaintiff.[2] By letter dated February 18, 2013, Hirani informed Plaintiff of the USACE's intent to terminate the Prime Contract, requested Plaintiff submit any facts assisting Hirani in demonstrating why the Prime Contract should not be terminated, and stated that "[t]he USACE['s] contention is that [Plaintiff] has delayed or simultaneously delayed this project and if you believe other wise [sic] you should have been submitting delay schedules and information showing the delay." Moldovan Decl. at 23–26 (Ex. E), at 1 [hereinafter Defs.' Ex. E]. The letter identified several perceived deficiencies in the timeliness and substance of the Work Plaintiff owed under the Subcontract, including that Plaintiff had failed to send Hirani project scheduling information. *Id.* at 2. Hirani demanded Plaintiff provide a detailed schedule on or before February 22, 2013; cure its deficient performance; and identify any material facts regarding those deficiencies by close of business that day. *Id.*

---

[2] The record reflects that Hirani also wrote to Plaintiff prior to receiving the USACE's first Show Cause Notice. By letter dated February 13, 2013, Hirani chastised Plaintiff for harassing one of Hirani's field representatives, causing him to quit; stated that the "items preventing timely completion [of the Subcontract are] within [Plaintiff's] scope of work and the current status of these items (caisson 12 repairs and project Stone work) are only due to [Plaintiff's] actions or inaction regarding submittals and the execution and completion of the work"; and requested "a proper schedule to show how you plan to complete your contract work by April 19th, 2013." Moldovan Decl. at 20–22 (Ex. D).

Plaintiff responded to Hirani's letter on February 22, 2013, and disputed that the Work was behind schedule. Plaintiff noted that there is "no contractually required completion date for this project" and "there is not and never has been any mutually agreed upon schedule for any work to be done regarding [Caisson 12] or any other work at the project." Moldovan Decl. at 27–36 (Ex. F), at 1. Additionally, Plaintiff provided an itemized list of 27 causes for the Project's delay that were outside Plaintiff's control. *See id.* at 3–9. Amongst these, Plaintiff cited the Government's failure to obtain necessary permits and coordinate neighboring projects; weather delays; "change order work . . . in excess of $500,000 . . . increasing the project scope by more than 20%"; Hirani and the USACE's failure to provide field management on site; and Hirani and the USACE's failure to "timely process Payment Requisitions for the project and make complete and proper payments to [Plaintiff], from which necessary cash flow to [Plaintiff] could be properly maintained." *Id.* As part of its response to the USACE's Show Cause Notice, by letter dated February 25, 2013, Hirani parroted Plaintiff's reasons for delay attributable to the Government and outlined a plan for future progress. *See* Moldovan Decl. at 37–46 (Ex. G) [hereinafter Defs.' Ex. G].

Substantial progress on the Project remained elusive, however, and the record reflects that Plaintiff and Hirani's relationship fractured in spring 2013. By letter dated March 12, 2013, Plaintiff informed Hirani that it would be out of productive work on the Project within the following three days due to Plaintiff and Hirani's inability to agree on the scope and price of additional work Hirani had demanded, Hirani's failure to provide written direction on other aspects of the Project in light of changed or unanticipated circumstances, and outstanding engineering and architectural layout problems with the original plans for certain portions of the Project. *See* Moldovan Decl. at 47–54 (Ex. H). As a result, Plaintiff explained, it would be "forced to significantly reduce [its] work force at the project site . . . . [and its] heavy and light equipment

complement at the work site," and would be "demobilizing specific or all pieces of heavy equipment accordingly," as well as "other tools and equipment during the upcoming period" so as "to mitigate damages and costs associated with the temporary shutdown of field operations due to no fault of [Plaintiff]." *Id.* at 6. On-site supervision also posed a problem. The record indicates that there was "no on-site supervision from September 29, 2012 through February 18, 2013." *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., ECF No. 46 [hereinafter Pl.'s Opp'n to Summ. J.], Attach. 3, ECF No. 46-3 [hereinafter Pls.' Opp'n Attach. 3], at 1–10 [hereinafter Stephen Decl.], ¶ 9. Although a new supervisor began work on February 19, 2013, he quit on April 10, 2013. *Id.* ¶ 10.

The USACE informed Hirani on March 15, 2013, that it had failed to satisfy the Show Cause Notice, *see* Moldovan Decl. at 55–61 (Ex. I), at 1, exacerbating tensions between the USACE and Hirani, as well as between Hirani and Plaintiff. The USACE rejected each of the 24 reasons Hirani had outlined as cause for the Project's delay and set forth 11 "key milestone dates" that Hirani had to meet in order to avoid termination of the Prime Contract. *See id.* at 1–5. This led Hirani, in turn, to write Plaintiff and state that "[Plaintiff's] show cause response was not acceptable." *See* Moldovan Decl. at 64–71 (Ex. K), at 1. The letter rejected Plaintiff's prior statement that there "has never been a mutually agreed schedule" because "[Plaintiff] was always responsible for providing the scheduling information required to complete the . . . [Work]." *Id.* Additionally, Hirani stated it "always timely processed pay requisitions and made proper payments to [Plaintiff]," but Plaintiff "refused to provide proper invoices or a schedule of values which sums to their contract total." *Id.* at 6. The invoices that had been submitted, Hirani claimed, were "inflated and intentionally attempt[ed] to exceed [Plaintiff's] subcontract value." *Id.* At its close, Hirani's letter laid out the 11 "key milestone dates" Hirani had received from the USACE and stated that Plaintiff had to meet those deadlines to avoid termination of the Subcontract. *Id.* at 7.

Hirani noted that because certain deadlines had already passed, Plaintiff needed to provide a revised schedule for completing the Work. *Id.*

Throughout this period, Plaintiff kept Colonial and the USACE informed of Hirani's failure to pay Plaintiff amounts it believed were owed under the Subcontract. On March 18, 2013—prior to receiving Hirani's rejection of its efforts to show cause—Plaintiff e-mailed Colonial to give notice that it would be out of work as of the following day, March 19, 2013, and to seek help in securing payment for its performance thus far. *See* Moldovan Decl. at 62–63 (Ex. J). Plaintiff claimed that Hirani had "flatly refused to honor their payment commitments and chosen to commit payment fraud," causing Plaintiff to be "about out of operating money." *Id.* Plaintiff's e-mail further stated that it had conferred with the USACE, which had told Plaintiff that if it is "not able to continue work for those two specific reasons . . . . i.e. non-payment and not able to proceed due to Hirani's not authorizing the CO work properly . . . . . then Hirani will probably be terminated at once. . . . . ." *Id.* (alterations in original). Plaintiff sent another e-mail to Colonial on March 26, 2013—after receiving Hirani's rejection of its efforts to show cause—stating that Hirani had not paid Plaintiff, Plaintiff was "out of money, and the crews ha[d] been off since Friday afternoon. . . . . . Without money and mutually agreed change orders to the subcontract, [Plaintiff is] not able to proceed with any work at site [sic]." Moldovan Decl. at 72–74 (Ex. L) [hereinafter Defs.' Ex. L], at 1 (alterations in original). Plaintiff estimated that it was owed approximately $221,000 for the pay period that ended on March 24, 2013. *Id.* Plaintiff's letter stated that Plaintiff had conveyed this information to the USACE, *see id.* at 2, and Plaintiff followed up with another e-mail to Colonial two days later, on which the USACE was copied, repeating that Plaintiff remained out of productive work due to Hirani's failure to pay, *see* Moldovan Decl. at 75–76 (Ex. M).

Hirani urged Plaintiff not to stop its work in light of the disagreement over payment. By letter dated March 28, 2013, Hirani disputed that it owed Plaintiff for costs incurred as a result of the delay, as Hirani attributed those costs to Plaintiff's own fault, and that Hirani had not fully paid Plaintiff, as Hirani believed it had not received "a proper invoice[,] as required by the subcontract agreement." Moldovan Decl. at 77–79 (Ex. N) [hereinafter Defs.' Ex. N], at 1. Hirani noted that if Plaintiff thought it had not been paid in full, then Plaintiff should "specifically detail what [it has] not been paid and provide a full and detailed schedule of values that sums to [Plaintiff's] contract total." *Id.* In the interim, Hirani directed Plaintiff to continue working because "[t]he USACE was clear . . . that they will terminate Hirani's contract if work does not continue, which will result in [Plaintiff]'s termination as per the subcontract agreement and be directly due to [Plaintiff]'s failure to continue work on the project." *Id.* Plaintiff replied with an e-mail the following day, in which it continued to dispute that the delays were its fault and stated it was continuing to perform work on the Project but had "simply run out of productive work to perform" in light of nonpayment. Moldovan Decl. at 80–84 (Ex. O), at 1–2. Plaintiff urged Hirani to make the payments owed and provide change orders so productive work could continue. *See id.* at 2–3.

By this point, Plaintiff believed Hirani owed it more than half a million dollars. In a more formal letter to Hirani, Plaintiff clarified that the last payment it had received on or "about December 5, 2012 was for work completed through November 20, 2012," and Plaintiff had not been paid since, despite the USACE continuing to pay Hirani. *See* Pls.' Opp'n Attach. 3 at 28–45 (Ex. A) [hereinafter Pl.'s Ex. A], at 1–2.[3] With its letter, Plaintiff included an itemized list of the

---

[3] The parties do not dispute that the USACE paid Hirani $285,947.84 in progress payments on March 4, 2013, for work performed by Plaintiff between November 22, 2012, and February 20, 2013. *Compare* Pl.'s Opp'n to Summ. J., Pl.'s Stmt. of Material Facts, ECF No. 46-2, ¶ 3, *with* Defs.' Reply in Supp. of Summ. J., ECF No. 53, Defs.' Resp. to Pl.'s Stmt. of Material Facts, ECF No. 53-1, ¶ 3. Plaintiff's letter alleged that, as of March 29, 2013, "Hirani ha[d] invoiced to the [USACE] and been paid to-date $3,475,273.12 through February 12, 2013 for base contract work and

total payments the USACE had made to Hirani through February 20, 2013, and the total payments that "SHOULD HAVE BEEN MADE to [Plaintiff]" through February 20, 2013, then compared the difference to determine that Hirani owed Plaintiff $373,189.93. *Id.* at 3–4. This figure, according to Plaintiff, did not account for (1) "specific extra work directed and other field charges invoiced by [Plaintiff] to Hirani," which exceeded the scope of the Work under the Subcontract; (2) legal indemnification fees; or (3) "base contract ad [sic] change order monies for work completed between February 13, 2013 and March 24, 2013." *Id.* at 4. Adding in those costs and making the bill current to March 29, 2013, Plaintiff calculated that Hirani owed it $524,907.19 and demanded immediate payment. *Id.* at 4–5.

The USACE subsequently issued Hirani a second notice of its intent to terminate the Prime Contract. *See* Moldovan Decl. at 85–87 (Ex. P). The notice stated that Hirani was now 549 days behind the Project's anticipated schedule, with 369 of those days due to "contractor-only or inexcusable delays[,] and the remaining 180 days [due to] . . . non-compensable concurrent or weather delays." *Id.* at 1. To avoid termination of the Prime Contract, the USACE directed Hirani to meet a new schedule of 13 "milestone dates," under which construction would be completed and all requisite documents submitted by June 30, 2013. *Id.* The USACE also warned that Hirani had "placed completion of this project in jeopardy by disregarding" its obligations to promptly pay its subcontractor. *See id.* at 2. Lastly, the USACE stated that, "in order to protect the interests of the Government[] and due to the fact that the contractor is severely behind schedule," it would withhold $125,000 in payment until the Project was "substantial[ly] complet[e]." *Id.*

---

change orders[,]" but "only paid [Plaintiff] the amount of $2,515,043.56 for base contract work and change orders, with the last payment being made to [Plaintiff] on or about December 5, 2012." Pl.'s Ex. A at 2.

When Hirani's on-site supervisor quit on April 10, 2013, the USACE warned Hirani that it was in breach of the Prime Contract and directed Hirani to temporarily shut down Plaintiff's operations, as of April 15, 2013, in light of Hirani's failure to provide field supervision. *See* Stephen Decl. ¶¶ 10–12; Pls.' Opp'n Attach. 3 at 50–51 (Ex. D), at 1. Plaintiff received verbal notice from Hirani of the need to temporarily suspend its operations on the afternoon of April 12, 2013, and wrote to Hirani on April 14, 2013, to provide written confirmation of the reasons for stopping its performance. *See* Moldovan Decl. at 91–93 (Ex. R).

Although Hirani hired a new site supervisor and Plaintiff resumed working on the Project on April 23, 2013, *see* Stephen Decl. ¶ 13, Plaintiff's performance shortly came to a halt once more. The USACE sent Hirani a letter on Friday, April 26, 2013, notifying Hirani of its final decision to terminate the Prime Contract, effective immediately. *See* Moldovan Decl. at 97–100 (Ex. T) [hereinafter Defs.' Ex. T]. The USACE explained that it was terminating the contract due to Hirani's "failure to (1) complete the contract by the extended contract completion date; (2) respond to the Government's repeated requests to correct performance deficiencies; and (3) provide adequate assurances that the contract will be completed in the near future." *Id.* at 1. The letter specifically noted that "critical work onsite has ceased since 22 March 2013 due to subcontractor management and non-payment issues," and Hirani had "not submitted periodic progress schedules." *Id.* Heavy rains prevented Plaintiff from performing any Work on Monday, April 29, or Tuesday, April 30, 2013. *See* Pls.' Opp'n Attach. 3 at 81–159 (Ex. J) [hereinafter Pl.'s Ex. J]. Plaintiff learned of the USACE's decision to terminate the Prime Contractor on April 30, 2013, but Hirani told Plaintiff on May 1, 2013, that Plaintiff was "not to stop working" because Hirani intended to fight the termination. *See id.* Plaintiff's Quality Control Reports reflect that

Plaintiff was on site and working on May 1, 2013, but on May 2, 2013, no Work was performed in light of the USACE's termination of the Prime Contract. *See id.*

Plaintiff's performance did not resume. Hirani replied to the USACE's final notice of termination on April 30, 2013, by rejecting the purported termination for default as defective on the grounds that Hirani never received an opportunity to cure and the USACE had caused the delays in construction. *See* Pl.'s Opp'n to Summ. J., Attach. 4, ECF No. 46-4, at 145–48 (Ex. T). At some point thereafter, Hirani terminated the Subcontract. *Cf.* Second Am. Compl. ¶ 28. Colonial purportedly approached Plaintiff in June 2013 and asked Plaintiff to complete the Project. *See id.* ¶ 20. Plaintiff requested that "its unpaid progress payments on the unchanged base contract work [be] brought up to date," but Colonial declined to pay these amounts, and Plaintiff's work on the Project ended. *See id.*

### C.    The Present Litigation

Plaintiff filed suit in this court on April 29, 2014. *See* Compl., ECF No. 1 [hereinafter Compl.]. Neither Plaintiff's original Complaint nor Plaintiff's Amended Complaint demanded a jury trial. *See id.*; Am. Compl., ECF No. 3 [hereinafter Am. Compl.]. In response to Plaintiff's Amended Complaint, Colonial filed four counterclaims. *See* Def. Colonial's Answer & Countercls., ECF No. 8 [hereinafter Colonial's Answer & Countercls.]. Plaintiff sought leave to file a Second Amended Complaint on February 12, 2016, which Defendants did not oppose and the court granted. *See* Pl.'s Unopposed Mot. for Leave to File Second Am. Compl., ECF No. 25; Min. Order, Feb. 16, 2016. Plaintiff's Second Amended Complaint repeated the same two claims for relief contained in the first two complaints and, for the first time, included a demand for a jury trial. *See* Second Am. Compl.

Plaintiff's Second Amended Complaint advances two claims.  In Count I, Plaintiff brings a breach of contract claim against Hirani, which alleges that Hirani breached the Subcontract by (1) wrongfully refusing to pay Plaintiff amounts due under the Subcontract, (2) delaying Plaintiff's performance of its work, and (3) terminating the Subcontract without notice.  *See id.* ¶¶ 26, 28.  Plaintiff seeks to recover the amounts unpaid under the Subcontract, as well as an additional sum for the "unpaid reasonable value of the services provided by [Plaintiff]." *Id.* ¶ 21.  All told, Plaintiff seeks $2,070,185.23 in money damages, plus prejudgment interest, attorney's fees, and costs. *Id.* ¶ 29.  In Count II, Plaintiff asserts a claim under the Miller Act against Colonial, premised on the payment bond Colonial issued in connection with the Subcontract and in light of Hirani's failure to pay.  Plaintiff makes the same demand for money damages against Colonial as it does against Hirani. *Id.* ¶¶ 31, 35.

Following discovery, Defendants jointly filed a Motion for Summary Judgment and a Motion to Strike Plaintiff's Jury Demand.  *See* Defs.' Mot. for Summ. J.; Defs.' Mot. to Strike Jury Demand, ECF No. 45 [hereinafter Defs.' Mot. to Strike].  Those Motions are now ripe for review.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny*, 125 F. Supp. 3d at 28 (citing Fed. R. Civ. P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Evidence that is "merely colorable" or "not significantly probative" will not defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249–50.

## III.   DISCUSSION

Defendants move for an entry of summary judgment in their favor as to both Plaintiff's common law claim for breach of contract (Count I) and federal claim under the Miller Act (Count II). As part of that motion, Colonial also seeks summary judgment on one theory of its counterclaim for breach of contract—namely, that Plaintiff breached the agreement by failing to provide work schedules, as required under the Subcontract. Lastly, Defendants move to strike the demand for a jury trial in Plaintiff's Second Amended Complaint.[4] The court addresses each motion in turn.

---

[4] Colonial raised multiple counterclaims in response to Plaintiff's Amended Complaint, including two counterclaims for breach of contract. *See* Colonial's Answer & Countercls. at 14–15. The only difference between the two breach of contract counterclaims is that one identifies Hirani as the victim of Plaintiff's purported breach, with Colonial seeking to recover as assignee, while the other identifies Colonial as the victim of Plaintiff's purported breach, with Colonial seeking to recover as subrogee. *See id.* For ease of reference in the present discussion, the court refers to these counterclaims as a single counterclaim for breach of contract.

## A.    Defendants' Motion for Summary Judgment

The court begins its analysis with the federal question in this case—whether Plaintiff can recover against Colonial under the Miller Act, 40 U.S.C. § 3133—before turning to Plaintiff's state law claim for breach of contract against Hirani and Colonial's counterclaim for breach of contract.[5]

### 1.    Plaintiff's Claim Against Colonial Under the Miller Act

Plaintiff's Second Amended Complaint seeks relief against Colonial for Hirani's failure to pay for labor, services, and materials Plaintiff furnished to the Project. *See* Second Am. Compl. ¶¶ 30–35. Defendants submit that Plaintiff's claim under the Miller Act is time barred because Plaintiff did not file suit within one year of either the Subcontract being terminated or the last day on which it supplied labor or materials to the Project. *See* Defs.' Mot. for Summ. J. at 10–13. Alternatively, Defendants contend that Plaintiff's claim must fail because Plaintiff has only claimed quantum meruit damages, which Defendants believe are unavailable for a claim under the Miller Act, thereby making it impossible for Plaintiff to prove "damages." *Id.* at 16–17. Plaintiff proffers that it *did* timely file suit on April 29, 2014, because the last day it performed the Work owed under the Subcontract was on May 1, 2013, and the Subcontract was not terminated until Hirani directed Plaintiff to stop working on May 2, 2013. *See* Pl.'s Opp'n to Summ. J. at 12–14. Additionally, Plaintiff submits that quantum meruit damages are available under the Miller Act. *Id.* 14–15.

### a.    When the Statute of Limitations Begins to Run

The Miller Act legally obligates those who contract with the federal government to work on "any public building or public work of the [f]ederal [g]overnment" to obtain a payment bond to protect subcontractors who provide the labor and materials necessary to carry out the project.

---

[5] Although each Count only pertains to one Defendant, for ease of discussion, the court refers to the arguments in favor of summary judgment as belonging to both Defendants.

40 U.S.C. § 3131. In the event the general contractor does not pay his subcontractors in full within 90 days of their performance, the Miller Act allows the subcontractor to file suit:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

*Id.* § 3133(b)(1). The Act explicitly sets an outer limit on when those suits must be filed: "An action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." *Id.* § 3133(b)(4). When the statute of limitations begins to run on a claim under the Miller Act is necessarily a fact-intensive inquiry. *See Ex parte Sw. Sur. Ins. Co.*, 247 U.S. 19, 20 (1918). Neither the Supreme Court nor the D.C. Circuit has interpreted the Miller Act's accrual provision, but several other federal circuits and district courts—including courts in this District—have done so. As a general matter, the federal courts have taken three approaches in determining when the statute of limitations begins to run on a claim under the Miller Act.

A majority of courts have held that only work performed and materials supplied as part of the original contract—as opposed to corrective or repair work performed after final inspection and not provided for in the contract—fall within the meaning of "labor" or "materials" for purposes of the statute of limitations provision in Section 3133(b). *See, e.g.*, *United States ex rel. Interstate Mech. Contractors, Inc. v. Int'l Fid. Ins. Co.*, 200 F.3d 456, 459–60 (6th Cir. 2000); *United States ex rel. Magna Masonry, Inc. v. R.T. Woodfield, Inc.*, 709 F.2d 249, 250–51 (4th Cir. 1983); *see also United States ex rel. Hussmann Corp. v. Fid. & Deposit Co. of Md.*, 999 F. Supp. 734, 742,

744 (D.N.J. 1998) (collecting additional cases); *cf. United States ex rel. State Elec. Supply Co. v. Hesselden Constr. Co.*, 404 F.2d 774, 776–77 (10th Cir. 1968) (applying this distinction to nearly identical statutory language in Section 3133(b)(2) to parse when notice is timely given); *United States ex rel. Austin v. W. Elec. Co.*, 337 F.2d 568, 572–73 (9th Cir. 1964) (same); *United States ex rel. Gen. Elec. Co. v. Gunnar I. Johnson & Son, Inc.*, 310 F.2d 899, 903 (8th Cir. 1962) (same). At least two courts in this District have followed that approach. *See Highland Renovation Corp. v. Hanover Ins. Grp.*, 620 F. Supp. 2d 79, 83–84 (D.D.C. 2009); *United States ex rel. Lank Woodwork Co. v. CSH Contractors, Inc.*, 452 F. Supp. 922, 924 (D.D.C. 1978).

The "correction-or-repair versus original-contract test" is distinct from the "substantial completion rule," under which the statute of limitations begins to run "whenever applicable contract law would deem substantial completion to have occurred." *Fid. & Deposit Co. of Md.*, 999 F. Supp. at 744. Courts applying the substantial completion rule hold that the statute of limitations continues to run on a subcontractor's Miller Act claim even "when 'insubstantial' subcontract requirements have not yet been completed." *Id.*; *see, e.g.*, *United States ex rel. T.L. Wallace Constr., Inc. v. Fireman's Fund Ins. Co.*, 790 F. Supp. 680, 684 (S.D. Miss. 1992); *see also Gen. Ins. Co. of Am. v. United States ex rel. Audley Moore & Son*, 406 F.2d 442, 443–44 (5th Cir. 1969).

Lastly, a few courts have applied a multi-factor analysis—considering "the value of the materials, the original contract specifications, the unexpected nature of the work, and the importance of the materials to the operation of the system in which they are used"—to determine if the date on which those materials or labor were provided should be the date when the limitations period begins to run. *See United States ex rel. Ga. Elec. Supply Co. v. United States Fid. & Guaranty Co.*, 656 F.2d 993, 995–96 (5th Cir. Unit B Sept. 1981) (articulating this approach for

the first time); *United States v. Benetech, LLC*, No. 12-393, 2013 WL 3984006, at *7 (E.D. La. Aug. 1, 2013) (discussing the *Georgia Electric* factors as a test distinct from the substantial completion rule), *aff'd sub nom. United States ex rel. Jems Fabrication, Inc. v. Fid. & Deposit Co. of Md.*, 566 F. App'x 298 (5th Cir. 2014); *Fid. & Deposit Co. of Md.*, 999 F. Supp. at 745 (describing and applying the *Georgia Electric* factors as distinct from the "correction-or-repair versus original-contract test" or "substantial completion test"); *cf. S. Steel Co. v. United Pacific Ins. Co.*, 935 F.2d 1201, 1204–05 & n.3 (11th Cir. 1991) (per curiam) (applying the *Georgia Electric* factors to interpret the Georgia Little Miller Act).

In the court's view, the latter two approaches unnecessarily complicate application of the statute. The statutory text says "performed or . . . supplied," 40 U.S.C. § 3133(b)(4), not "substantially performed" or "substantially supplied." Moreover, Congress did not set out any factors for the courts to weigh when considering whether the labor or materials a subcontractor supplies are of the right type to fall within the meaning of the statute. Over the years, courts following these approaches have embroidered requirements and exceptions onto the text that simply do not exist on its face. The malady is obvious: the broad remedy Congress provided to ensure compensation of subcontractors who benefit the public by working on federal projects has become, in many instances, a subjective line-drawing exercise by judges unfamiliar with the intricacies and nuances of construction work.

Instead, the court will simply look to the contract to determine for what tasks the parties agreed the subcontractor would be compensated, then determine the last date on which the subcontractor supplied materials or labor for one of those tasks. This approach generally aligns with the one the majority of courts are taking, but avoids the unnecessary distinction between "corrective or remedial work" and "original contract work" to determine when the statute of

limitations begins to run. *Cf. United States ex rel. GE Supply v. C & G Enters., Inc.*, 212 F.3d 14, 17–18 (1st Cir. 2000) (interpreting the Miller Act statute of limitations provision broadly to run from "the time that the last material was supplied" for the project).

Focusing the analysis on the parties' contractual agreement, without providing room for judicially created exceptions, also more closely tracks the text of the statute. Subsection (b)(1) defines those able to bring suit as "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131," 40 U.S.C. § 3131, and subsection (b)(4) restricts the timeline for filing those lawsuits to "no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action," *id.* § 3133(b)(4). By including the phrase "the person bringing the action" in the statute of limitations provision, the drafters explicitly cross-referenced and incorporated the earlier provision, tying the two together. The words "labor" and "materials" in (b)(4) find meaning through reference to (b)(1), which describes those terms in the context of "work *provided for in a contract*." The relevant contract is the subcontract—the contract that obligated the prime contractor to secure a bond under Section 3131. Therefore, the statute of limitations begins to run when the subcontractor bringing suit "last" performed labor or supplied materials for "work provided for" in the subcontract.

In sum, to determine whether a claim is timely brought under the Miller Act, the court need only (1) identify the compensable tasks to which the parties agreed, as set forth in the subcontract, and (2) determine the last date on which labor was performed or materials were supplied for any one of those tasks.

Defendants claim Plaintiff's suit is untimely for either of two reasons.  First, Defendants contend that when the Prime Contract was terminated on April 26, 2013, there was no longer any work to be performed under the Subcontract because "the only contract that linked [Plaintiff] to the Project had already been terminated."  Defs.' Mot. for Summ. J. at 11.  In other words, Defendants believe termination of the Prime Contract automatically terminated the Subcontract and cut off the possibility of any compensable work as of the date the USACE terminated the Prime Contract.  Accordingly, they conclude, April 26, 2014, was the last day on which Plaintiff could timely file suit, making the suit Plaintiff filed on April 29, 2014, untimely.  *See id.* Alternatively, Defendants submit that the last day Plaintiff performed Work, as that term is defined in the Subcontract, was on March 22, 2013, and the statute of limitations began to run on that day. *Id.* at 12–13.  For support, Defendants point to the series of e-mails in which Plaintiff advised Hirani that it was out of productive work in light of monetary constraints.  *Id.*  On that theory, the last day on which Plaintiff could timely file suit was March 22, 2014.  *See id.*  Plaintiff counters that its suit is timely filed because the last day on which it performed Work under the Subcontract was May 1, 2013—pursuant to Hirani's explicit instruction to continue working despite termination of the Prime Contract—and the original Complaint was timely filed on April 29, 2014. *See* Pl.'s Opp'n to Summ. J. at 12–14.

The court finds Defendants' first theory unpersuasive because it misconstrues under which contract Plaintiff performed.  Defendants cite three cases for the proposition that a subcontractor cannot supply labor or materials in "carrying out work provided for in a contract" when the *subcontract* has been terminated by the prime contractor, then simply assert that "[t]he same logic is true where the prime contract has been terminated."  Defs.' Mot. for Summ. J. at 11.  Not so

fast.  The subcontractor is only ever "carrying out work provided for in a [*sub*]contract"—the document the subcontractor signed.[6]  Although the subcontract may incorporate portions of the prime contract to outline the work to be performed, such references do not convert agreement to the subcontract into agreement to the prime contract; the subcontractor is only bound by the subcontract.  Attendant federal regulations confirm that the subcontract operates independent of the prime contract.  After receiving notice that the prime contract has been terminated, a prime contractor is required, among other things, to "[t]erminate all subcontracts related to the terminated portion of the prime contract."  48 C.F.R. § 49.104(b).  That provision would be superfluous if, as Defendants posit, the subcontract automatically terminated in response to the prime contract being terminated.  A prime contractor could, in theory, seek to comply with the federal regulation by including a provision in the subcontract that provides for automatic termination upon termination of the prime contract, but he or she would need do so expressly.  Thus, termination of the prime contract has no immediate effect on the subcontract unless the subcontract so provides.

Here, the text of the Subcontract confirms that termination of the Prime Contract for default did not automatically terminate the Subcontract.  The Subcontract's "Termination of Agreement" provision contemplates two circumstances in which the Subcontract could be terminated: (1) when Plaintiff defaults by failing to "timely provide labor, services, and/or materials for the Project" in compliance with the terms of the Subcontract; or (2) when the Government terminates Hirani for convenience, thereby triggering termination of the Subcontract for convenience.  *See* Subcontract at 6 (Art. XV, § 15.1).  There is neither allegation nor evidence before the court suggesting the Prime Contract was terminated for convenience; indeed, the USACE's termination letter expressly

---

[6] This makes intuitive sense:  there may be more than one subcontractor contributing to the creation of a federal project outlined, in whole, in a prime contract—the individual subcontracts define the work to be carried out by each subcontractor.

cites default.  *See* Defs.' Ex. T.  Therefore, the court finds that termination of the Prime Contract for default on April 26, 2013, had no effect on the Subcontract.  The Subcontract had to be terminated separately, *see* 48 C.F.R. § 49.104(b), and, prior to its termination, Plaintiff could continue to carry out Work under the Subcontract, such that the statute of limitations had not started to run.  The court therefore rejects Defendants' theory that termination of the Prime Contract on April 26, 2013, caused the Subcontract to terminate and the statute of limitations to begin running.

Defendants' second theory identifies the right legal framework for determining when the statute of limitations began to run on Plaintiff's Miller Act claim, but there is a genuine dispute as to whether Plaintiff performed compensable work after April 29, 2013.  Plaintiff has put forward several Quality Control Reports that contemporaneously and specifically document the tasks Plaintiff performed each day at the Project's worksite.  The Reports for April 29 and April 30, 2013, state that no work took place on those days due to heavy rain.  *See* Pl.'s Ex. J (Quality Control Reports for April 29 and 30, 2013).  The Report for May 1, 2013, reads as follows:

> WORK PERFORMED TODAY:  All crew members in today; Today, clean up lumber and WWF fabric mesh up off of East Side of project; Backfill remaining East Side Grade Beam cutting hole along curb line at East Side of Project; Remove that covering lumber and plywod and take to staging yard; Install temporary fence at construction entrance East Side at end of day; Finish grass cutting and cleanup of any trash or debris at East Side from construction operations; West Side take down and disaassemble [sic] MOT signage from stands; Take signs back to staging yard; Remove MPT barrels from site today and take to staging yard; Take WWF fabric mesh from West Side side [sic] [illegible] areas back to staging yard for storage; Cleanup West Side work area of any possible remaining minor construction trash from last week work; Move all heavy equipment from West Side work area to Staging Area today; Clean up heavy equipment at West Side before move to staging area; also trailers, etc. . . . . Leave CAT 325CXL and Drill and 10'6" Stick on West Side until move here this week; Move sanitary toilet to area where service can pick it up; Buttum [sic] up construction entrances

with Orange snow fence for temporary period; Apparently some walkthrough tomorrow per George Barger; by Noon Time all small heavy equipment, signage, formwork, lumber, and related items were into staging yard by [Plaintiff's] crews; Holes were getting backfilled; safety fences were going up, and cleanup at site was occurring by [Plaintiff]; Heavy equipment maintenance and cleanup and greasing in afternoon;

EXTRA OR ADDITIONAL WORK: Temporary close down of project site per George Barger per yesterday; Some walkthrough is tomorrow; Remove MOT devices and equipment and items from site for now to Stage Area; All extra work today due to termination if [sic] Hirani; Safety and project close up for safety possibly long term;

. . . .

REMARKS: . . . . Called Eric Hirani back at 10:45 AM to see why he called me about 9 times this morning; At opening of phone call he was a smart ass, [illegible] why I would not drop my other calls; I told I [sic] do not drop calls, he knew that already; He then wanted to talk about the stone and other work; I told him that George Barger had told me this morning that Hirani had gotten fired yesterday; Eric said they were fighting it and that I was not to stop any work at site; He said he wanted to be clear about that; Told him only got work left for about 1 day in any event; Need CO answers on traffic control, and other items; He started yelling at that point; I then asked to get off the phone and would not talk to him this way; He then called back several minutes later asking me what I was going to do if he can not [sic] get the firing reversed; Told him did not know here; I asked him what the Surety Company said on this; He siad [sic] that they have not commented other than to say they will study the matter; Told of course that [sic] what they say in these matters; After a few minutes he said that he would get back to me on continuing to work here, but that I was not to stop working; Told him needed to answer [sic] in next day or so, so I can plan moving out if necessary; He acknowledged this[.]

*Id.* (Quality Control Report for May 1, 2013). This Report raises a genuine issue of material fact concerning whether Plaintiff performed compensable work under the Subcontract on May 1, 2013. Schedule B of the Subcontract, which identifies the Work in greater detail, specifically includes: "Furnish & install all fencing (site, silt, tree protection, temporary) and relocate as per the drawings and specifications with appropriate signage." *See* Subcontract at 1, 9 (Art. I, § 1.3; Sch. B, Pt. 11).

At the same time, the Subcontract makes clear that cleaning up the worksite, including removal of all equipment, is *not* compensable work and was to be performed at Plaintiff's own cost. *See id.* at 3 (Art. VII, § 7.1). The Report discusses both installation of fencing and removal of equipment from the worksite, as well as indicates that Plaintiff was performing "extra work" in light of Hirani's termination. *See* Pl.'s Ex. J (Quality Control Report for May 1, 2013). It is unclear to the court whether Plaintiff's efforts on May 1, 2013, were solely to clean up the worksite in response to the phone call with Hirani or whether Plaintiff performed both compensable and non-compensable work that day. If the latter, then the statute of limitations did not begin to run until May 1, 2013, making Plaintiff's lawsuit timely filed on April 29, 2014; if the former, then the limitations period began to run on some date *prior* to April 29, 2013, when Plaintiff could not perform any work due to weather conditions, making Plaintiff's suit untimely.

In sum, Plaintiff has advanced significantly probative evidence that it performed Work on the Project after April 29, 2013, and that a reasonable jury could find its suit was timely filed. *See Anderson*, 477 U.S. at 249–50; *Elzeneiny*, 125 F. Supp. 3d at 28. Thus, there is a triable issue of fact as to the last day on which Plaintiff performed Work on the Project.

c.     Whether Plaintiff Can Recover in Quantum Meruit

Lastly, Defendants submit that Plaintiff's claim fails, even if timely filed, because Plaintiff cannot recover in quantum meruit for a material breach under the Miller Act, which is the only theory of relief Plaintiff alleged. *See* Defs.' Mot. for Summ. J. at 16. It follows, according to Defendants, "that [Plaintiff] cannot prove an essential element of its claim against Colonial and Colonial is entitled to summary judgment." *Id.* at 17. Plaintiff contests Defendants' reading of the case law and asserts that quantum meruit damages are available against a surety on a Miller Act claim. *See* Pl.'s Opp'n to Summ. J. at 14–15.

Defendants' theory misunderstands the text of the statute. To state a claim under the Miller Act, a plaintiff need only make out two elements: "(1) it has 'furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131'; and (2) it 'has not been paid in full within 90 days.'" *United States ex rel. Tenn. Valley Marble Holding Co. v. Grunley Constr.*, 433 F. Supp. 2d 104, 114 (D.D.C. 2006) (quoting 40 U.S.C. § 3133(b)(1)). A specific theory of damages is not a necessary element.

Additionally, Defendants' reading of the case law is mistaken. Although the D.C. Circuit has not conclusively held that recovery in quantum meruit is available under the Miller Act when the general contractor breaches the subcontract, several federal appellate courts have done so. *See, e.g.*, *United States ex rel. Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 337 (9th Cir. 1974); *United States ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638, 640 (4th Cir. 1973); *S. Painting Co. of Tenn. v. United States ex rel. Silver*, 222 F.2d 431, 433–34 (10th Cir. 1955); *United States ex rel. Susi Contracting Co.*, 146 F.2d 606, 610, 612 (2d Cir. 1944). As discussed below, there remains a genuine issue of material fact concerning whether Hirani breached the Subcontract, thus squarely placing the facts presented in that category of cases in which other courts have recognized recovery in quantum meruit to be available. This court anticipates the D.C. Circuit may adopt its sister Circuits' reasoning, as it already has recognized at least one instance in which equitable recovery under the Miller Act is appropriate and, in so doing, cited for support "cases decided under the Miller Act that allow quantum meruit recovery against a surety." *See United States ex rel. Heller Elec. Co. v. William F. Klingensmith, Inc.*, 670 F.2d 1227, 1232–33 (D.C. Cir. 1982) (holding that when the prime contractor has caused delay of the subcontractor's performance, "a surety is liable for the value of material and services provided at the time they were provided," and citing *Western Casualty & Surety Co.*, 498 F.2d 335, and

*Algernon Blair, Inc.*, 479 F.2d 638). Moreover, the Supreme Court has stated on more than one occasion that the Miller Act "was intended to be highly remedial and should be construed liberally." *Fleisher Eng'g & Constr. Co. v. United States ex rel. Hallenbeck*, 311 U.S. 15, 17–18 (1940); *accord United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957); *see United States ex rel. Noland Co. v. Irwin*, 316 U.S. 23, 29 (1942). In light of such emphasis on the statute's remedial purpose, even were the D.C. Circuit to conclude recovery in quantum meruit is not available for a Miller Act claim when the general contractor has breached the subcontract, the court doubts the Circuit would foreclose Plaintiff from recovering altogether simply for failure to plead the correct theory of recovery. Thus, the court concludes Plaintiff's claim does not fail as a matter of law simply because Plaintiff seeks relief in quantum meruit.[7]

### 2. *Plaintiff's Claim Against Hirani for Breach of Contract*

Plaintiff also seeks relief against Hirani for breach of contract because Hirani (1) wrongfully failed to pay Plaintiff amounts due under the Subcontract for Work performed, causing delay of Plaintiff's performance; and (2) terminated the Subcontract without notice. *See* Second Am. Compl. ¶¶ 26, 28. Plaintiff seeks to recover the reasonable value of its services, which it submits is $2,070,185.23. *See id.* ¶ 29; Moldovan Decl. at 101–06 (Ex. U) [hereinafter Pl.'s Revised Rule 26(a)(2) Discl.], at 2. That sum includes "[t]he reasonable gross profit for heavy and highway (civil) construction work in the metropolitan DC area during the 2011–2013 time period,"

---

[7] To be clear, the court does not read Plaintiff's Miller Act claim to seek *only* quantum meruit damages. True, Plaintiff seeks "[t]he unpaid reasonable value of the labor, materials and services provided to the Project," which Plaintiff asserts is over $2 million. Second Am. Compl. ¶¶ 32–33. As just discussed, to the extent Plaintiff seeks monetary compensation for work performed beyond what the Subcontract called for, such damages are recoverable under a theory of quantum meruit. When Plaintiff's demand is properly understood, however, it also encompasses the unpaid amounts that Plaintiff claims it is owed for work performed under the Subcontract. *See id.* ¶ 14 (alleging Plaintiff is due "$571,447 from Pay Requisition Nos. 19–22, which Hirani and Colonial . . . failed to pay"). Those are contract damages. Ultimately, the trier of fact will have to decide how to apportion Plaintiff's claimed Miller Act damages, if any.

when Plaintiff performed Work on the Project, which Plaintiff calculated as 35 percent of direct costs. Pl.'s Revised Rule 26(a)(2) Discl. at 2, 5.

Defendants move for summary judgment on Plaintiff's breach of contract claim on the ground that Plaintiff's claim fails as a matter of law because recovery in quantum meruit is not possible when a valid and enforceable contract—like the Subcontract—exists. Instead, Defendants submit, Plaintiff is bound to the terms of the Subcontract, which sets a fixed price for the Work and precludes Plaintiff from recovering any amount beyond that fixed price absent Hirani's written consent. Thus, because Plaintiff has not submitted any evidence of damages for which the Subcontract allows recovery, Defendants conclude, Plaintiff cannot prove Hirani breached their agreement. *See* Defs.' Mot. for Summ. J. at 14–15.

To state a claim for breach of contract under District of Columbia law,[8] the moving party must show (1) a valid contract existed between the parties; (2) the contract created an obligation or duty; (3) the other party breached that duty; and (4) the moving party was damaged as a result of the breach. *Corp. Sys. Res. v. Wash. Metro. Area Transit Auth.*, 31 F. Supp. 3d 124, 129 (D.D.C. 2014). As a general matter, the existence of a valid and enforceable contract precludes a plaintiff from recovering under a theory of unjust enrichment. *See Harrington v. Trotman*, 983 A.2d 342, 346–48 (D.C. 2009). However, the District of Columbia Court of Appeals has recognized that, in the narrow circumstance "[w]hen an express contract has been repudiated or materially breached by the defendant, restitution for the value of the non-breaching party's performance is available as

---

[8] Both parties assume that District of Columbia law governs claims arising out of the Subcontract, and the court agrees. The District of Columbia plainly is the jurisdiction with the "most significant relationship" to the dispute. *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010). Plaintiff's claim concerns a contract for a construction project located in the District of Columbia, to be performed for a federal government entity headquartered in the District of Columbia, and the text of the contract directs the parties to the "[c]ourt system in the District of Columbia" for resolution of at least certain disputes arising under the contract. *See* Subcontract at 1, 6 (Art. I, § 1.1; Art. XII, § 12.1). Accordingly, Plaintiff's claim is subject to District of Columbia contract law.

an alternative to an action for damages on the contract." *Lee v. Foote*, 481 A.2d 484, 485 (D.C. 1984) (per curiam); *accord Harrington*, 983 A.2d at 346–48; *see Shtauber v. Gerson*, No. 16-961, 2017 WL 972088, at \*6 (D.D.C. Mar. 10, 2017). Consequently, depending on the facts, a non-breaching plaintiff who is a party to a contract may seek relief for the reasonable value of the services rendered rather than for contract damages.

The court is unpersuaded that Plaintiff cannot succeed on its breach of contract claim against Hirani as a matter of law simply because Plaintiff calculates its damages based on the reasonable value of its services as opposed to the text of the Subcontract. As a preliminary matter, failure to attach the proper "legal label for the relief sought is not controlling so long as the complaint complies with [the local civil rule] to put defendant on notice regarding the nature of the claim." *Lee*, 481 A.2d at 487 n.8. Plaintiff's Second Amended Complaint plainly put Defendants on notice that it claimed it was damaged by Hirani's failure to pay for the services and materials it provided. *See* Second Am. Compl. ¶¶ 5, 9–10, 13–14, 21, 25–26, 29; *cf.* Sup. Ct. Civ. R. 8(a). More importantly, though, the law in the District of Columbia plainly allows for recovery in quantum meruit, as an alternative to contract damages, when the defendant breached the contract—precisely the facts Plaintiff alleges. *See Lee*, 481 A.2d at 487. Here, the Subcontract both provided for a sum-certain amount to be paid upon the Work's completion and contemplated compensating Plaintiff should the amount of Work need to be enlarged. The Subcontract states that "the sum to be paid by [Hirani] to [Plaintiff] for the satisfactory performance and completion of the Work and of all of the duties, obligations, and responsibilities of [Plaintiff] under this Subcontract . . . is $2,845,600.00 . . . subject to additions and deductions as herein provided." Subcontract at 2 (Art. III, § 3.1). The agreement also allows Hirani "to make changes, additions, and/or deletions in the Work as it may deem necessary upon written order," but only permits

Plaintiff to seek additional compensation for extra or additional work "done pursuant to a written order, signed by the representative designated by [Hirani]." *Id.* (Art. IV, § 4.1). Plaintiff has alleged that Hirani materially breached the Subcontract by requiring Plaintiff to perform additional work but failing to pay Plaintiff for such performance. *See* Second Am. Compl. ¶ 10. To support its claim, Plaintiff has presented sworn statements and evidence of payment history that indicate both an enlargement of the Work performed under the Subcontract and nonpayment for that performance. *See* Stephen Decl. ¶ 7; Pls.' Opp'n Attach. 3 at 28–45 (Ex. A.), at 2; *id.* at 46–47 (Ex. B). Thus, there remains a genuine dispute as to whether Hirani breached the Subcontract by withholding from Plaintiff payments owed under the Subcontract either for work expressly contemplated by the Subcontract or additional work demanded by Hirani. *See Elzeneiny*, 125 F. Supp. 3d at 28. On these facts, Plaintiff may seek to recover the reasonable value of its services and the materials furnished as an alternative to contract damages. *See Shtauber*, 2017 WL 972088, at *6.

### 3. Colonial's Counterclaim for Breach of Contract

Although Colonial's counterclaim alleges that Plaintiff breached the Subcontract in no less than 16 different ways, Colonial seeks summary judgment only as to whether Plaintiff breached the Subcontract by failing to provide schedules and scheduling information to Hirani during the Project. *See* Colonial's Answer & Countercls. at 14; Defs.' Mot. for Summ. J. at 17–21. Colonial complains that Plaintiff's failure to provide Hirani with the schedules and scheduling information caused the USACE to terminate the Prime Contract for default, thereby damaging both Hirani and Colonial. *See* Colonial's Answer & Countercls. at 14. For the reasons that follow, the court concludes there remain triable issues of fact concerning the scope of Plaintiff's scheduling responsibilities under the Subcontract and whether Plaintiff fulfilled those responsibilities.

Both Colonial and Plaintiff believe the text of the Subcontract answers the question of who was responsible for the Project's scheduling. Indeed, each party hangs its hat on the phrase "scheduling information" in Article II, Section 2.2 of the Subcontract. Colonial contends that that phrase obligated Plaintiff to oversee *all* scheduling matters for the Project, and Plaintiff's failure to do so constituted a material breach warranting termination of the Subcontract. *See* Defs.' Mot. for Summ. J. at 18; *cf.* Defs.' Mot. for Summ. J., Attach. 2, ECF No. 44-2 [hereinafter Hirani Decl.], ¶¶ 5–7. Plaintiff contends that the Subcontract obligated Plaintiff to provide only "scheduling information," which it complied with in full, but the overarching schedule for the Project was Hirani's responsibility. *See* Pl.'s Opp'n to Summ. J. at 15–16.

For ease of discussion, the court groups the relevant portions of the Subcontract, which read as follows:

> [Plaintiff] shall provide the entire scope of work to construct and manage the 17th Street closure structure except for the Project Manager and the misc. metal structures/panels as required by Hirani under the base bid to the USACE and related work required . . . for the Local Flood Protection Project @ 17th Street Closure Structure . . . located at 17th Street . . . .
>
> . . . .
>
> The scheduling of all construction operations at the Project, including the Schedule, shall be as mutually agreed with [Hirani], and [Plaintiff] shall, if requested, furnish all scheduling information in such form and detail as requested by [Hirani], to the satisfaction [of] [Hirani], and [Plaintiff] shall furnish such information within seven (7) days of request. [Plaintiff] shall also update and/or revise such information as requested by [Hirani], at any time, either prior to or during the performance of its Work.
>
> . . . .
>
> In the event [Plaintiff] fails to commence the Work after being notified in writing to do so, or should [Hirani] judge that [Plaintiff] is delaying the process of the Work or not complying with the Schedule, or not pursuing the Work in the manner set forth by the drawings, specifications or the other Subcontract Documents, or in

> a thorough and workmanlike manner, [Hirani] shall notify [Plaintiff] in writing, who shall, within seven (7) calendar days thereafter, furnish additional materials are required by [Hirani] and employ additional workmen, equipment and supplies, as required, so as to bring the Work into conformity with the Schedule or as required by [Hirani], or be found in material breach and default of this Subcontract, at the option of [Hirani].

Subcontract at 1–2 (Art. I, § 1.1; Art. II, §§ 2.2, 2.3).

Two things are clear from the plain language of the Subcontract: Plaintiff was obligated to provide "scheduling information," "if requested," and, contrary to Colonial's argument, Hirani bore some responsibility for "the Schedule." The operative sentence in Section 2.2 states: "[t]he scheduling of all construction operations at the Project, including the Schedule, shall be as mutually agreed with [Hirani], and [Plaintiff] shall, if requested, furnish all scheduling information in such form and detail as requested by [Hirani], to the satisfaction of [Hirani] . . . ." *Id.* (Art. II, § 2.2). The parties plainly gave this clause special attention, because the words following "shall be" and preceding "Hirani" are crossed out and replaced with the handwritten words "as mutually agreed with." A natural reading of the clause makes it clear that Plaintiff was not solely responsible for "the Schedule." Plaintiff, as the subcontractor, was responsible for providing "scheduling information" "if requested" by Hirani. Why might Hirani request scheduling information "in such form and detail as requested by Hirani" and "to the satisfaction of Hirani"? In order to "mutually agree" to "the Schedule." Although the Subcontract does not define the term "Schedule," it likely includes "[t]he scheduling of all construction operations at the Project." Thus, a straightforward reading of the Subcontract provides that Hirani's assent was required in the scheduling of all construction operations. Colonial's suggested reading of the Subcontract—that Plaintiff's obligation to provide "scheduling information" means it was responsible for all scheduling of the Project and that Hirani bore no responsibility for it—bulldozes the clear contractual language.

Additionally, Plaintiff has pointed to probative evidence that it was not responsible for preparing all scheduling matter relating to the Project. First, Plaintiff provided material referenced by and incorporated into the Subcontract as part of "the Work" for which Plaintiff was responsible, but which are not part of Defendants' exhibit—specifically, Section 01 32 01. *See* Subcontract at 1, 8 (Art. I, § 1.3; Sch. A); Stephen Decl. ¶ 20. That Section states, in part:

> 3.1 GENERAL REQUIREMENTS
>
> Prepare for approval a Project Schedule, as specified herein, pursuant to the Contract Clause, SCHEDULE FOR CONSTRUCTION CONTRACTS. Show in the schedule the sequence in which the Contractor proposes to perform the work and dates on which the Contractor contemplates starting and completing all schedule activities. The scheduling of the entire project, including the design and construction sequences, is required. The scheduling of construction is the responsibility of the Contractor. Contractor management personnel shall actively participate in its development. SubContractors and suppliers working on the project shall also contribute in developing and maintain an accurate Project Schedule. The schedule must be a forward planning as well as a project monitoring tool.

Pl.'s Opp'n to Summ. J., Attach. 4, ECF No. 46-4, at 69–85 (Ex. N). Although the above-quoted text talks about the responsibilities of "the Contractor" and "the SubContractor," by incorporating this document into the Subcontract as "Work" for which Plaintiff was responsible, *see* Subcontract at 1 (Art. I, § 1.3), it is plausible that Plaintiff was to perform *all* the scheduling responsibilities of the Contractor and SubContractor in this document. It is equally plausible, though, as Plaintiff posits, that Hirani was only responsible for those tasks assigned to the SubContractor in this document—namely, "contribut[ing] in developing and maintain[ing] an accurate Project Schedule." *See* Pl.'s Opp'n to Summ. J. at 16. Clearly, this evidence generates further dispute as to who was responsible for the Project's schedule. In light of this ambiguity, the court may consider evidence beyond the four corners of the Subcontract. *See Armenian Assembly of Am.,*

*Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014). Plaintiff also provided evidence that Hirani specifically hired an individual to create an overarching schedule for the Project. *See* Stephen Decl. ¶¶ 21–22, 25 (explaining that Hirani hired an outside scheduler, Tom Miller, "to prepare the overall Project Baseline Schedule"); Pl.'s Opp'n to Summ. J. at 7. That evidence also indicates Plaintiff was not charged with all scheduling responsibilities.

Lastly, ambiguity surrounding the role of the Project Manager also precludes an entry of summary judgment in Colonial's favor on its counterclaim. The Subcontract is silent as to the scope of the Project Manager's responsibilities, but plainly calls for an individual other than Plaintiff to fill the role of Project Manager. Plaintiff was responsible for "the entire scope of work to construct and manage the 17th Street closure structure *except the Project Manager*." Subcontract at 1 (Art. I, § 1.1) (emphasis added). And, Schedule B expressly obligates Plaintiff to "[p]rovide project supervision (Superintendent, Site Safety Officer, Traffic Control Officer) except for a project manager to act on behalf of [Hirani]" and to "work *with* the Hirani project manager in submitting monthly requisitions, progress updates, etc." *Id.* at 9 (Sch. B, Pts. 2, 5) (emphasis added). These contractual provisions indicate Hirani may have had ultimate scheduling responsibility, as the Project Manager was part of its team. Indeed, the record supports that inference. In certain correspondence, for example, Eric Hirani signs his name as "Project Manager" but also asserts that others are serving as Project Managers or that Hirani is attempting to find a Project Manager. *See* Moldovan Decl. at 20–22 (Ex. D); Defs.' Ex. E; Defs. Ex. G. Consequently, the scope of the Project Manager's duties—i.e., Hirani's duties—is unclear on the present record but may have included ultimate responsibility for the Schedule.

In sum, the text of the Subcontract, the additional evidence Plaintiff presents, and the ambiguity surrounding the role of the Project Manager lead the court to conclude there exists a

genuine issue of fact as to who was responsible for "[t]he scheduling of all construction operations at the Project, including the Schedule," *see* Subcontract at 1 (Art. II, § 2.2), and, correlatively, whether Plaintiff satisfied its contractual obligation.

Even assuming Plaintiff was only responsible for furnishing "scheduling information," a genuine dispute of material fact would still exist as to whether Plaintiff satisfied its contractual obligation. The Subcontract plainly states that Plaintiff would be in breach and the Subcontract subject to termination if Hirani determined Plaintiff was delaying performance of the Work, which could reasonably be read to include delaying its provision of "scheduling information" upon request. *See* Subcontract at 2 (Art. II, § 2.3). Each party has put forward probative and contradictory evidence as to whether Plaintiff provided all the "scheduling information" that was requested. Hirani points to correspondence sent to Plaintiff on February 13, February 18, March 22, and April 2, 2013, in which Hirani repeatedly told Plaintiff that it needed scheduling information. *See* Def.'s Mot. for Summ. J. at 19–20; Hirani Decl. ¶¶ 9, 10, 13, 15. Plaintiff submits that it "provided Hirani with 'Three Week Look Ahead Schedules' on a weekly basis throughout the life of the Project" regarding its own activities, which were incorporated into weekly progress meetings Plaintiff and Defendants attended. *See* Stephen Decl. ¶¶ 26. On the record presented, the court cannot determine whether Plaintiff fulfilled its responsibilities or breached the Subcontract.

Thus, the court concludes there exist genuine issues of material fact as to (1) whether Plaintiff was responsible for all scheduling aspects of the Project, and (2) whether Plaintiff satisfied its contractual obligations.

## B.     Defendants' Motion to Strike Plaintiff's Jury Demand

Defendants move to strike the jury demand in Plaintiff's Second Amended Complaint on the ground that it was not timely noticed. *See* Defs.' Mot. to Strike Jury Demand, ECF No. 45 [hereinafter Defs.' Mot. to Strike], at 2–3. Defendants acknowledge that they did not oppose Plaintiff's motion for leave to file its Second Amended Complaint, but contend that their acquiescence was predicated on Plaintiff's misrepresentation that the newly amended pleading did not contain a jury demand. *See id.* at 2; Defs.' Reply in Supp. of Mot. to Strike, ECF No. 52 [hereinafter Defs.' Reply to Mot. to Strike], at 2. Specifically, Defendants state they were the victims of a bait-and-switch because Plaintiff gave Defendants a draft version of the Second Amended Complaint that did not contain a jury demand, sought their approval, and, upon filing the actual Second Amended Complaint, did not alert them or the court to the new demand for a jury trial. *See* Defs.' Reply to Mot. to Strike at 2.

Plaintiff submits that it properly served Defendants with its jury demand in its Second Amended Complaint, which Defendants did not oppose, and Defendants should not now be permitted to revoke their consent. *See* Pl.'s Opp'n to Defs.' Mot. to Strike, ECF No. 47 [hereinafter Pl.'s Opp'n to Mot. to Strike], at 2–3. By consenting to the filing of the Second Amended Complaint and failing to oppose the jury demand until more than a year later, Plaintiff asserts that Defendants waived their opportunity to oppose trial by jury. *Id.*; *cf.* Defs.' Reply to Mot. to Strike at 2 (acknowledging that Defendants did not object to Plaintiff's jury demand until mid-April 2016).

Under Rule 38 of the Federal Rules of Civil Procedure, a party waives a jury trial unless it serves its demand on opposing counsel "no later than 14 days after the last pleading directed to the issue is served" and "fil[es] the demand in accordance with Rule 5(d)." Fed. R. Civ. P. 38(b), (d).

Amending a pleading does not "revive a right to jury trial previously waived on the issues already framed by the original pleadings." 9 CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 2320, Westlaw (database updated Apr. 2017); *see also Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 683 F. Supp. 2d 1, 10 (D.D.C. 2010).

The court holds that Plaintiff's jury demand is untimely. Plaintiff raised the exact same two claims in each of its three complaints: a claim under the Miller Act against Colonial, and a claim for breach of contract against Hirani. *See* Compl.; Am. Compl.; Second Am. Compl. Even assuming that Colonial's pleading of counterclaims on June 20, 2014, in response to Plaintiff's Amended Complaint extended the time for Plaintiff's jury demand, *cf. Bricks, Blocks & Concrete Co. v. Frontier Ins. Co.*, 39 F. App'x 610, 611–12 (D.C. Cir. 2002) (per curiam), Plaintiff would have had to serve and file its demand no later than July 7, 2014. Plaintiff's submission of a jury demand on February 16, 2016, in its Second Amended Complaint—more than 18 months later— plainly is too late.

## IV.    CONCLUSION

In light of the foregoing, the court denies Defendants' Motion for Summary Judgment, both as to Plaintiff's claims and Colonial's counterclaim, and grants Defendants' Motion to Strike Plaintiff's Jury Demand. A separate Order accompanies this Memorandum Opinion.

Dated: June 27, 2017

Amit P. Mehta
United States District Judge