# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of AMERICAN CIVIL CONSTRUCTION, LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>HIRANI ENGINEERING & LAND SURVEYING, P.C., et al.,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 14-cv-00745 (APM) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This dispute between Plaintiff American Civil Construction, LLC ("Plaintiff" or "ACC") and Defendants Hirani Engineering & Land Surveying, PC ("Hirani") and Colonial Surety Company ("Colonial") arises out of ACC's work as a subcontractor to Hirani on a federal government construction project located on the National Mall in the District of Columbia.

ACC brought this action against Colonial under the Miller Act, 40 U.S.C. § 3133, and also brought a state law claim against Hirani for breach of contract. As to both claims, Plaintiff seeks $2,172,285.23 in money damages, plus prejudgment interest, attorney's fees, and costs. Colonial, in turn, brings a variety of counterclaims against ACC and asserts that it incurred losses in the amount of $723,049.14 to finish the project that ACC failed to complete.

After denying Defendants' motion for summary judgment, the court conducted a five-day bench trial in March 2018. After the bench trial concluded, the parties submitted proposed findings

of fact and conclusions of law, as well as briefs in rebuttal. The court held a final oral argument on June 14, 2018.

As required by Federal Rule of Civil Procedure 52(a)(1), the court now makes its Findings of Fact and Conclusions of Law. The court has reviewed the parties' submissions, carefully considered the evidence presented at trial, weighed the credibility of the witnesses, and applied the applicable law. For the reasons set forth below, the court has determined that Plaintiff has met its burden of proof with respect to its Miller Act claim against Colonial and its breach of contract claim against Hirani. On the other hand, the court finds that Defendant Colonial has not sustained its burden of proof on its counterclaims.

Accordingly, the court will enter final judgment in favor of ACC. It will formally do so, however, only after ACC submits a final damages calculation that is consistent with these Findings of Fact and Conclusions of Law.

## **BACKGROUND**

To provide clarity and context for these findings of fact and conclusions of law, the court provides a brief overview of the undisputed facts underlying this case and then summarizes the case's procedural history.

### A.    **Factual Background**

In June 2010, the United States Army Corps of Engineers ("USACE") issued a solicitation for bids to construct a levee wall across 17th Street, N.W. in the District of Columbia, south of Constitution Avenue, N.W. (the "Project"). Flanked on the west side by the National World War II Memorial and on the east side by the Washington Monument, the 380-foot-long levee wall was designed to prevent the Potomac River from flooding across the National Mall into downtown Washington, D.C. As designed, the 17th Street levee wall consists of two permanent stone-clad

levee stem wall sections, one on the east side and the other on the west side of 17th Street, which sit on a curved grade beam foundation supported by twenty-four reinforced concrete caissons running underground across the street. The grade beam foundation running across 17th Street contains eight "post pockets." In the event of a 100-year flood, these pockets are filled with an eight-foot-tall temporary metal post and aluminum panel system that connect to the east and west levee stem walls to block surging floodwaters. The images below illustrate the Project.

 

**Images: completed stone-clad levee stem walls (Source Pl.'s Ex. 5)**



**Drawing of 17th Street levee (Source: Washington Post)**

Following a bid process, on September 16, 2010, the USACE awarded Hirani the contract ("the Prime Contract") to construct the 17th Street levee wall for the amount of $3,833,097.00. The USACE subsequently awarded "Option 1" to Hirani on December 16, 2010, requiring Hirani

to install stone veneer cladding and coping on the permanent levee walls for $641,369.00. As required by Hirani's contract with the USACE, Colonial issued performance and payment bonds on behalf of Hirani.

On April 4, 2011, ACC and Hirani entered into a fixed-price subcontract ("the Subcontract") for $2,845,600.00, under which ACC agreed to perform most, but not all, of Hirani's obligations under the Prime Contract. ACC began performing under the Subcontract a week later, and Hirani subsequently subcontracted Option 1 to ACC in the amount of $613,650.00.

The ensuing years on the Project were beset by a series of delays, modifications to the scope of the Project, and work-related disputes. By letter dated April 26, 2013, two-and-a-half years after it awarded the Prime Contract to Hirani, the USACE gave notice of its intent to terminate Hirani. In the days following Hirani's termination, ACC left the Project site. The USACE subsequently made a demand against the Performance Bond issued by Colonial, and Colonial stepped in to complete the Project. With the assistance of Loewke Brill, a consulting firm, Colonial contracted with Akima Construction Services, LLC, Lorton Stone, LLC, and Structural Stone, LLC, to complete the Project, including Option 1, and did so around November 2014.

B.    Procedural Background

ACC filed suit in this court against Hirani and Colonial on April 29, 2014. *See* Compl., ECF No. 1. Colonial responded by filing four counterclaims against ACC: (1) two for breach of contract, one as assignee of Hirani and one as surety; (2) one for breach of the covenant of good faith and fair dealing; and (3) one for interference with contractual relations. *See* Def. Colonial's Answer & Countercls., ECF No. 8. With leave of court, Plaintiff filed a Second Amended Complaint on February 16, 2016, asserting two claims: (1) breach of contract against Hirani, and

(2) a payment demand under the Miller Act against Colonial, premised on the payment bond Colonial issued in connection with the Prime Contract. Plaintiff's Second Amended Complaint sought *quantum meruit* damages in the amount of $2,070,185.23. *See* Second Amended Compl., ECF No. 26.

Following discovery, Defendants jointly filed a Motion for Summary Judgment and a Motion to Strike Plaintiff's Jury Demand. *See* Defs.' Mot. for Summ. J., ECF No. 44; Defs.' Mot. to Strike Jury Demand, ECF No. 45. The court denied Defendants' Motion for Summary Judgment and granted Defendants' Motion to Strike the Jury Demand on June 27, 2017. *See* Mem. Op., ECF No. 54; Order, ECF No. 55. Following a delay in the proceedings, the parties appeared for a Pretrial Conference on February 23, 2018. *See* Pretrial Conf. Hrg. Tr. (February 23, 2018), ECF No. 75. The court thereafter conducted a bench trial over the course of five days from March 5, 2018, to March 9, 2018. *See* Trial Tr. Day 1 A.M. Session (March 5, 2018), ECF No. 76 [hereinafter Day 1 A.M. Tr.]; Trial Tr. Day 1 P.M. Session [hereinafter Day 1 P.M. Tr.]; Trial Tr. Day 2 A.M. Session (March 6, 2018), ECF No. 77 [hereinafter Day 2 A.M. Tr.]; Trial Tr. Day 2 P.M. Session [hereinafter Day 2 P.M. Tr.]; Trial Tr. Day 3 A.M. Session (March 7, 2018), ECF No. 78 [hereinafter Day 3 A.M. Tr.]; Trial Tr. Day 3 P.M. Session [hereinafter Day 3 P.M. Tr.]; Trial Tr. Day 4 A.M. Session (March 8, 2018), ECF No. 79 [hereinafter Day 4 A.M. Tr.]; Trial Tr. Day 4 P.M. Session [hereinafter Day 4 P.M. Tr.]; Trial Tr. Day 5 A.M. Session (March 9, 2018), ECF No. 80 [hereinafter Day 5 A.M. Tr.].

During the bench trial, ACC presented three witnesses: (1) Irene Stephen, owner of ACC, who also served as Hirani's on-site Contractor Quality Control Assistant on the Project; (2) Jitendra Hirani, president of Hirani; and (3) Rick Janeiro, president of Roubin & Janeiro, Inc., a local stone contractor. Ms. Stephen, ACC's primary witness, testified both as a fact witness and

as an expert in cost accounting in the heavy and highway construction industry. *See* Day 1 A.M. Tr. at 37:14–95:1; Day 1 P.M. Tr. at 5:10–21:5; Day 2 A.M. Tr. at 6:5–125:17; Day 2 P.M. Tr. at 3:9–112:12; Day 3 A.M. Tr. at 77:1–138:11; Day 3 P.M. Tr. at 3:4–86:6. Mr. Hirani, called as an adverse witness, testified as a fact witness regarding Hirani's Prime Contract with the USACE, disputes and delays on the Project resulting from claimed failures by ACC to submit scheduling data, and Hirani's termination from the Project. *See* Day 1 P.M. Tr. at 21:12–107:24. Mr. Janeiro testified as a fact witness regarding his company's role as ACC's stone supplier and subcontractor to complete Option 1 of the Project. *See* Day 3 A.M. Tr. at 6:7–75:25.

Defendants presented two witnesses in their case: (1) Michael Vogt, an executive vice president of Loewke Brill Consulting Group, Inc., which Colonial hired in July 2013 to oversee completion of the Project after Hirani's termination; and (2) Robert Franklin, the USACE's project engineer for the Project. Mr. Vogt testified as a fact witness regarding the status of the Project upon Hirani's termination, the work remaining under the Prime Contract and Subcontract, and the costs incurred by Colonial to complete the Project. *See* Day 4 A.M. Tr. at 11:6–118:5; Day 4 P.M. Tr. at 3:4–85:11; Day 5 A.M. Tr. at 6:1–22:21, 98:9–130:20. Mr. Franklin testified as a fact witness regarding Hirani's and ACC's performances under the Prime Contract and Subcontract, the USACE's termination of Hirani, and Colonial's eventual completion of the Project. *See* Day 5 A.M. Tr. at 23:15–97:25. In its rebuttal case, ACC recalled Irene Stephen. *See* Day 5 A.M. Tr. at 139:11–160:13. Both parties introduced a substantial volume of exhibits.

After Defendants rested their case, defense counsel made oral motions for judgment as a matter of law as to ACC's Miller Act claim pursuant to Federal Rules of Civil Procedure 50(a) and 52(c), asserting that no reasonable factfinder could conclude that ACC performed compensable work within one year of commencing its action as required by the Miller Act, 40 U.S.C.

§ 3133(b)(4).  *See* Day 5 A.M. Tr. at 161:2–161:20.  The court deferred ruling on these motions. *Id.* at 161:21–162:3.[1]

Following the close of trial, each party submitted its proposed findings of fact and conclusions of law to the court.  *See* Pl.'s Proposed Findings of Fact & Conclusions of Law, ECF No. 82 [hereinafter Pl.'s FOF & COL]; Defs.' Proposed Findings of Fact & Conclusions of Law, ECF No. 83 [hereinafter Defs.' FOF & COL].  The parties also submitted opposition briefs.  *See* Defs.' Rebuttal re: Pl.'s FOF & COL, ECF No. 86 [hereinafter Defs.' Rebuttal]; Pl.'s Response re: Defs.' FOF & COL, ECF No. 87 [hereinafter Pl.'s Rebuttal].  The court held oral argument on these submissions on June 14, 2018.  *See* Oral Arg. Tr. (June 14, 2018), ECF No. 90 [hereinafter Final Arg. Tr.].

## **LEGAL STANDARD**

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  *Id.* "The [c]ourt's findings must be sufficient to indicate the factual basis for the ultimate conclusion." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A.*, 188 F. Supp. 3d 22, 34 (D.D.C. 2016) (internal quotation marks omitted).  However, "[i]n setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial."  *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and citations omitted).  Instead, "'the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters'" in a manner that is "sufficient to allow the appellate court to conduct a meaningful review."  *Wise v. United States*,

---

[1] By virtue of these Findings of Fact and Conclusions of Law, the court denies Defendants' motions made under Rules 50(a) and 52(c).

145 F. Supp. 3d 53, 57 (D.D.C. 2015) (quoting Fed. R. Civ. P. 52(a) advisory committee note to 1946 amendment).

A litigant bears the burden of proving each element of its claim by a preponderance of the evidence, a standard that "requires a factfinder to decide that the existence of a fact is more probable than not." *See Window Specialists, Inc. v. Forney Enters, Inc.*, 106 F. Supp. 3d 64, 88 (D.D.C. 2015) (citing *Concrete Pipes & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)). As the factfinder, the court "must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010) (quotation marks and citation omitted).

## FINDINGS OF FACT[2]

With these principles in mind, the court makes the following findings of fact:

**THE PARTIES**

1. Plaintiff American Civil Construction ("ACC") is a Maryland limited liability company. At all times relevant, ACC was engaged in the business of heavy and highway civil construction contracting.

2. Defendant Hirani Engineering & Land Surveying ("Hirani") is a New York corporation.

3. Defendant Colonial Surety Company ("Colonial") is a Pennsylvania surety corporation.

---

[2] The court cites portions of the record to support its findings of fact, but has not identified every portion of the record upon which it relies to make those findings. The omission of a citation to a particular portion of the record does not necessarily mean that the court did not rely on that portion to make its findings of fact. Rather, the court has considered the record in its entirety, including the court's own determination of witnesses' credibility, and its citations to portions of the record are simply intended to provide a helpful reference for the basis of its findings. *See Paleteria La Michoacana*, 188 F. Supp. 3d at 35.

## THE PROJECT AND PRIME CONTRACT

**4.** On or about June 25, 2010, the United States Army Corps of Engineers ("USACE") issued a solicitation for a fixed-price construction proposal for a project to build a levee flood wall across 17th Street, N.W. in the District of Columbia, between Constitution and Independence Avenues, N.W. Pl.'s Ex. 10, at 37; Pl.'s Ex. 11.

**5.** The construction project is known as the "Washington D.C. and Vicinity, Local Flood Protection Project, 17th Street Closure Structure" (the "Project"). Pl.'s Ex. 11.

**6.** The Project involved the installation of twenty-four reinforced concrete caissons embedded approximately five to ten feet into solid bedrock. These twenty-four caissons support a 380-foot long, curved grade beam foundation. Sitting on top of this grade beam foundation are two permanent 120-foot levee stem wall sections, one on the east side and one on the west side of 17th Street.

**7.** The Project also required, among other things, construction of a temporary eight-foot high protective stockade wood fence around the construction work areas; regrading of disturbed areas; temporary maintenance of traffic barriers and signs during partial closures of 17th Street to vehicle traffic; and landscaping (tree and sod planting).

**8.** On August 27, 2010, Hirani submitted its bid proposal, in the following amounts: (1) $3,833,097.00 for the base contract work of the Project, excluding any options that the USACE may exercise during the course of the Project; (2) $641,369.00 for installing stone veneer on the levee walls ("Option 1"); and (3) $99,125.00 for planting new trees and sod on the east side of 17th Street ("Option 2"). *See* Pl.'s Ex. 17, at 1, 3–6.

**9.** On September 16, 2010, the USACE awarded Hirani Contract No. W912DR-10-C-0093 (the "Prime Contract"), accepting Hirani's base contract work bid of $3,833,097.00 for the construction of the Project. *See id.* at 1.

**10.** The Prime Contract contemplated completion of the Project by October 12, 2011, one year from issuance of the Notice to Proceed dated October 13, 2010. Pl.'s Ex. 56 at 3.

**11.** The Prime Contract required Hirani to obtain a surety bond. Pl.'s Ex. 17 at 3.

**12.** On October 1, 2010, Colonial, as surety, issued a performance bond and payment bond in the sum of $3,833,097.00, each bearing the bond number CSC-218890, on behalf of Hirani, as principal, and the United States of America, as obligee. *See* Pl.'s Exs. 24, 25.

## THE SUBCONTRACT WITH ACC

**13.** On April 4, 2011, six months after the USACE awarded the Prime Contract to Hirani, ACC and Hirani entered into a written subcontract (the "Subcontract"), under which ACC would perform specified work on the Project, as defined by the Subcontract. *See* Pl.'s Ex. 54 [hereinafter Subcontract], at 6–16.

**14.** Also, on April 4, 2011, Hirani separately retained Irene Stephen, a co-owner and an officer of ACC, to serve as Hirani's "Alternate Contractor Quality Control System Manager" and "Project Quality Control System Administrator" on the Project. *See* Pl.'s Ex. 77 at 16–18. Ms. Stephen's responsibilities included, among other things, (a) to "[a]ssist with the conducting on a continuing basis, sufficient daily follow-up reviews of work to ensure that all workmanship and materials" conform to Project specifications; (b) to "[a]ssist with coordination and management of all quality control and materials testing functions"; (c) to "[a]ssist with the preparation, management, and submission of all Daily Quality Control Reports to the Owner's Representative each workday at

10

the project"; and (d) to "[a]ssist with the management, review, and tracking of" construction efforts, construction deficiencies, and any stoppages or cessations of work. *Id.* at 17–18.

**15.** ACC first began performance under the Subcontract beginning on April 11, 2011. Pl.'s Ex. 31 at 1; *see* Day 2 A.M. Tr. at 34:16–34:17.

**16.** The Subcontract was a fixed-price agreement in the amount of $2,845,600.00 for "all labor, services, materials, equipment or other items acquired, performed, furnished or used . . . with respect to the Work," along with applicable federal, state, and local taxes. *See* Subcontract at Art. III, § 3.1.

**17.** Pursuant to the Subcontract, ACC was required to provide the entire scope of work to construct and manage the Project, except for Project management, quality control, and miscellaneous metal structures and panels and related work assigned to Hirani under the Prime Contract. *See id.* at Art. I, §§ 1.1, 1.4.

**18.** Schedules A and B of the Subcontract define in greater detail the work ACC was required to perform. *See id.* at Art. I, §§ 1.2, 1.3; *id.* at Sch. A–B.

**19.** As provided in Schedule B, among other tasks, ACC was required to "provide project supervision (Superintendent, Site Safety Officer, Traffic Control Officer) except for a project manager to act on behalf of [Hirani]"; "work with the Hirani project manager in submitting monthly requisitions, progress updates"; "provide all field labor to maintain the site and do general cleanup as required"; "[f]urnish [and] install all fencing (site, silt, tree protection, temporary), and relocate as per the drawings and specifications with appropriate signage"; "provide all grading including all excavation & backfill as per the plans and specifications"; and "[f]urnish and install all stone masonry work for base scope of work: curbs, grade beam, stone coping and cladding

adjacent to end post channels & expansion joints as per the plans and specifications." *See id.* at Sch. B, Pts. 2, 5, 8, 11, 14, 19.

20.    In the Subcontract, Hirani reserved the right to change, add, or eliminate portions of the Work "at any time whatsoever, whether the Work or any part thereof shall or shall not have been completed," by written order submitted to ACC, and ACC agreed not to seek "extra or additional compensation on account of any such work, unless same shall have been done pursuant to a written order, signed by" a designated Hirani representative. *See id.* at Art. IV, § 4.1.

21.    ACC additionally agreed that, in the event a "dispute, controversy [,] or question" arose in the interpretation of the Subcontract, it would not stop or delay performance of the Work or delivery of labor or material, but would continue to work "pending the determination of such dispute or controversy." *See id.* at Art. XIV, § 14.1.

22.    The Subcontract specified the grounds for contract termination. *See id.* at Art. XV, § 15.1.

23.    Under the termination for default provision, the Subcontract provided that if ACC "fail[ed] to timely provide labor, services, and/or materials for the Project in accordance with the terms of [the] Subcontract, then Hirani [retained] the right at any time upon 7 days written cure notice to [ACC] to terminate [the] Subcontract and require [ACC] to cease work." *See id.*

24.    Under the termination for convenience provision, the Subcontract provided that if the USACE "ch[ose] to terminate Hirani for the convenience of the [USACE], then [ACC] shall be similarly terminated, and the obligations and rights of the parties shall be in accordance with the provisions of the prime contract for such termination for convenience." *See id.*

**THE PROJECT SCHEDULE**

25.    The Prime Contract required Hirani to "[e]nsure that the work in progress, and the finished product, complies with all quality requirements of the plans and specifications." Pl.'s Ex. 17 at 2.

26.     Section 01 32 01 of the USACE's Construction Specifications relates to scheduling for the Project and details requirements for the creation, production, and updating of the Project Schedule. *See* Pl.'s Ex. 12 [hereinafter Project Schedule Specifications], at 26–39.

27.     The Project Schedule was required to be a forward-planning and project monitoring tool for the entire Project, including the design and construction sequences. The Schedule was required to show the sequence in which the work on the Project would be performed and dates on which all scheduled activities would be started and completed. *Id.* at § 3.1.

28.     The Project Schedule Specifications required that an authorized representative be designated by Hirani "to be responsible for the preparation of the schedule and all required updating (activity status) and preparation of reports." *Id.* at § 1.2; *see* Day 1 P.M. Tr. at 64:11–65:7.

29.     Hirani was responsible for the scheduling of construction for the Project, and Hirani management personnel were required to actively participate in the development of the Schedule. Project Schedule Specifications at § 3.1.

30.     ACC was required to contribute in developing and maintaining an accurate Project Schedule. *Id.*

31.     Hirani was required to provide to the USACE a Schedule Status Report at least on a monthly basis. *Id.* at § 3.1.2.

32.     If the USACE Contracting Officer determined that Hirani was falling behind the approved schedule, the Contracting Officer could require increased work and overtime operations until the approved rate of progress was restored. Hirani's failure to comply with the requirements of the USACE Contracting Officer would constitute grounds for a determination that Hirani was not

prosecuting the work with sufficient diligence to ensure completion of the Project within the time specified in the Prime Contract. *Id.* at §§ 3.1.2, 3.1.3.

**33.**   The Subcontract between Hirani and ACC incorporated the USACE's Construction Specifications and required ACC to perform the work under the Subcontract "in strict compliance with the drawings, specifications, addenda, and bulletins." *See* Subcontract at Art. I, § 1.2; Day 1 A.M. Tr. at 68:13–68:17.

**34.**   According to the Subcontract, the scheduling of all construction operations at the Project was to be "mutually agreed" upon between ACC and Hirani and, "if requested," ACC was required to "furnish all scheduling information in such form and detail as required by [Hirani], to the satisfaction [of] [Hirani]," within seven days of the request.  ACC was also required to "update and/or revise such information as requested by [Hirani] at any time, either prior to or during the performance of [ACC's] [w]ork." *See* Subcontract at Art. II, § 2.2.

**35.**   In or around April 2011, Hirani hired Tom Miller of JSM Associates, Inc. as the scheduler for the Project tasked with producing an initial schedule, or "Baseline Schedule," and periodically updated schedules for the Project.  Day 1 A.M. Tr. at 78:9–78:22; *see* Day 1 P.M. Tr. at 39:23–41:15, 64:11–65:7.

**36.**   Hirani submitted the Baseline Schedule to the USACE, as agreed upon by both Hirani and ACC, and the USACE subsequently approved it in June of 2011. *See* Pl.'s Ex. 45; Day 1 A.M. Tr. at 78:23–81:24.

**37.**   The Baseline Schedule projected a Project completion date of December 9, 2011. *See* Pl.'s Ex. 45 at 18.

**38.**   After the USACE approved the Baseline Schedule, neither ACC nor the USACE agreed to an updated Project schedule again.  Day 1 A.M. Tr. at 81:22–82:4.

39.     Hirani submitted updated schedules to the USACE an additional four times: (1) on January 26, 2012, Pl.'s Ex. 46; (2) on April 23, 2012, Pl.'s Ex. 47; (3) on October 2, 2012, Pl.'s Ex. 48; and (4) on December 12, 2012, Pl.'s Ex. 49.[3]  The USACE rejected each of these submissions. *See* Pl.'s Exs. 46, 47, 48, 49; *see also* Day 1 A.M. Tr. at 85:13–85:21 (explaining that designation of "E" on each cover page signified rejection by the USACE).

40.     Throughout its performance of the work, ACC supplied scheduling information to Hirani in the form of (1) "Basic Outlines of Dates for Work Performed at the Site," a backward-looking spreadsheet summarizing work performed, and the dates of work performed, by ACC, *see* Pl.'s Ex. 29; and (2) three-week "look-ahead" schedules, which as the name implies provided a projection of work to be accomplished in the ensuing three weeks, *see* Pl.'s Ex. 41.  Additionally, Hirani's own Quality Control Reports, which Ms. Stephen prepared on a daily basis, provided information about work that ACC had accomplished on a given day.  *See* Pl.'s Ex. 30.

41.     ACC further supplied an "Option 1 Schedule" reflecting when ACC intended to complete Option 1 of the Prime Contract, i.e., the stone cladding on the stem walls.  *See* Pl.'s Ex. 139 at 3–5.

42.     On February 18, 2013, Hirani issued a Show Cause letter to ACC, in which Hirani requested that ACC provide a proposed schedule for completing the Project with a contract completion date of April 19, 2013.  *See* Defs.' Ex. 54 at 2.

---

[3] There is some ambiguity in the record as to whether Plaintiff's Exhibits 46–49 are in evidence, as questions regarding those exhibits were met with repeated objections regarding hearsay within those records.  *See* Day 1 A.M. Tr. at 84:15–94:25.  Although the court resolved these objections in favor of ACC, ruling that the USACE's comments as reflected in Exhibits 46–49 were not hearsay, *see* Day 1 P.M. Tr. at 3:2–5:7, ACC never formally sought to move these exhibits into evidence.  In any event, the sole purpose for which the court cites Plaintiff's Exhibits 46–49—that the USACE rejected Hirani's updated schedules—was independently established through the testimony of Ms. Stephen.

43.     The Show Cause letter was the first time, in writing, that Hirani had informed ACC that the scheduling information ACC had submitted was unsatisfactory in form or detail, in the manner provided in the Subcontract.  *See* Defs.' Ex. 54; *see also* Subcontract at Art. II, §§ 2.1–2.3.

44.     Additionally, the Show Cause letter was the first time, in writing, that Hirani had asked ACC to update or revise any unsatisfactory scheduling information, in the manner provided in the Subcontract.  *See* Defs.' Ex. 54; *see also* Subcontract at Art. II, §§ 2.1–2.3.

45.     Mr. Hirani testified at trial that Hirani requested scheduling data, verbally or in writing, from ACC "50 to 100 times" prior to February 18, 2013, but ACC never delivered it.  *See* Day 1 P.M. Tr. at 35:24–36:12 *see also* Defs.' Ex. 62 at 6 (asserting in a letter to ACC dated March 22, 2013, that "ACC has failed to provide the necessary information required to maintain a progress schedule for the last *20 months* on the [P]roject as requested by Hirani . . . and did not provide written justification of the delays per the schedule specification") (emphasis added).

46.     The court does not find this testimony to be credible.  Defendants presented no evidence, written or testimonial, to corroborate Mr. Hirani's assertion that ACC left unanswered Hirani's demands for satisfactory scheduling information.

47.     Defendants did not submit proof of *any* written demand by Hirani, in any form (e.g., letter, email, handwritten note), for scheduling information from ACC during the nearly 20 months that passed between approval of the Baseline Schedule in June 2011 and the Show Cause letter on February 18, 2013.  The voluminous documentary evidence showed that ACC maintained copious records concerning the Project, including of its communications with Hirani.  The court finds it utterly implausible that, if as Mr. Hirani testified, he demanded scheduling information from ACC dozens of times without success before February 18, 2013, that there would be *no written record whatsoever* of at least one such demand.

**48.** Defendant presented no testimonial evidence to corroborate Mr. Hirani's claim regarding unanswered demands for scheduling information, including from Eric Hirani, Mr. Hirani's son, who was physically present at the Project more often than his father.

**49.** Once more, beyond Mr. Hirani's incredible testimony, there is no evidence in the record that ACC ever refused, verbally or in writing, to provide Hirani with updated scheduling information as required by § 2.2 of the Subcontract and Section 01 32 01 of the USACE's Construction Specifications.

**PROGRESS ON THE PROJECT**

**50.** On April 8, 2011, four days after Hirani entered into the Subcontract with ACC, the USACE issued a Cure Notice to Hirani requiring the following corrective actions to cure Hirani's performance problems on the Project to date: (1) resubmit an approvable Contractor Quality Control plan; (2) designate a qualified Contractor Quality Control System Manager; (3) resubmit an initial one-year Project schedule with a completion date of October 12, 2011; (4) supply construction submittals; and (5) provide proof that competent Project Management staff is in place to manage the Project. *See* Pl.'s Ex. 56.

**51.** On August 26, 2011, the USACE issued a Change Order AD to Hirani, providing a non-compensable time extension of 48 calendar days, thereby extending the substantial completion date for the entire Project to November 30, 2011. Pl.'s Ex. 40 at 3–4.

**52.** Over one year later, the Project remained unfinished. On December 16, 2012, the USACE issued a unilateral modification to the Prime Contract through Change Orders AQ, AY, BF, and BJ. *See* Pl.'s Ex. 123. The contract completion date for the Prime Contract was extended by 60 calendar days because of these modifications, resulting in an expected Project completion date of January 29, 2012. *See* Pl.'s Ex. 123 at 5.

53.     Change Order BJ, known as "East Side Grade Beam Adjustment," required Hirani to supply the labor, equipment, and materials to trim concrete and rebar in the areas where the grass met the grade beam in order to allow grass to grow in that area. *See* Pl.'s Ex. 123 at 4; Day 2 A.M. Tr. at 56:4–58:16.

54.     From July 3, 2012, to April 23, 2013, the USACE issued numerous unilateral change orders and constructive change directives to Hirani, who in turn subcontracted the work to ACC to complete these change orders. *See* Pl.'s Ex. 40 at 34–69.

55.     On April 5, 2013, the USACE issued Change Order BL to Hirani, providing a non-compensable time extension of 180 calendar days, thus extending the Project completion date from January 29, 2012, to July 27, 2012. *See* Pl.'s Ex. 40 at 61–62. According to Change Order BL, the USACE authorized the additional time due to "120 days [ ] for concurrent delay and 60 days . . . for work stoppage due to weather impacts." *Id.* at 62. The USACE identified the "concurrent delay" as related to, among other things, "East and West grade beam adjustment" and "Additional west side grading."

## OPTION 1 AND THE GEOMETRY "BUST"

56.     Section 02 00 00 of the USACE's Construction Specifications relates to the stone cladding and coping to be affixed to the permanent levee walls and details requirements for its completion. *See* Pl.'s Ex. 12, § 27 at 215–25.

57.     On December 17, 2010, the USACE issued a modification exercising Option 1 in the amount of $641,369.00, requiring Hirani to install the stone cladding and coping on the permanent levee walls. This modification increased the Prime Contract from $3,833,097.00 to $4,474,466.00. *See* Pl.'s Ex. 26.

58.     On August 12, 2010, the USACE issued Amendment No. 0003, modifying the Site Stone Cladding Specification.  The Amendment specified American Granite, as supplied and fabricated by Champlain Stone Ltd., as the source of cladding and coping stones for the levee wall façade and the granite pavers on the exposed grade beam surface.  Amendment No. 0003 further provides that "only the stone from Champlain Stone, Ltd. has been presented and approved by the Commission of Fine Arts, the National Capitol Planning Committee, and the National Park Service."  According to the Amendment, if Hirani were to select a stone from any other manufacturer, Hirani would be responsible for obtaining approval from those organizations.  Pl.'s Ex. 15.

59.     The USACE and National Park Service wanted the color of the stone cladding on the levee walls to match the color of the stone on the Lockkeeper's House, a historical building on the corner of 17th Street and Constitution Avenue.  Day 3 A.M. Tr. at 21:21–23:19.

60.     On December 14, 2011, ACC executed Change Order No. 001 to the Subcontract in the amount of $613,650.00, in which Hirani awarded Option 1 to ACC to complete the stone cladding and coping work on the permanent levee walls.  Pl.'s Ex. 79.

61.     On or around May 18, 2011, ACC received sample American Granite stones, supplied by Champlain, the only supplier contractually permitted to provide stone for the Project.  ACC visited the Lockkeeper's House to compare the stone samples with the existing stone façade on the Lockkeeper's House and found they did not match.  *See* Pl.'s Ex. 31 at 139–40.

62.     The following year, on or around April 5, 2012, ACC learned that there was a geometry "bust" problem with Option 1, meaning that the stone cladding could not be installed as required by the Project plans because the structural drawings and the architectural drawings were misaligned.  *See* Pl.'s Ex. 87; Day 3 A.M. Tr. at 57:7–58:3.

**63.** On July 27, 2012, employees of Janeiro, Inc., ACC's stone installation subcontractor, visited the Project site to build mockups of a sample stone alternative to Champlain stones on a portion of the levee wall for review by the Commission of Fine Arts, the National Capitol Planning Committee, and the National Park Service. Pl.'s Ex. 1 at 59; *see* Day 2 P.M. Tr. at 51:4–51:14.

**64.** Around the first week of November 2012, the USACE, Champlain Stone Ltd., Janeiro, ACC, and OLIN, the landscaping and stone architect on the Project, held a meeting. During the meeting, Champlain's representatives explained that they could not provide stones in the strength, sizes, and shapes required to complete Option 1. Day 3 A.M. Tr. at 18:7–18:24.

**65.** Following this meeting, the USACE requested that Janeiro provide different stone samples from different quarries that could be used in the Project. *Id.* at 21:21–23:19; *see* Pl.'s Ex. 1 at 69.

**66.** Rick Janeiro suggested stones from a quarry in Carderock, Maryland, for the cladding and a granite stone called Jet Mist Granite from a quarry in Le Croix, Canada, for the pavers and coping. Day 3 A.M. Tr. at 23:16–24:3.

**67.** In early 2013, Rick Janeiro, Ed Hollander of ACC, OLIN, the National Park Service, and the USACE visited the Carderock quarry. Pl.'s Ex. 170; Day 3 A.M. Tr. at 26:17–26:19. Ed Hollander co-founded ACC with Ms. Stephen and served as ACC's field superintendent for the Project. Mr. Hollander died before the start of trial.

**68.** In early 2013, Janeiro received a notice of approval for the two types of stone chosen: Carderock stone and Jet Mist Granite. Day 3 A.M. Tr. at 25:3–25:6; Day 5 A.M. Tr. at 88:7–88:11.

**69.** On March 18, 2013, Hirani's on-site field superintendent submitted RFI No. 122 requesting confirmation of the following changes to the Site Stone Cladding Specification:

Change stone veneer thickness from 3" to 2".
Jet Mist Copings with rock pitch / split face and thermal top and ends
Jet Mist wall end stones with end face thermal finish and wall face rock pitch / split face
Jet Mist typical veneer for dark shaded stone as viewed on contract drawings L-044 and L-045
Joint widths are to be 3/8" plus / minus tolerances
Variance in the stone surface will be allowed to the extent exhibited in the sample reviewed on site.
Tolerances listed in the specifications will be modified / exceeded due to the nature of the stone selected.
Thermal finish on veneer stone will be applied in accordance with Olin's review comments on submittal 27-7.
Due to the nature of the split faced stone the design intent of having a 1/8" reveal on the brass expansion joints becomes impossible. Please confirm that some deviation from this expected and acceptable.

Pl.'s Ex. 43 at 262.

**70.** On March 21, 2013, Robert Franklin of the USACE responded to RFI No. 122, and approved the use of two-inch thick stone cladding and a joint width of three-eighths inch. Pl.'s Ex. 43 at 262; *see* Day 5 A.M. Tr. at 87:4–87:18.

**71.** The record does not support Defendants' assertion that the USACE resolved the stone geometry issue—also known as the "geometry bust"—as early as August 14, 2012. *See* Defs.' Rebuttal at ¶ 212.

**72.** Instead, the record supports ACC's contention that the "geometry bust" issue was not resolved by the USACE until March 21, 2013. *Compare* Pl.'s Ex. 105 (ACC letter dated August 17, 2012, noting that ACC is "still waiting on many decisions and resolutions . . . associated with [the geometry bust]"), *with* Pl.'s Ex. 43 at 262 (March 21, 2013, USACE response to RFI No. 122, memorializing that teleconferences held on March 11 and 14 to "address [c]ontractor stone issues" and that on March 19, 2013, "[Hirani was] told via email and phone call that [the comments in RFI] are acceptable").

**73.** Until March 21, 2013, when the USACE responded to RFI No. 122, ACC could not cut the stone for cladding and coping in order to move forward on Option 1.

**74.** On March 26, 2013, Ed Hollander prepared a work plan for moving forward on Option 1 of the Project. Day 5 A.M. Tr. at 89:21–92:6; Pl.'s Ex. 139. This proposed Option 1 schedule estimated the stonework would be completed by the end of July 2013. Pl.'s Ex. 139 at 5.

**FEBRUARY 2013 THROUGH MAY 2013 ON THE PROJECT**

**75.** On or about February 14, 2013, the USACE sent Hirani a Cure Notice letter, requesting that Hirani show cause why the Prime Contract should not be terminated. Hirani responded to the USACE's letter by letter dated February 25, 2013. See Pl.'s Ex. 131.

**76.** On February 19, 2013, David Lussier, Hirani's newly installed on-site field representative, began working at the Project site. *See* Pl.'s Ex. 31 at 577; Pl.'s Ex. 30 at 813.

**77.** From February 24, 2013, through April 16, 2013, the National Cherry Blossom Festival and its subsequent two-day cleanup took place on the National Mall. Pl.'s Ex. 31 at 611–912.

**78.** As a result of the Cherry Blossom Festival, ACC was not able to perform work on the Project on and under 17th Street, as the road was required to stay open during the Festival. *E.g.*, *id.* at 612 (Hollander noting that ACC is "[n]ot allowed back into 17th Street to complete remaining work until after April 15, 2013"); *see also* Day 4 P.M. Tr. at 10:21–11:21 (Vogt explaining that during Cherry Blossom Festival, "[t]here was limited work allowed" and "no road work" could be performed on the Project because "the road has to remain open during Cherry Blossom time").

**79.** On March 4, 2013, the USACE paid Colonial, as surety, $285,947.84 for work performed by ACC between November 21, 2012, and January 4, 2013, as reflected in ACC's Payment

Requisition No. 19. ACC actually had requested $368,107.46 under Payment Requisition No. 19, but the USACE withheld $100,000 from its payment.[4]

80.    By letter dated March 12, 2013, ACC informed Hirani that it would be out of productive work on the Project within three days due to Plaintiff and Hirani's inability to agree on the scope and price of the additional work Hirani had demanded.

81.    By letter dated March 29, 2013, ACC sent Hirani a payment demand on Payment Requisition No. 19 for work ACC had completed at the site between November 21, 2012, and February 20, 2013, in the amount of $373,189.93. *See* Pl.'s Ex. 141. According to the letter, Hirani had last paid ACC on or about December 5, 2012, for work completed through November 20, 2012. *Id.* at 1. ACC complained that the amount due on Payment Requisition No. 19 remained outstanding, even though ACC understood that the USACE had approved the work for that time period and remitted payment. *Id.* at 3–4.

82.    On April 2, 2013, a key meeting with all principals—Hirani, ACC, and Colonial—took place at National Park Services headquarters to discuss "open change orders, pay estimates not being paid, and moving forward on work and payments." *See* Pl.'s Ex. 31 at 828–29.

83.    On April 10, 2013, David Lussier, Hirani's on-site Project Manager, quit. Pl.'s Ex. 31 at 884–885, 920; Day 2 A.M. Tr. at 120:21-22.

84.    Following David Lussier's resignation from the Project, Hirani directed ACC to shut down field operations effective Monday, April 15, 2013, because the USACE and National Park Service

---

[4] The court sees no need to resolve the parties' dispute as to the reason for the withheld $100,000. Defendants do not claim that the $100,000 was withheld because that amount reflects either non-compensable work or the cost of materials not contemplated by the Subcontract. Rather, they assert that the sum was retained by the USACE, as is common for owners to do as a project nears completion. Therefore, there is no dispute as to whether the Miller Act allows ACC to seek recovery of that sum.

would not allow field operations at the Project to continue absent competent field supervision provided by Hirani. *See* Pl.'s Ex. 146; Pl.'s Ex. 30 at 897.

85. The Project site was shut down from April 15, 2013, through April 22, 2013, due to Hirani's failure to provide competent field supervision. Pl.'s Ex. 30 at 897–902; *see* Pl.'s Ex. 147.

86. On April 22, 2013, Eric Hirani called Ed Hollander to tell him Hirani had hired an on-site supervisor and asked Hollander to provide an estimated start date so that the new on-site manager could be present. Hollander thereafter began calling crew members to restart the Project the next morning. Pl.'s Ex. 31 at 917–18.

87. Work on the Project resumed on April 23, 2013, when Rob Kraus began his first day as Hirani's new Field Representative and the ACC crew returned to the Project site. *See* Pl.'s Ex. 147; Pl.'s Ex. 31 at 919–20.

88. The record evidence does not support Defendants' assertion that ACC unilaterally shut down the Project site from April 15 through April 22, 2013. In letters to Hirani dated April 14, 2013, and April 22, 2013, Ed Hollander memorialized phone calls received from Eric Hirani informing ACC that the USACE and National Park Service would not allow work on the Project site to continue without a Hirani Field Representative present. *See* Pl.'s Exs. 146, 147. Copies of these letters were sent to Robert Franklin of the USACE and Wayne Nunziata of Colonial. *See id*. The substance of these letters is corroborated by Ed Hollander's Daily Reports, *see* Pl.'s Ex. 31 at 909–18, which reflect that no work was allowed on the Project site due to Hirani's failure to have approved supervision personnel on-site, *id*. Likewise, Ms. Stephen, as Hirani's on-site Contractor Quality Control Assistant, inputted daily Hirani's Quality Control Reports during this time period reflecting that there were "[n]o trades on site due to project shutdown until such time that a Hirani

project superintendent is on site full time." *See* Pl.'s Ex. 30 at 897–902. Thus, Hirani's own records confirm ACC stopped work as ordered by the USACE.

89.     Defendants have not offered any evidence that Hirani, Colonial, or the USACE rejected Hollander's characterization of the shutdown, orally or in writing, in response to Hollander's letters of April 14 or April 22, 2013, or the Quality Control Reports submitted by Ms. Stephen, to which Hirani and the USACE had access. If ACC in fact had shut down the work unilaterally, the court would expect there to be *some* contemporaneous documentary evidence to support that position. But Defendants presented no such records. The absence of such records in a heavily documented construction project leads the court to find that the USACE ordered the mid-April shutdown.

90.     From April 24 through April 26, 2013, ACC excavated and cut the areas between the Naval Brass Channel and the 17th Street curb line on the east side. ACC began to cut the grade beam in these excavated areas from nine-feet wide to seven-feet wide, as required by Change Order BJ. Day 2 A.M. Tr. at 58:21–58:22; *see* Pl.'s Ex. 1 at 84; Pl.'s Ex. 31 at 921–26.

91.     On April 26, 2013, ACC backfilled two of the excavated grass areas adjacent to the 17th Street curb line on the east side and covered the remaining areas with lumber and plywood for backfilling the following week. Pl.'s Ex. 172 at 1; Pl.'s Ex. 31 at 925–26.

92.     By letter dated April 26, 2013, the USACE terminated the Prime Contract with Hirani for default on the Project. Pl.'s Ex. 150.[5]

93.     In the termination letter, USACE explained that it had "little confidence" that Hirani would finish the Project because Hirani had not: (1) taken necessary steps to improve its progress; (2) critical work onsite had ceased since March 22, 2013 "due to subcontractor management and

---

[5] The court makes no finding of fact as to when Hirani or Colonial received notice of this termination letter.

nonpayment issues;" (3) Hirani "had not submitted periodic progress schedules;" and (4) Hirani failed to "fulfill commitments to meet milestone deadlines necessary for completing the remainder of the [Prime] Contract." Pl.'s Ex. 150.

94.     The USACE further stated that Hirani's performance on the Project had been "beset with scheduling problems, a failure to pay subcontractors in violation of the Contract, and a demonstrated lack of diligence." *Id.*

95.     The court finds that the USACE terminated Hirani because Hirani failed to submit periodic progress schedules in accordance with its obligations under the Prime Contract and the USACE Specifications incorporated therein; Hirani failed to timely pay its subcontractors, including ACC; Hirani failed to provide on-site management on the Project; and Hirani failed to diligently manage and supervise the Project.

96.     The court's conclusion that Hirani was at fault for its own termination is bolstered by record evidence that, as of Hirani's termination on April 26, 2013, Hirani had received three interim unsatisfactory performance evaluations, a cure notice (sent merely days after Hirani entered into the Subcontract with ACC), and a show cause notice from the USACE. *See* Pl.'s Ex. 150. Notably, the April 8, 2011, Cure Notice identified many of the same deficiencies in Hirani's performance at that early stage that would eventually lead to Hirani's termination, including Hirani's failure to secure adequate Project Management staff to supervise the schedule and subcontractors as well as Hirani's late start on the Project. *See* Pl.'s Ex. 56.

97.     ACC crew did not work on the Project site on Saturday, April 27 or Sunday, April 28, and heavy rains prevented work on Monday, April 29 and Tuesday, April 30, 2013. *See* Pl.'s Ex. 30 at 911–12; Pl.'s Ex. 31 at 927–30; Day 2 A.M. Tr. at 61:13–61:20.

**98.** On April 30, 2013, Ed Hollander learned that Hirani had been terminated by the USACE. *See* Pl.'s Ex. 31 at 929–30.

**99.** By letter dated April 30, 2013, Mr. Hirani rejected USACE's Termination for Default and requested a meeting with the USACE so that the termination could be reversed. Pl.'s Ex. 151.

**100.** On May 1, 2013, Eric Hirani called Ed Hollander and told him that Hirani was fighting the termination and that ACC was not to stop work at the Project site. *See* Pl.'s Ex. 31 at 931–932.

**101.** On May 1, 2013, Ed Hollander detailed the following in his daily report:

> WORK PERFORMED TODAY: All crew members in today; Today, clean up lumber and WWF fabric mesh up off of East Side of project; Backfill remaining East Side Grade Beam cutting hole along curb line at East Side of project; Remove that covering lumber and plywood and take to staging yard; Install temporary fence at construction entrance East Side at end of day; finish grass cutting and cleanup of any trash or debris at East Side from construction operations; . . . Cleanup West Side work area of any possible remaining minor construction trash from last week work; . . . Holes were getting backfilled; safety fences were going up, and cleanup at site was occurring by ACC; Heavy equipment maintenance and cleanup and greasing in afternoon.

*Id.* at 932.

**102.** On May 1, 2013, ACC backfilled the excavated grass areas adjacent to the 17th Street curb line on the east side. Day 2 A.M. Tr. at 58:21–58:23; Pl.'s Ex. 30 at 913–14; *see* Pl.'s Ex. 1 at 88; *compare* Pl.'s Ex. 1 at 84 (April 26, 2013 photo), *with* Pl.'s Ex. 1 at 86–89 (May 2, 2013 photos).

**103.** On May 2, 2013, Hirani conducted a walk-through of the Project site with the USACE. Pl.'s Ex. 30 at 915; *see also* Pl.'s Ex. 1 at 86–89.

**104.** On May 2, 2013, Eric Hirani sent Ms. Stephen an email informing her to cease all work on the Project immediately, due to Hirani's termination. Pl.'s Ex. 152.

105. Ms. Stephen continued entering daily reports into the RMS quality control system in her role as Hirani's on-site Quality Control System Administrator until May 6, 2013. *See* Day 2 A.M. Tr. at 77:25–78:4.

**COLONIAL'S COMPLETION OF THE PROJECT**

106. After Hirani's termination, the USACE made a demand upon Colonial to satisfy its obligations under the Performance Bond. Day 4 A.M. Tr. at 17:1–17:3.

107. To finish the Project, Colonial retained the consulting firm Loewke Brill in June 2013. Day 4 A.M. Tr. at 18:22–18:23.

108. Michael Vogt is vice president of Loewke Brill, and in his role on the Project, Mr. Vogt met with Robert Franklin and John Devine of the USACE in July 2013 to discuss Hirani's termination, the status of the Project, and next steps to complete the Project. Day 4 A.M. Tr. at 20:20–21:16.

109. Loewke Brill subsequently considered the proposals of multiple potential contractors seeking to complete the Project, including proposals from ACC, Akima Construction, and Fort Myer Construction. Day 4 A.M. Tr. at 25:11–25:16, 26:16–26:23, 28:17–29:20.

110. As of September 30, 2013, the final Prime Contract price was $4,632,715.23. Defs.' Ex. 90, at 2. Twenty-seven modifications had been issued totaling $799,618.23, added to the original Prime Contract price of $3,833,097.00. *Id.* At that point, Hirani had earned but had not been paid $161,071.75. The contract balance was therefore $1,257,442.06. *See id.*

111. On September 30, 2013, the USACE and Colonial entered into a Surety Takeover Agreement. *See id.* at 2.

112. In the Surety Takeover Agreement, the USACE agreed to pay Colonial $1,257,442.06. *See id.*

**113.** Paragraph 10 of the Surety Takeover Agreement provides that the USACE would continue to assess liquidated damages at the rate of $1,379.00 for each calendar day of unexcused delay until performance is substantially complete. *Id.* at 4. As of April 26, 2013—the date of Hirani's termination—the official contract completion date, including excused delays, was July 27, 2012. *Id.*

**114.** The USACE ultimately never assessed liquidated damages against the contract balance. Day 4 P.M. Tr. at 75:6–75:7.

**115.** On September 30, 2013, Colonial entered into a subcontract with Akima Construction Services, LLC, in the amount of $1,326,244.00. *See* Defs.' Ex. 91 [hereinafter Akima Subcontract].

**116.** Akima agreed to furnish all labor, materials, services, and equipment to complete the agreed-upon scope of work. Defs.' Ex. 91, Ex. A.

**117.** Akima began performance of the Akima Subcontract on October 1, 2013. Defs.' Ex. 92.

**118.** Akima's scope of work included, among other things: excavating for grade beam, installing flowable fill, rebarring cage for the bank, installing cobblestone pavers in the roadway, digging holes and planting trees, removing construction fencing, and finalizing site cleanup. Defs.' Ex. 91, Ex. A.

**119.** Akima also performed the remainder of work left by ACC to complete Change Order BJ. *See* Defs.' Ex. 98 (line item 80-92).

**120.** To complete Option 1, Loewke Brill retained a fabricator called Structural Stone to fabricate the stone from the Carderock quarry. Defs.' Ex. 132.

**121.** To complete Option 1, Loewke Brill retained a stone installer called Lorton Stone, LLC, to install the wall cladding, coping stone, and pavers. *See* Defs.' Ex. 111.

## FINDINGS AS TO WITNESS CREDIBILTY

**122.**     Irene Stephen is a co-founder and owner of ACC and a cost accounting consultant for heavy and highway civil construction contractors.  She testified as both a fact witness and a cost accounting expert in the heavy and highway civil construction contracting industry.

**123.**     Ms. Stephen has been working as a cost accountant in the heavy and highway civil construction contracting industry for 45 years.  *See* Pl.'s Ex. 166.1.  Ms. Stephen is certified by the USACE in Construction Quality Management for Contractors.  *See* Pl.'s Ex. 166.2.

**124.**     Ms. Stephen worked as Hirani's "Alternate Contractor Quality Control System Manager" and "Quality Control System Administrator" for the Project.  In that full-time role, Ms. Stephen was expected to maintain a presence at the Project site; to assist with the scheduling, reviewing, checking, and certifying of all submittals and shop drawings; and to draft and submit daily logs memorializing the status of the Project site, known as "Contractors Daily Quality Control Reports," or QCRs.  *See* Pl.'s Ex. 77 at 16–18; *see also* Pl.'s Ex. 30.

**125.**     As a fact witness, Ms. Stephen testified about her personal knowledge and observations as Hirani's on-site Contractor Quality Control Administrator from the time Hirani and ACC executed the Subcontract to the end of ACC's presence on the Project site.

**126.**     The court found Ms. Stephen's testimony as a fact witness to be credible.  Ms. Stephen possessed a strong memory and excellent recall of the events, which she witnessed first-hand as a representative of Hirani on the Project.  Ms. Stephen is the only witness called during trial who was present on the Project site nearly every day, and the court found her testimony regarding progress on the Project site to be reliable and helpful.  To the extent that Ms. Stephen's testimony regarding the state of affairs on the Project may be biased by her interest in the outcome of the

litigation, the court is assured that the testimony of Ms. Stephen it relies on is also substantiated by record evidence admitted at trial and other witness testimony.

127.    As an expert witness, Ms. Stephen offered her opinion on the reasonable markup for the highway and heavy construction industry and project overhead in the District of Columbia area from 2011 to 2013.   Ms. Stephen further offered her opinion as to the reasonable value of Ed Hollander's services as ACC's on-site supervising Project Manager.  Day 1 A.M. Tr. at 52:23–53:3.

128.    The court found Ms. Stephen's testimony as an expert witness to be credible.

129.    Jitendra Hirani is the president of Hirani.  Mr. Hirani testified as a fact witness.

130.    At trial, Mr. Hirani testified as to his personal knowledge and observations from the time Hirani first bid on the Project until Hirani's termination by the USACE.

131.    Generally speaking, the court found Mr. Hirani not to be credible or helpful, certainly relative to Ms. Stephen.  Mr. Hirani was defensive and hostile in answering questions posed by ACC's counsel on direct examination, and often responded that he could not recall or did not remember key events central to the dispute between Hirani and ACC and to Hirani's termination from the Project.  Mr. Hirani spent little time at the Project site, and there was little documentary evidence presented to corroborate Mr. Hirani's version of events.

132.    Mr. Hirani testified that he personally asked ACC to submit scheduling information "50 to 100 times" and that, each time, ACC refused to submit the information upon demand, as required by the Subcontract.

133.    The court does not credit Mr. Hirani's testimony with regard to ACC's role in the scheduling of the Project.  Mr. Hirani was unable to articulate how and when he asked ACC for these scheduling updates, nor how and when ACC rejected or ignored his requests.  Moreover,

Mr. Hirani's assertion that he unsuccessfully asked ACC for scheduling information "50 to 100 times" is unsupported by any record evidence, such as correspondence or emails with ACC. The first such correspondence is dated February 18, 2013, almost two years after the parties entered into the Subcontract. The lack of such records, when the Project otherwise was heavily documented, leads the court to find that ACC did not refuse to submit scheduling information as claimed by Mr. Hirani.

134.    Michael Vogt is an executive vice president of the construction consulting firm, Loewke Brill Consulting Group. Mr. Vogt became involved in the Project after Hirani was terminated by the USACE, at which time Colonial hired Loewke Brill to assist in the Project's completion in or around June 2013. Day 5 A.M. Tr. at 11:22-12:8, 16:18–18:15. On the Project, Mr. Vogt served as the Quality Control System Manager for Colonial. Day 5 A.M. Tr. at 81:21–82:12. Mr. Vogt testified as a fact witness.

135.    As a fact witness, Mr. Vogt testified about his personal knowledge and observations about the completion of the Project following Hirani's termination, including the status of the Project after ACC left the site, and the hiring of Akima Construction and other subcontractors to complete the Project.

136.    The court found Mr. Vogt to be a credible witness. Mr. Vogt was a forthright and honest witness, who gave detailed testimony regarding the events he witnessed firsthand after Hirani's termination until Colonial's eventual completion of the Project.

137.    Fred Ricky Janeiro is the president of Roubin & Janeiro, d/b/a Janeiro, Inc. Janeiro is a local stone contractor that furnishes and installs natural stones.

**138.** The court found Mr. Janeiro to be a credible witness. Mr. Janeiro testified honestly and helpfully regarding ACC's work on Option 1, Janeiro's involvement in locating suitable stones for cladding and coping of the permanent levee walls, and resolution of the geometry "bust."

**139.** Robert Franklin is a project engineer for the USACE who was tasked with management and oversight of the Project. Day 5 A.M. Tr. at 24:1–24:22. Mr. Franklin testified as a fact witness.

**140.** As a fact witness, Mr. Franklin specifically testified about progress (or lack thereof) on the Project from January through April 2013, as well as the decision to terminate Hirani. Mr. Franklin asserted that Hirani was terminated in part because ACC failed to progress the work on the Project beginning in mid-March 2013 due to disputes between ACC and Hirani regarding payment. Mr. Franklin also asserted that the USACE *did not* prohibit ACC and Hirani from continuing field operations at the Project due to inadequate on-site supervision by Hirani.

**141.** Mr. Franklin testified to the best of recollection, but he had difficulty accurately recalling details of the Project during the critical time period of mid-March 2013 through early May 2013. The record evidence refutes key portions of Mr. Franklin's testimony, most notably his testimony that (1) the USACE had not ordered ACC to stop work in April 2013 because of the absence of a Hirani on-site Project manager and (2) ACC had essentially ceased doing productive work during this period without cause. The court therefore does not credit Mr. Franklin's testimony to the extent it was inconsistent with record evidence.

**142.** Although he did not testify, the court accepted for their truth statements made by Eric Hirani, as reflected in correspondence prepared by ACC or in ACC's Daily Reports. *See supra* ¶¶ 86, 88, 100, 104. As discussed below, ACC's records are admissible under the business records exception, *see* Fed. R. Evid. 803(6), and Eric Hirani's statements contained therein are not hearsay and are admissible under Federal Rules of Evidence 801(d)(2)(C) and (D).

## DOCUMENTS RELIED ON BY THE COURT

**143.**     In making its findings of fact, the court has relied on the contemporaneous photos Ms. Stephen took of the Project site.  *See* Pl.'s Ex. 1.  According to Ms. Stephen, taking such photos was a regular practice of hers on construction jobsites, and she took photos of the Project site for ACC.  *See* Day 2 A.M. at 43:18–44:7.  The parties stipulated during trial that the dates superimposed on these photographs in yellow text derive from metadata within the photo file, and are therefore assumed to be correct.  Day 2 P.M. Tr. at 32:11–33:9.

**144.**     In making its findings of fact, the court has relied on Ed Hollander's Daily Reports documenting his activities as ACC's Field Superintendent on the Project and all work activities on the Project.  *See* Pl.'s Ex. 31. The Daily Reports are admissible as business records of ACC.  *See* Fed. R. Evid. 803(6); *see also Equity Lifestyle Props., Inc. v. Fla Mowing & Landscape Serv.*, *Inc.*, 556 F.3d 1232, 1243–44 (11th Cir. 2009) (holding that invoices based upon a foreman's daily reports were admissible as business records); *Just Wood Indus., Inc. v. Centex Const. Co.*, 188 F.3d 502, No. 98-1855, 1999 WL 606859, at *6 (4th Cir. Aug. 12, 1999) (holding that subcontractor's daily log book met the business records exception); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981) (holding that drilling company's daily reports were admissible under business records exception); *cf. United States v. Bess*, 75 M.J. 70, 74 (C.A.A.F. 2016) (holding that daily muster reports qualified as admissible business records).  These Daily Reports were "made at or near the time by" Mr. Hollander, someone with knowledge; the reports were "kept in the course of a regularly conducted activity of a business"; making these reports was "a regular practice" of that business activity; and the court has not been shown that these reports were prepared in such circumstances as to suggest a lack of trustworthiness.  *See id*. at 73–74; Fed. R. Evid. 803(6).  Although Mr. Hollander is deceased and unavailable to testify as to the accuracy of

these reports, the court finds the Daily Reports to be a reliable recounting of events as they occurred. Additionally, the court has gone to great lengths to substantiate information it relied on within these Daily Reports with other record evidence and witness testimony.

**145.** In making its findings of fact, the court has relied on Hirani's daily QCRs. *See* Pl.'s Ex. 30. As the on-site quality control manager for Hirani, Ms. Stephen was required to draft and input these reports into the Resident Management System ("RMS") on a daily basis. These documents are admissible as business records of Hirani. *See* Fed. R. Evid. 803(6). These daily reports were "made at or near the time by" Ms. Stephen, someone with knowledge as a Hirani representative; the reports were "kept in the course of a regularly conducted activity of a business"; making these reports was "a regular practice" of that business activity; and the court has not been shown that these reports were prepared in such circumstances as to suggest a lack of trustworthiness. *See id.* Ms. Stephen verified the accuracy of the reports' contents, and contemporaneously drafted these daily reports in her regular practice as Hirani's quality control representative. Additionally, the QCRs are admissible as statements under Federal Rules of Evidence 801(d)(2)(C) and (D). Ms. Stephen was Hirani's representative on the Project at the time she completed the QCRs.

## CONCLUSIONS OF LAW

Having set forth its findings of fact, the court turns now to make its conclusions of law. For reasons that will become obvious, the court begins with Colonial's counterclaims, before turning to Plaintiff's claim under the Miller Act and for breach of contract.

## I.    COLONIAL'S COUNTERCLAIMS

At the heart of each of Colonial's counterclaims is the assertion that ACC's failures to perform breached the Subcontract, causing Colonial to incur substantial losses, costs, and expenses in the amount of $723,049.14 to complete the Project. To prevail on a claim of breach of contract,

a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Window Specialists, Inc.*, 106 F. Supp. 3d at 88; *see also Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).[6] "A 'breach' is 'an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages.'" *Window Specialists, Inc.*, 106 F. Supp. 3d at 88 (quoting *Fowler v. ABA Co.*, 262 A.2d 344, 347 (D.C. 1970)). "A material breach is one where the injured party received something substantially less or different from that for which [it] bargained." *Id.*

Colonial contends that ACC breached the Subcontract in two material ways. First, Colonial maintains that ACC failed to progress the work on the Project after ACC demanded, but did not receive, payment for Requisition No. 19 from Hirani, in violation of Paragraph 14.1 of the Subcontract. Second, Colonial claims that ACC breached Paragraph 2.2 of the Subcontract by failing to provide Hirani with scheduling information. According to Colonial, these material breaches of the Subcontract caused the USACE to terminate Hirani and to make a claim against the Performance Bond issued by Colonial. The court considers each of these alleged breaches in turn.

### A.  ACC Did Not Fail to Substantially Progress the Work

Under Paragraph 14.1, ACC agreed that, in the event a "dispute, controversy[,] or question" arose in the interpretation of the Subcontract, ACC would not stop or delay performance of the Work or delivery of labor or material, but would continue to work "pending the determination of such dispute or controversy." Subcontract at Art. XIV, § 14.1. Relying on the testimony provided by Robert Franklin, Colonial asserts that ACC violated Paragraph 14.1 of the Subcontract by

---

[6] As the court already has found, District of Columbia law governs the claims arising out of the Subcontract. *See* Mem. Op. at 27 n.8.

delaying work on the Project because of its ongoing dispute with Hirani regarding non-payment of Requisition 19. *See* Defs.' FOF & COL at 35–37. According to Colonial, once engaged in this payment dispute, ACC unilaterally suspended operations at the Project site after David Lussier's resignation and failed to perform any critical work to progress the project from March 2013 through Hirani's termination on April 26, 2013.

Based on the record evidence and the testimony of witnesses at trial, the court rejects Colonial's view of the final months of the Project. Because ACC did not unilaterally suspend operations on the Project from April 15 through April 22, 2013, and because it progressed the available work during the relevant period, the court concludes that ACC did not breach Paragraph 14.1 of the Subcontract.

### 1. *The April 2013 Shutdown Was Not Unilateral*

Colonial's claim that ACC unilaterally suspended operations on the Project following David Lussier's resignation lacks record support. The court has found that the Project site shutdown from April 15 through April 22, 2013, was caused by Hirani's failure to provide competent field supervision as ordered by USACE. *See supra* ¶¶ 85–89. Contemporaneous business records in the form of ACC's Daily Reports, Hirani's QCRs, and correspondence between ACC and Hirani confirm that the shutdown was due to Hirani's failure to provide on-site supervision. Notably, one Daily Report reflects that Eric Hirani informed ACC that it could resume work upon Hirani's hiring of an on-site Project manager, and that he planned the on-site manager's start date to coincide with the first day that the work resumed. *See* Pl.'s Ex. 31 at 918. Moreover, it is simply implausible that ACC could have unilaterally shut down the Project without a single record documenting or protesting such a shut down. Had ACC acted as Colonial insists, surely there would exist in the record at least one piece of paper from either Hirani, the USACE,

or the National Park Service reflecting or objecting to ACC's complete work stoppage. But there is no such record.

Accordingly, the court finds that ACC did not breach the Subcontract by unilaterally shutting down the Project site.

## 2. ACC Progressed Work on the Project

Relying predominately on Robert Franklin's testimony, Colonial maintains that certain critical path items were available to ACC to complete from mid-March 2013 until Hirani's termination, but that ACC did only meaningless work and willfully delayed progress on the Project because of the payment dispute. This contention lacks sufficient evidentiary support.

Mr. Franklin testified that the following "critical path" work was available to ACC, but not performed, during the time period of mid-March 2013 through April 2013: (1) installing the stone on the stem walls; (2) working on the grade beam sections between caissons 12 and 13, and caissons 13 and 14; and (3) trimming the east-side grade beam pursuant to Modification BJ. *See* Day 5 A.M. Tr. at 26:20–28:2, 36:18–37:7. Despite Mr. Franklin's forthright demeanor at trial, the court does not credit Mr. Franklin's recollection about the work available to ACC during the relevant time period because it is directly contradicted by record evidence. Each item identified by Mr. Franklin as "available" to ACC after March 2013 was actually unavailable due to delays and events beyond ACC's control, or ACC actually performed the work.

First, contrary to Mr. Franklin's testimony, ACC could not even begin to cut the stone required to complete Option 1 until March 21, 2013, when Mr. Franklin responded to RFI No. 122 and approved the use of two-inch thick stone cladding and a joint width of three-eighths inch. Pl.'s Ex. 43 at 262. Critically, upon receiving this approval, on March 26, 2013, Ed Hollander submitted to Hirani and the USACE, including Mr. Franklin, an "aggressive" schedule to move forward on

Option 1, with a projected completion date at the end of July 2013. *See* Pl.'s Ex. 139. The schedule contemplated mid-April as the earliest time for installing the stone—work that would be done by Janeiro, not ACC—and that most of that work would occur after May 1. *See id.* Before May 1, nearly all the stone cladding-related work was to be done off-site. *See id.* at 3 (showing design, fabrication, and delivery work prior to May 1). Thus, there was little available stone work at the Project site itself during the period that Mr. Franklin claimed ACC was not progressing the work.

Second, from February 24, 2013, through April 16, 2013, the National Cherry Blossom Festival prevented ACC from performing work in and on 17th Street—the precise location of the grade beam supported by Caissons 12, 13, and 14. In other words, because ACC did not have access to the roadway for seven weeks in the spring of 2013, ACC could not work on the grade beam sections between caissons 12 and 13, and 13 and 14, as Mr. Franklin recalled.

And finally, Mr. Franklin's testimony that ACC did not perform the work required by Change Order BJ, or "even begin to cut the grade beam" on the east side of 17th Street, was plainly erroneous. *See* Day 5 A.M. Tr. at 28:5–28:16. Photographs show ACC excavated and cut the east side grade beam on April 26, 2013, as required by Change Order BJ. Pl. Ex. 1 at 84–85. Moreover, it is noteworthy that while Change Order BJ was issued to Hirani for $59,033, *see* Pl.'s Ex. 123 at 5, upon Akima's completion of Change Order BJ, Akima was paid only $9,115.33, *see* Defs.' Ex. 98 (line 87). Those different amounts make clear that ACC did the bulk of the work required to complete Change Order BJ before Akima came on the scene.

In summary, ACC's final six weeks on the job was beset with delays and work stoppages that were beyond ACC's control. When ACC *could* work it did. Therefore, the court rejects Colonial's assertion that ACC failed to progress the Project in violation of the Subcontract's dispute clause.

### B.    ACC Did Not Fail to Provide Scheduling Information

Colonial next argues that ACC violated Paragraph 2.2 of the Subcontract by failing to timely provide essential scheduling information in the form required by Hirani. Paragraph 2.2 required ACC, "if requested," to "furnish all scheduling information in such form and detail as required by [Hirani], to the satisfaction [of] [Hirani]," within seven days of the request. Subcontract at § 2.2.

As the court already has found, *see supra* ¶¶ 129–33, Mr. Hirani's insistence that he demanded scheduling information from ACC "50 to 100 times" is not credible. Mr. Hirani was unable to articulate how and when he asked ACC for these scheduling updates, nor how and when ACC rejected his requests. Additionally, there is no evidence that Hirani made any written demand for scheduling information prior to Hirani's letters to ACC dated February 18, 2013, and March 22, 2013. Not by coincidence, Hirani sent these letters only *after* the USACE issued Hirani a Cure Notice on February 14 of that year. *See* Defs.' Exs. 54, 62. Nor is there any evidence of any demand by Hirani that ACC submit scheduling information in a form conducive to creating a "Primavera" schedule—a type of scheduling software—as Colonial now suggests was required. *Cf.* Defs.' Rebuttal at 7 ¶ 56. This absence of evidence leads the court to conclude that ACC did not repeatedly refuse Hirani's scheduling demands, as Colonial maintains.

The record evidence, in fact, supports the conclusion that ACC *did* regularly provide scheduling information to Hirani, in the form of (1) outlines of work already performed on site, *see* Pl.'s Ex. 29; and (2) three week "look-ahead" schedules, *see* Pl.'s Ex. 41; as well as (3) the Option 1 schedule, Pl.'s Ex. 139. *See also* Defs.' Rebuttal at 7 ¶ 56 (conceding receipt of the listed scheduling information). Hirani's QCRs also provided daily updates on the work's progress. *See* Pl.'s Ex. 30. Other than Mr. Hirani's incredible testimony, Colonial presented no evidence of any

expressed dissatisfaction with these forms of scheduling information prior to February 2013. ACC thus did not violate Paragraph 2.2 of the Subcontract by failing to provide scheduling information to Hirani, as requested.

*     *     *

In light of the foregoing, the court concludes that Colonial has not established by a preponderance of the evidence that ACC breached the Subcontract. Therefore, as to Colonial's counterclaims, the court finds in favor of ACC.

## II.     ACC'S CLAIMS

Having concluded that ACC did not breach the Subcontract, the court proceeds to ACC's Miller Act and breach of contract claims.

### A.     Miller Act Claim

Count II of Plaintiff's Second Amended Complaint seeks *quantum meruit* damages against Colonial pursuant to the Miller Act for Colonial's failure to pay ACC for the reasonable value of labor, services, materials, and equipment that ACC furnished to the Project. Colonial primarily advances a statute of limitations defense. It asserts that ACC is not entitled to recover any damages under the Payment Bond, because ACC failed to bring its Miller Act claim within one year after the last day on which ACC performed compensable work on the Project, as required under the Act.

The Miller Act requires prime contractors, like Hirani, to obtain performance and payment bonds, which guarantee performance of the contractor's contractual duties and payment to subcontractors and suppliers. 40 U.S.C. § 3131. The payment bond protects "all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person," including subcontractors. *Id.* § 3131(b)(2).

To state a valid Miller Act claim, a subcontractor "must prove essentially two elements: (1) it has 'furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131'; and (2) it 'has not been paid in full within 90 days.'" *United States ex rel. Tenn. Valley Marble Holding Co. v. Grunley Constr.*, 433 F. Supp. 2d 104, 114 (D.D.C. 2006) (quoting 40 U.S.C. § 3131(b)(1)). Such a claim "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4). "When the statute of limitations begins to run on a claim under the Miller Act is necessarily a fact-intensive inquiry." *See* Mem. Op. at 16 (citing *Ex parte Sw. Sur. Ins. Co.*, 247 U.S. 19, 20 (1918)). The contractor bears the burden of proving that it performed compensable work within the limitations period. *See United States v. Cont'l Ins. Co.*, 776 F.2d 962, 964 (11th Cir. 1985).

At the summary judgment stage, the court considered the various approaches that courts around the country have used to determine what constitutes the "last of the labor [ ] performed or material [ ] supplied" for purposes of the one-year limitations period. Mem. Op. at 16–18. Evaluating these approaches in light of the Miller Act's statutory text and broad remedial purpose, the court concluded that, in order to avoid engaging in a "subjective line-drawing exercise," it would "simply look to the contract to determine for what tasks the parties agreed the subcontractor would be compensated, then determine the last date on which the subcontractor supplied materials or labor for one of those tasks." *Id.* at 18; *cf. Hensel Phelps Constr. Co. v. Cooper Carry Inc.*, 861 F.3d 267, 274 (D.C. Cir. 2017) (assessing whether breach of contract claim was time barred by looking solely to the "plain terms" of the contract and explaining that "it is objective language, not subjective intent, that guides our analysis"). Accordingly, to determine whether ACC brought a timely Miller Act claim, the court must: "(1) identify the compensable tasks to which the parties

agreed, as set forth in the subcontract, and (2) determine the last date on which labor was performed or materials were supplied for any one of those tasks." *Id.* at 19.[7]

The court concludes that ACC timely filed its Miller Act claim on April 29, 2014. ACC last performed compensable work under the Subcontract on May 1, 2013, when it (1) backfilled the east side grade beam cutting hole along the curb line, as required by Change Order BJ, and (2) supplied equipment to perform that work. *See* Pl.'s Ex. 123 at 4; *see also* Subcontract at Sch. B., Pt. 14 (providing that ACC "shall provide all grading including all excavation & backfill as per the plans and specifications").[8] The court reaches this conclusion based on the following record evidence: (1) photographs of the Project site depicting the east side grade beam area during the relevant time period; (2) the testimony of Ms. Stephen; and (3) the daily reports of ACC and Hirani, which recorded the events that took place on the Project site on May 1, 2013. This evidence is described further below.

Colonial contends that ACC's backfilling of the east side grade beam area does not constitute compensable work performed within the applicable limitations period for two reasons: (1) no photographic evidence or eyewitness testimony establishes that ACC actually backfilled the area on May 1, 2013; and (2) even if backfilling did occur on that date, backfilling of the east side grade beam area is not compensable under the Subcontract or Change Order BJ. *See* Defs.' FOF & COL at 41–44; Defs.' Rebuttal at 30–31 ¶ 8. The court finds neither of these arguments convincing.

---

[7] ACC attempts to dissuade the court from applying this test, *see* Pl.'s FOF & COL at 61 ¶¶ 5–7, but the court declines to revisit the law of the case.

[8] The court therefore need not consider Plaintiff's alternative arguments that work performed by Ed Hollander on the Project site between April 29, 2013, through May 1, 2013, as well as fencing work and cleanup performed by ACC during that time period are compensable tasks under the Subcontract and thus occurred within the one-year limitations period. *See* Pl.'s FOF & COL at 61–63 ¶¶ 8–10.

*1.     On What Date Did ACC Backfill the East Side Grade Beam?*

As to its first argument, Colonial insists that ACC has not shown that compensable work took place on May 1, 2013, because ACC failed to come forward with any photographic or firsthand testimonial evidence that backfilling occurred on that date. The absence of such *direct* evidence, Colonial says, means that such work could have been performed on April 27, 28, or 29 (outside the one-year limitations period) or even by someone other than ACC. *See* Defs.' FOF & COL at 48.[9]

The flaw in Colonial's position is that ACC presented sufficient *circumstantial* evidence to show that it backfilled the east side grade beam area on May 1, 2013. *See Standardized Civil Jury Instructions for the District of Columbia*, § 2.03 (2018) ("The law says that both direct and circumstantial evidence are acceptable as a means of proving a fact. The law does not favor one form of evidence over another."). Colonial points out that Ms. Stephen was not present on the Project site on May 1, 2013, due to illness. But her observations as to what occurred on the days before and after May 1, 2013, establish that backfilling took place on that date. *See* Day 2 A.M. at 58:21–62:12. Ms. Stephen testified that she was at the Project site on April 26 when ACC excavated the east side grade beam. She further knew that ACC had performed no work on the site from April 27 through April 30, in part because of rain. *See id.* When she returned to the Project site on May 2, Ms. Stephen stated, she observed that the east side grade beam area that previously had been excavated was now backfilled, leading her to conclude that the work had been performed the day before. *See id.* Though this testimony qualifies as circumstantial evidence, it

---

[9] Defendants also assert, based on Robert Franklin's testimony, *see* Day 5 A.M. at 28:14–28:16, that ACC never even started to cut the east side grade beam. Defs.' FOF & COL at 42; Final Arg. Tr. at 54:7–54:8. As discussed, this testimony was refuted by other record evidence.

nevertheless shows that ACC backfilled the east side grade beam area on May 1, 2013. *See Standardized Civil Jury Instructions*, § 2.03 (overnight falling of snow example).

Other evidence corroborates Ms. Stephen's recollections. Photographs taken on April 26, 2013, depict the exposed east side grade beam area covered with plywood. *See* Pl.'s Ex. 172 at 1–5. Then, photographs taken on May 2, 2013, depict the previously exposed areas now backfilled, *see id.* at 6–9; *see also* Day 5 A.M. Tr. at 66:4–66:7 (Robert Franklin reviewing these photos and testifying that the area portrayed on April 26, 2013, covered with plywood is the same area shown backfilled on May 2, 2013). In between these two dates, both Hirani's QCRs and ACC's Daily Reports confirm that ACC did no work from April 27 to April 30. *See* Pl.'s Ex. 30 at 910–912; Pl.'s Ex. 31 at 925–30 (no reports for April 27 and April 28, which were a Saturday and Sunday; reports for April 29 and April 30 indicate no work due to, at times, "heavy" rains). Therefore, the backfilling must have occurred on the first day after April 26 that ACC worked on the Project site, which was May 1, 2013.

Though there is sufficient circumstantial evidence to support that finding, there is also *direct* evidence. Hirani's QCR for May 1, 2013, states under the heading "Activities in Progress": "Backfill east side grade beam." Pl.'s Ex. 30 at 913. ACC's Daily Report is to the same effect. It memorializes that the east side grade beam areas, temporarily covered with plywood the previous week, were backfilled on May 1: "Backfill remaining East Side Grade Beam cutting hole along curb line at East Side of project; Remove that covering lumber and plywood and take to staging yard." Pl.'s Ex. 31 at 931–32. These records thus corroborate the logical inference the court draws from Ms. Stephen's testimony and the photographs taken on April 26 and May 2, 2013, namely, that ACC backfilled the east side grade beam area on May 1, 2013.

Accordingly, based on the foregoing evidence, the court finds that ACC's "last of the labor [ ] performed," 40 U.S.C. § 3133(b)(4), occurred on a date within the one-year limitations period.

### 2.    *Was Backfilling Compensable Work under the Subcontract?*

Next, Colonial argues that, even if backfilling occurred on May 1, 2013, ACC's Miller Act claim is still untimely. According to Colonial, because Change Order BJ does not expressly identify "backfilling" as a covered task, *see* Pl.'s Ex. 123 at 4, it was not compensable work under the Subcontract. Therefore, the day on which backfilling occurred under Change Order BJ, May 1, 2013, cannot qualify as the "last of the labor [ ] performed" for purposes of the one-year limitations period.

By pressing this argument, Colonial demands a literal reading of Change Order BJ that defies common sense. Change Order BJ provides that:

> The contractor shall supply the labor, equipment, and materials to trim the concrete and the rebar from the east side grade beam in accordance with the drawings that were provided with the RFP. The top of the grade beam should be saw cut to create a clean cut line across the top. The rebar will be removed to a depth of 1" below the concrete surface. Non-shrink epoxy mortar will be used to repair the concrete surface
>
> The grade beam modification will only occur in the areas where the grass meets the grade beam. The grade beam will not be modified in the areas where the roadway and sidewalk meet the grade beam.

Pl.'s Ex. 123 at 4. To be sure, the text of Change Order BJ does not expressly address backfilling. But common sense leads to the conclusion that, to complete Change Order BJ, ACC not only had to excavate the ground and cut the grade beam, but it also had to backfill the open hole. Surely, the USACE would not have accepted Change Order BJ as complete if ACC had walked away with a gaping hole in the ground along the path of the grade beam, leaving the grade beam exposed. A common sense reading of Change Order BJ therefore supports the conclusion that it encompassed

backfilling as compensable work. *Cf. Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) (avoiding interpretation of settlement agreement that "would yield absurd results" (citing *United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996)).

In further support of its position, Colonial points to Change Order AY, which does expressly refer to backfilling. But Change Order AY does not help Colonial's cause. Change Order AY, issued on the same date as Change Order BJ, pertains to electrical wiring for the west side. *See* Pl.'s Ex. 123 at 3–4. Change Order AY requires the contractor to "provide all labor, materials, and equipment to install the electrical wiring and conduit on the west side of 17th Street" and further provides that "[t]he existing soil (minus organics and large rocks), will be used to backfill the excavation." *See id.* at 3. As the quoted text demonstrates, the USACE expressly provided for backfilling in the context of Change Order AY because such backfilling was to be performed in a specific manner using specific materials. By contrast, the absence of a similar instruction in Change Order BJ does not mean that backfilling of the excavated east side grade beam was outside the scope of the modification; rather, it suggests only that the USACE did not require the contractor to use any particular material for that purpose. Colonial's reliance on Change Order AY is therefore unpersuasive.

Finally, it is notable that, after Hirani's termination, Akima received compensation for backfilling as part of its work to complete cutting the east side grade beam. *See* Pl.'s Ex. 171 at 4, 8 (invoice from Akima subcontractor, Asher Construction, Inc., describing work of excavating along the grade beam, coating the beam, "and backfill"). As Mr. Vogt testified, Akima's scope of work under the Akima Subcontract did not exceed ACC's work under its Subcontract with Hirani. *See* Day 4 A.M. at 77:13–77:16. Akima's receipt of compensation for backfilling the excavated

east side grade beam area is further proof that backfilling was a compensable activity under Change Order BJ.

*  *  *

In view of the foregoing, the court concludes that ACC has satisfactorily shown by a preponderance of the evidence that it performed compensable work under the Subcontract within one year of filing its Miller Act claim on April 29, 2014. Furthermore, ACC has established that (1) it "furnished labor or material in carrying out work provided for in a contract for which payment bond is furnished under section 3131" and (2) it was not "paid in full within 90 days." 40 U.S.C. 3133. The court therefore will enter judgment in favor of ACC on its Miller Act claim.

### B.  Breach of Contract Claim

Count I of the Second Amended Complaint seeks relief against Hirani for breach of contract. ACC asserts that Hirani breached the Subcontract by: (a) failing to pay ACC for work performed after November 21, 2012, through May 1, 2013; (b) failing to provide constant Project on-site supervision; (c) failing to update the baseline schedule per contract requirements so as to demonstrate the effect of the government's responsibility for causes of delay; and/or (d) causing the Prime Contract with the USACE to be terminated on April 26, 2013, due to Hirani's failure to provide updated schedules and failure to pay ACC for work performed for the last five months of its subcontract performance. *See* Pl.'s FOF & COL at 64.

For essentially the same reasons already discussed, the court finds in favor of ACC on its breach of contract cause of action against Hirani. Put simply, Hirani breached the Subcontract by refusing to pay ACC for the work that it performed, *see supra* ¶ 81, and Hirani had no valid justification for doing so. The court therefore will enter judgment in favor of ACC on its breach of contract claim against Hirani.

## REMEDIES

Having determined the outcome of ACC's claims and Colonial's counterclaims, the court moves on to determine an appropriate damages award.

## I.   QUANTUM MERUIT DAMAGES

ACC asserts that its *quantum meruit* damages total is $2,172,285.30, as summarized below. *See* Pl.'s Ex. 169.[10]

| | |
|---|---|
| Subcontractors | $786,069.82 |
| Rented Equipment | $138,135.34 |
| Materials | $605,752.90 |
| On-site ACC Field Labor | $1,024,019.23 |
| USACE Region II Ownership Equipment Rates | $540,250.12 |
| Ed Hollander Supervision for 102 weeks | $306,000 |
| 35% Gross Markup Margin | $1,190,079.59 |
| Loss of Fencing Salvage Value | $43,046.95 |
| Janeiro's Stone Shop Drawings | $53,975.00 |
| | Credit ($2,515,043.65) |
| | **TOTAL $2,172,285.30** |

Defendants raise a host of objections to this damages calculation, to which the court now turns.

### A.   Equitable Adjustment Under the Federal Acquisition Regulations

The court first considers Defendants' assertion that ACC is barred from recovering more than the original price of the Subcontract because ACC provided Hirani no notice of any request for an equitable adjustment within 30 days of receipt of any change order. *See* Defs.' FOF & COL at 48.   Under what is known as the "Changes Clause," federal regulations provide that a "[c]ontractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written [change] order."   48 C.F.R. § 52.243-1; *see also* Subcontract 4.1 (stating

---

[10] As ACC concedes, *see* Pl.'s Rebuttal at 32–33 ¶¶ 108-14, Defendants cannot be liable for any costs incurred prior to the April 4, 2011, formation of the Subcontract.  Some of the invoices and checks included in Plaintiff's Exs. 32, 33, and 34, however, predate the Subcontract.  Although ACC agrees that such costs are not recoverable, it is not clear to the court whether they are part of the damages computation.  Accordingly, ACC will have to sort through these exhibits to exclude those non-recoverable items and provide the court with updated damages summaries.

that the "subcontractor acknowledges and agrees that it shall make no claim for extra or additional compensation on account of any such work," unless authorized in writing by Hirani). Because ACC did not comply with the Changes Clause, Defendants maintain, ACC cannot recover costs associated with any of the change orders. The court rejects this argument for two reasons.

First, even if the Changes Clause is incorporated into the Subcontract[11]—ACC does not contend otherwise—the Clause on its face does not apply as between a prime contractor and subcontractor. The Clause provides that a "Contractor" must assert its right of adjustment within 30 days after receipt of a change order or other written notice by "submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government." 48 C.F.R. § 52.243-4(e). The references in the regulation to "Contractor," "Contracting Officer," and "Government" make clear that the Changes Clause concerns a change to the prime contract, that is, the agreement the between the prime contractor and the United States. It does not impose any notice requirements on a subcontractor of the prime contractor.

The very case that Defendants rely upon, *U.S. ex rel. Sequoia Electric, LLC v. Guarantee Co. of N.A.*, Case No. 2:14-cv-2045 JCM (VCF), 2018 WL 1320042 (D. Nev. March 14, 2018), is consistent with this interpretation. There, the court held the subcontractor could not obtain an equitable adjustment because it had failed to make a timely request to the prime contractor within 10 days, as required under the *subcontract*. *Id.* at *3. The court observed that the 10-day period was included in the subcontract to allow enough time for the *prime contractor* to submit its right of adjustment to the government within 30 days *to the government*, as required under the Changes Clause. *See id.* at *3 & n.2; *see also U.S. ex rel. Duncan Pipeline, Inc. v. Walbridge Aldinger Co.*,

---

[11] The court makes no legal determination as to whether the Subcontract incorporates the Changes Clauses.

No. CV411-092, 2013 WL 1338392, at *12–13 (S.D. Ga. Mar. 29, 2013) (similarly interpreting a 14-day notice obligation contained in a subcontract "so that [the prime contractor] could then satisfy any obligations it may have had with the Corps"); *cf. Conner Bros. Const. Co. v. United States*, 65 Fed. Cl. 657, 670 (2005) ("The spirit and purpose of an equitable adjustment, such as that sought by plaintiff here, is to benefit the contractor and make it whole for changes ordered by the government."). Thus, *Sequoia Electric*'s discussion of the subcontractor's obligations refers only to the notice requirement of the subcontract, not the Changes Clause. Defendants cite no authority for the proposition that the Changes Clause extends to a subcontractor like ACC.

Second, even if the Changes Clause applies as between Hirani and ACC, Defendants have shown no prejudice from the purported absence of notice. Although the regulation contains a time limit for providing notice, "[w]ritten notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts." *K-Con Bldg. Sys., Inc. v. United States*, 100 Fed. Cl. 8, 30 (2011) (internal quotation marks and citation omitted). Thus, "[i]f the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs." *Id.* (internal quotation marks and citation omitted). Here, Defendants do not dispute (nor could they) that Hirani was on notice of the various change orders issued by the USACE. Moreover, as to unanticipated site conditions or design defects, Hirani had actual knowledge of them because Ms. Stephen, as Hirani's representative, was present on the site every day. Hirani also received constructive notice of unexpected developments through, among other records, the QCRs, correspondence from Ed Hollander, and three-week look-ahead schedules. *See* Pl.'s Rebuttal ¶¶ 120–126 (listing examples of such records). Thus, to the extent Defendants now

claim that they suffered prejudice from a purported lack of notice because it precluded *them* from seeking an equitable adjustment from the USACE, *see* Defs.' FOF & COL at 48, that assertion simply is not supported by the record.

### B.     Markup on Direct Expenses

A substantial portion of the damages that ACC seeks—$1,190,079.59—consists of "[r]easonable gross markup of ACC's performance throughout the Project from April 2011 through May 1, 2013[.]" Pl.'s FOF & COL at 59 ¶ 262.  Ms. Stephen testified that, when ACC submitted its bid to Hirani, it included a 35% markup of its direct costs, a percentage that she described was "not untypical" within the civil construction industry in the Washington, D.C., area. *See* Day 2 PM at 85:8–86:1. Defendants object to the 35% markup, asserting that Ms. Stephen's testimony was not sufficient to support that percentage as an industry norm.  Defs.' Rebuttal ¶¶ 261–62.

The court finds that the 35% markup as a component of Plaintiff's damages calculation is reasonable and consistent with the industry standard in this locality.  To be certain, evidence that the 35% markup was customary came largely from Ms. Stephen.  But her testimony was sufficient to sustain Plaintiff's burden for several reasons.  First, the court accepted Ms. Stephen's testimony not only as a percipient witness, but also as an expert in cost accounting in the heavy and highway civil construction and found her to be credible.  *See* Findings of Fact, *supra*, ¶¶ 123–24, 127–28. Second, Ms. Stephen's testimony concerning the reasonableness of the 35% was based on her experience in the industry, including her work as a consultant for other companies which gave her access to their books and records.  *See* Day 2 PM at 86:1–86:22. That experience allowed Ms. Stephen to testify credibly, and with actual knowledge, that others in the industry charged a higher markup than ACC.  *See id.*  Third, Ms. Stephen's testimony was corroborated in part by

independent data from an industry publication. During her testimony, Ms. Stephen referenced the industry publication RS Means Site Work & Landscape Cost Data, *see* Ex. Pl.'s Ex. 7, which reported an "Average Fixed Overhead" cost in the industry of 16.3% during 2010, *see id.* at 9. That average is in line with the 17.5% overhead figure that ACC used when it bid the Project. Finally, Ms. Stephen's expert opinion concerning the reasonableness of the 35% was not rebutted by any contrary evidence.

For these reasons, ACC provided satisfactory proof justifying a 35% markup of recoverable direct expenses.

### C. Equipment Standby Expenses

ACC seeks $138,135.34 in damages for costs related to its idle equipment at the Project site. *See* Pl.'s Ex. 36. According to ACC, that figure represents "the standby costs of having its owned equipment idling at the site as part of the reasonable value of ACC's owned equipment furnished in connection with the Project." Pl.'s Rebuttal ¶ 140. That figure does not represent, ACC says, "rental or use value of the equipment, which represents opportunities to create profits by using the equipment left idling." *Id.* Defendants assert that standby equipment expenses are not available under the Miller Act. *See* Defs.' FOF & COL at 49–51.

The parties agree that the D.C. Circuit has not addressed whether idling or standby time for owned equipment is recoverable under the Miller Act. So, both parties cite various out-of-circuit authorities to support their respective positions, but none provides a clear answer. Defendants, for instance, rely on a host of cases that stand for the proposition that the rental value of a contractor's equipment is not recoverable under the Miller Act during periods of delay. *See, e.g., U.S. ex rel. T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Tex.*, 942 F.2d 946, 952 (5th Cir. 1991); *U.S. ex rel Pertun Const. Co. v. Harvesters Grp., Inc.*, 918 F.2d 915, 919

(11th Cir. 1990); *U.S. ex rel. Edward E. Morgan Co. v. Md. Cas. Co.*, 147 F.2d 423–25 (5th Cir. 1945); *cf. U.S. ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 780-81 (11th Cir. 1991) (declining to decide whether "standby time" qualified as "labor or material" under the Miller Act but denying request for compensation as not "justly due").   ACC, on the other hand, relies primarily on a 1972 case from the Middle District of Tennessee, in which the court stated that "[t]he fair rental value of equipment used on the project is covered by the Miller Act payment bond even though the equipment may be idle at times during the period of the lease."  *See U.S. ex rel. E & R Const. Co. v. Guy H. James Const. Co.*, 390 F. Supp. 1193, 1245 (M.D. Tenn. 1972).  These cases are not on point, however, because ACC seeks not rental value, but the standby costs of its own equipment for *all purposes.*   ACC makes no distinction as to the reason for a piece of equipment's non-use, whether it remained idle because of project delays or because of a lack of need on a given day.  *See* Pl.'s Ex. 36 (calculating value of standby costs for each piece of equipment for the days each piece of equipment was on the Project site).  The cited cases do not address whether such costs are recoverable under the Miller Act.

The court thus returns to first principles.  The Miller Act allows a contractor who "furnish[es] labor or material in carrying out work provided for in a contract" to sue on a payment bond.  40 U.S.C. §3133(b)(a).  "[T]he language of the statute, interpreted in light of its protective purpose, provides the analytical key to determining whether the supplier can recover under the Miller Act."  *T.M.S. Mech. Contractors*, 942 F.2d at 949.  Viewed through this lens, it is apparent that standby time cannot be viewed as an indivisible whole.  Consider two scenarios.  In the first a contractor brings a piece of equipment to the work site and uses it over a period of weeks but not on each day during those weeks.  In the second, the contractor brings that same piece of equipment to the site, but it remains idle for 60 days before it is used.  In the former case, the equipment

reasonably can be treated as "furnished" "in carrying out work" even on those days it is in non-use. After all, the contractor cannot reasonably be expected to remove equipment from the site for every period of idle time between uses. The same does not hold true for the second scenario, however. If a contractor brings a piece of equipment to the job site and it sits unused for two months, absent some reasonable explanation for its non-use during such an extended period, the contractor cannot be said to have "furnished" the equipment "in carrying out work." The equipment cost is compensable in the first case, but not the second.

The challenge the court faces here is that, in calculating costs for standby time, ACC has not distinguished between these two scenarios. It seeks, for instance, the standby costs for a hydraulic breaker, which it brought to the site on April 11, 2011, but used for the very first time on March 6 *of the following year*, and intermittently thereafter. *See* Ex. 36 at 1–10. Similarly, ACC seeks full standby costs for a "C12 Trailer" brought to the site on April 11, 2011, yet used only six times during the entire life of the project. *Id.* Likewise, ACC asks to be compensated for a "Cat 325/Rev Drill" brought to the site on December 27, 2011, used for six days in January 2012, but only once more for the remainder of the project. *Id.* at 4–10. Not all equipment was used so infrequently, however. Take the "Cat 236." It arrived at the site on December 11, 2017, and was used regularly until the end of the job, though not every day. *Id.* at 1–10. The same is generally true of the "Cat 430," though ACC did not use it for nearly six weeks after it first arrived and for multiple extended periods of time thereafter. *Id.*

ACC's indiscriminate demand for *all* standby costs cannot be sustained under the Miller Act. A plaintiff seeking *quantum meruit* as a measure of damages "has the burden of showing facts and circumstances sufficient to justify the inference of an implied promise to pay for the services or materials in question and of proving the amount and value thereof to a reasonable

degree of certainty or by a preponderance of the evidence." 66 Am. Jur. 2d Restitution and Implied Contracts § 87 (2d ed.) (2018) (footnotes omitted). "Reasonable certainty" in this context "embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor." *USA Mach. Corp. v. CSC Ltd.*, 184 F.3d 257, 265 (3d Cir. 1999) (internal quotation marks and citation omitted); *see also U.S. ex rel. Maris Equip. Co. v. Morganti, Inc.*, 163 F. Supp. 2d 174, 188 (E.D.N.Y. 2001) (stating in a Miller Act case that "quantum meruit damages must be based upon a definite and logical connection between what is proven and the damages sought to be recovered and cannot be speculative") (internal quotation marks and citation omitted).

Applying these principles here, the court finds that ACC is entitled to payment for some, but not all, of the equipment that it furnished. With respect to pieces of equipment that were present at the site and used with regularity, awarding the costs of standby time is consistent with the text and purposes of the Miller Act. The same cannot be said, however, of equipment that idled at the site for extended periods of time without any explanation (e.g., the hydraulic breaker). At most, ACC offered evidence that it decided to keep equipment on site "in case [ACC] need[ed] it." Day 3 A.M. Trial Tr. 112:8–23. Such proof is plainly insufficient to sustain ACC's burden.

The court has reviewed the summary chart supporting ACC's demand for equipment standby expenses, *see* Ex. 36, and attempted to distinguish between the time that is recoverable from that which is not, based on the foregoing principles. A summary of standby costs that the court deems recoverable is reflected in the following chart. ACC is entitled to $38,897.61 for standby expenses.

**Summary of Recoverable Equipment Standby Expenses**

| Equipment | Compensable | Days Deducted for Unexplained Non-Use | Total Deducted* (*Each day is counted at 8 hours, except for diesel trucks counted at 16 hours per day) | Total Award |
|---|---|---|---|---|
| Cat 303 | Yes | 21 days (Aug. 11, 2011 through Aug. 31, 2011) | $418.32 (21 days x $2.49/per hr) | $6,749.15 |
| Cat 430 | Yes | 122 days (April 11, 2011 through Jun 7, 2011; Aug. 23, 2011 through Sept. 25, 2011; Nov. 12, 2011 through Dec. 11, 2011) | $6,178.08 (122 days x $6.33/hr) | $16,633.66 |
| Hydraulic Breaker | No | | $13,183.52 | $0 |
| Cat 299 | Yes | 34 days (Mar. 28, 2013 through Apr. 30, 2013) | $603.84 (34 days x 2.22/hr) | $1,014.54 |
| Cat 236 | Yes | 46 days (Nov. 22, 2012 through Jan. 6, 2013) | $842.72 (46 days x $2.29/hr) | $4,272.57 |
| Cat 325/Rev Drill | No | | $50,181 | $0 |
| C12 Trailer | No | | $12,901.68 | $0 |
| Subair Compressor | No | | $1,179.14 | $0 |
| Pick Up Trucks – Gas | No days on standby | | | $0 |
| Pick Up Trucks – Diesel | Yes | 47 days (Oct. 15, 2011 through Oct. 31, 2011; Nov. 12, 2011 through Dec. 11, 2011) | $1,331.04 (47 days x $1.77/hr) | $9,244.71 |
| Generator | Yes | 0 days | $0 | $982.98 |
| Total | | | $86,819.34 | $38,897.61 |

### D. Ed Hollander's Salary

ACC seeks $306,000 as compensation for Ed Hollander's work as project manager during the life of the Project—all 102 weeks. *See* Pl.'s Ex. 169. In Defendants' view, ACC cannot recover for Hollander's time because Hollander did not perform the type of labor that is recoverable under the Miller Act. *See* Def.'s FOF & COL at 51–53. Defendants also challenge the weekly rate of $3,000 that Ms. Stephen used to calculate Hollander's salary. *Id.* at 53.

Not all work done in connection with a construction project is compensable under the Miller Act. Courts agree that the term "labor" under the Miller Act is intended to encompass only physical or manual labor. *E.g., United States ex rel. Shannon v. Fed. Ins. Co.*, 251 Fed. App'x. 269, 272–73 (5th Cir. 2007); *U.S. ex rel. Barber-Colman Co. v. U.S. Fid. & Guar. Co.*, No. 93-1665, 1994 WL 108502, at *3 (4th Cir. Mar. 31, 1994); *U.S. ex rel. Constructors, Inc. v. Gulf Ins. Co.*, 313 F. Supp. 2d 593, 597 (E.D. Va. 2004); *U.S. ex rel. Big-D Constr. Corp. v. Rafter H Constr., L.L.C.*, Case No. 16-cv-00115, 2017 WL 9292187, at *5 (D. Wyo. Feb. 14, 2017). Although the D.C. Circuit has not addressed whether on-site managerial and administrative work of the type done by Hollander is compensable under the Miller Act, other circuit courts have held that "the on-site supervisory work of a project manager falls within the purview of the Miller Act if such a superintendent did *some physical labor* at the job site." *U.S. ex rel. Olson v. W.H. Cates Constr. Co.,* 972 F.2d 987, 991 (8th Cir. 1992) (emphasis added); *accord Fed. Ins. Co.*, 251 Fed. App'x. at 273 (citing *Olson*); *Barber-Colman Co.*, 1994 WL 108502, at *3. Thus, "[p]aying invoices, reviewing proposals, and supervising hiring are clerical or administrative tasks which, even if performed at the job site, do not involve physical toil or manual work necessary to bring them within the scope of the Miller Act." *Constructors, Inc.*, 313 F. Supp. 2d at 597; *accord Big-D Constr. Corp.*, 2017 WL 9292187, at *5 (quoting *Constructors, Inc.*, 313 F. Supp. 2d at 97).

In this case, ACC did not muster sufficient evidence to establish that Hollander's time constituted "labor" under the Miller Act. Hollander was the President of ACC and an engineer by training. Trial Tr. Day 1 A.M. Session at 64:18–65:18. He was a daily presence at the worksite, *see* Pl.'s Ex. 31, and he wore many hats. According to Ms. Stephen, Hollander functioned as project manager, superintendent, and estimator for ACC. Day 3 A.M. Tr. at 101:19–22. He had a work space in the on-site trailer, Day 1 A.M. Tr. at 61:15-18, and his specific tasks included drafting the daily reports, writing letters, and preparing scheduling information, *id.* at 24:11–15; 63:9–64:4; Day 3 A.M. Tr. at 45:10-15. On the manual labor side of the ledger, Mr. Janeiro described Hollander as a "unique engineer" because "he worked with his hands in the field." Day 3 A.M. Tr. at 11:15-18. But other than that limited testimony, which is not even specific to the Project, ACC offered no evidence that Hollander engaged in manual labor. Moreover, even if Mr. Janeiro's testimony applied to the Project, ACC offers no evidence establishing the percentage of time Hollander devoted to physical work in the field or the average number of hours per day that he engaged in such work. The court therefore has no reasonable basis to determine what share, if any, of the over $300,000 ACC seeks for Hollander's time constitutes compensable "labor" under the Miller Act. To award any percentage of that amount would require the court to speculate. And that it cannot do. *See USA Machinery Corp.*, 184 F.3d at 265. Accordingly, the court finds that ACC is not entitled to recover any amount for Hollander's time during the life of the project.

###    E.    Salvage Value of Fencing Material

ACC seeks to collect $43,046.95 for the salvage value of fencing material that was left at the work site but never recovered. Pl.'s Ex. 169. According to ACC, the Subcontract "took into consideration the fact that after the construction was completed, the eight-foot stockade fence material would be returned to ACC," and ACC negotiated the price of the Subcontract in part "to

include the cost of the stockade fence and the labor to install it, less the salvage value." Pl.'s Rebuttal at 48–49. ACC, however, cites no evidence for that assertion. The only agreement about fencing reflected in the Subcontract is that ACC agreed it would "[f]urnish & install all fencing (site, silt, tree protection, temporary) and relocate as per the drawings and specifications with appropriate signage." Subcontract, Schedule B, ¶ 11. ACC bid $110,000 for "Site Fencing Installation/Removal Work," *see id.* at 1, and Hirani agreed to pay ACC an upfront lump sum of $125,000 for initial project staging costs, including putting up fencing, that ACC would pay back to Hirani over time, *id.* at 3. Nothing in the Subcontract, however, states that ACC would take the fencing at the end of the job, or that ACC discounted the fencing component of its bid to account for post-job salvage value. Therefore, there is simply no evidence that ACC "furnished" fencing material to the Project under terms that would entitle ACC to recover $43,046.95 in salvage value under the Miller Act.

### F. Reasonable Value of Janeiro's Work

ACC seeks to recover $53,975.00 for services rendered by Janeiro, including stone measurements, shop drawing, fabrication tickets, and stone cladding mockups. *See* Pl.'s Ex. 169; Pl.'s FOF & COL at 73 ¶ 41; Pl.'s Rebuttal at 47–48 ¶¶ 160–63. The court concludes, however, that ACC cannot recover costs incurred by Janeiro because ACC has neither paid Janeiro nor settled Janeiro's claim.

Neither party has cited a case that addresses whether a subcontractor, like ACC, can seek to recover on a Miller Act payment bond amounts due and owing to a "sub-subcontractor," like Janeiro. ACC relies primarily on *U.S. Industries v. Blake Construction Co.*, 671 F.2d 539 (D.C. Cir. 1982). *See* Pl.'s Rebuttal at 48. There, the D.C. Circuit held the district court had committed error when it disallowed a contractor from pursuing as part of its claim against the prime contractor

the claims of its subcontractors. *See Blake Constr.*, 671 F.2d at 550 ("It is common practice for a contractor to present claims of its subcontractors in a suit against the other party to the prime contract."). The court rooted its decision in basic principles of contract law. The contractor could seek to recover the subcontractors' costs, the court explained, because the subcontractors could not directly sue the prime contractor. In other words, there was "no privity" between the subcontractor and the prime contractor. *See id.* at 550–51 (citing *United States v. Blair*, 321 U.S. 730, 737–38 (1944) (holding that a subcontractor cannot sue the government directly on a government contract because of the absence of an agreement between the government and subcontractor, but the prime contractor may sue to recover a subcontractors' costs)). Thus, the court concluded, "[a]s long as [the contractor] was required to remit to [the subcontractors] any amount it recovered on their behalf from [the prime contractor]—as its contracts with those two firms required it to do— [the contractor] was entitled to assert claims on [the subcontractors'] behalf." *Id.* at 551.

The holding of *Blake Construction*, at first blush, arguably supports ACC's position that it can seek from Defendants the costs incurred by Janeiro. But not so fast. The D.C. Circuit was careful to distinguish the situation in *Blake Construction* from a Miller Act claim. The district court had disallowed the contractor to assert the subcontractors' claims because of a concern that allowing the contractor to do so would provide the subcontractor with an end run around the requirements of the Miller Act (the project in that case was the building of an army hospital, and the prime contractor was a party to the government contract). *See id.* The D.C. Circuit rejected that reasoning. It explained: "The [district] court's concern that permitting [the contractor] to assert the claims would circumvent the jurisdictional requirements of the Miller Act ignores the fact that this suit is not on the performance and payments bonds (to which the Miller Act relates),

but for breach of the contract between [the contractor] and [the prime contractor]." *Id.* Stated differently, the district court's concern might have been valid had the subcontractors' claims been made under the Miller Act. After all, under the Miller Act, the subcontractors could have sought recovery from the surety directly. To allow the subcontractors to present their claims indirectly through the contractor would circumvent the Miller Act's requirements. Of course, that is the very factual circumstance of this case. Nothing prevented Janeiro from seeking recourse directly from Colonial on the payment bond. For reasons not apparent on the record, it elected not to make a claim. ACC cannot now stand as a proxy for Janeiro on a claim that Janeiro, in effect, has forfeited.

There is yet another critical distinction between this case and *Blake Construction*. In that case, the contractor had entered into separate agreements with its subcontractors promising that it would prosecute the subcontractors' claims on their behalf and would compensate them for any amounts recovered. *Id.* at 44. Here, on the other hand, ACC presented no evidence that it has such an agreement with Janeiro. That fact distinction is legally consequential. In *Morrison Knudsen Corp. v. Fireman's Fund Insurance Co.*, the Tenth Circuit explained the general rule of government contracting that allows a prime contractor to recover against the government for the unpaid costs of its subcontractor, but only if the prime contractor has first settled with the subcontractor. 175 F.3d 1221, 1249–54 (10th Cir. 1999) (citing 48 C.F.R. § 49-108-1) ("Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors."). That approach provides a mechanism to compensate a subcontractor upon termination of the prime contract, without running afoul of cost principles that do not allow compensation for future contingencies—an unsettled claim of a subcontractor is treated as a contingent cost. *See id.* at 1252–53. In this case, because ACC did not settle Janeiro's claim prior to seeking recovery from

Defendants, Janeiro's claim remains a contingent, unrecoverable cost. ACC's demand for damages equal to the costs incurred by Janeiro is therefore denied.

## II. PREJUDGMENT INTEREST AND ATTORNEY'S FEES AND COSTS

In addition to *quantum meruit* damages, ACC seeks an award of prejudgment interest and an award of attorney's fees and costs under the Miller Act. *See* Pl.'s FOF & COL at 74–75 ¶¶ 43–46. Colonial opposes these awards. *See* Defs.' Rebuttal at 46–48 ¶¶ 43–46.

### A. Prejudgment Interest

"The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." *F.D. Rich Co. v. U. S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974). The Miller Act does not contain an express provision authorizing the recovery of pre-judgment interest. *See* 40 U.S.C. § 3131, *et seq.* In the absence of such provision, the federal appellate courts, although recognizing that the question is one of federal law, have looked to state law for guidance. *E.g., U.S. ex rel. Lochridge-Priest, Inc. v. Con-Real Support Grp., Inc.*, 950 F.2d 284, 289 (5th Cir. 1992); *U.S. ex rel. C.J.C., Inc. v. W. States Mech. Contractors, Inc.*, 834 F.2d 1533, 1541–42 (10th Cir. 1987); *U.S. ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677–78 (11th Cir. 1987). This court does the same.

Under District of Columbia law, "[p]rejudgment interest operates in part to compensate prevailing plaintiffs for the loss of the use of money that was wrongfully withheld by the defendant." *Mazor v. Farrell*, 186 A.3d 829, 832 (D.C. 2018). Because of its remedial nature, the D.C. Court of Appeals has stated that prejudgment interest should be awarded "absent some justification" for denying it. *Washington Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 581 (D.C. 2011) (internal quotation marks omitted).

Prejudgment interest in the District of Columbia is a creature of statute. As applicable here, D.C. Code § 15-109 provides that a trial court may award prejudgment interest on an unliquidated debt "if necessary to fully compensate the plaintiff." *See also Gen. Ry. Signal Co. v. Washington Metro. Area Transit Auth.*, 875 F.2d 320, 328–29 (D.C. Cir. 1989) ("Section 15-109 expressly refers only to 'action[s] to recover for breach of contract,' but it has been applied to a suit for accounting which, 'although not framed as a breach of contract action, was based on a contractual relationship between the parties.'") (quoting *House of Wines v. Sumter*, 510 A.2d 492, 499 (D.C. 1986)).[12] The trial court has "broad discretion" to award prejudgment interest under this statute, *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 310 (D.C. 1987), and the statute "should be generously construed so that the wronged party can be made whole." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 732 (D.C. 2003) (quoting *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1255 (D.C. 1990). These principles are consonant with the Supreme Court's statement that "the Miller Act should receive a liberal construction to effectuate its protective purposes." *U.S. ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957).

The court finds that an award of prejudgment interest is appropriate here to make ACC whole. Hirani last paid ACC for work in December 2012. Hirani never compensated ACC for the work reflected in Payment Requisition No. 19, which covered work completed at the site between November 21, 2012, and February 20, 2013. *See* Pl.'s Ex. 141. ACC also never received payment on Payment Requisition No. 20, which reflected work done by ACC through March 24, 2013. *See* Pl.'s Ex. 157. An award of prejudgment interest is appropriate to compensate ACC for these and other unpaid amounts to make up for the lost time value of money.

---

[12] By contrast, D.C. Code § 15-508 concerns awarding prejudgment interest in cases of *liquidated* damages. The D.C. Court of Appeals has held that debts resting on *quantum meruit* recovery are "by their very nature unliquidated" and therefore prejudgment interest is not available on such damages under section 15-508. *See Mazor*, 186 A.2d at 833–34 (quoting *Schwartz v. Swartz*, 723 A.3d 841, 844 (D.C. 1998) (internal quotation marks omitted)).

Neither party has addressed the appropriate rate of interest to be paid on a judgment. Courts confronted with the question under the Miller Act, once again, have looked to state law for an answer. *E.g.*, *N. Star Terminal & Stevedore Co. ex rel. v. Nugget Const. Inc.*, 126 F. App'x 348, 351 (9th Cir. 2005); *U.S. ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 922 (5th Cir. 1998); *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 764 (10th Cir. 1997); *U.S. ex rel. Yonker Const. Co. v. W. Contracting Corp.*, 935 F.2d 936, 941 (8th Cir. 1991). Under District of Columbia law, "when the rate of interest has not been specified in the contract, courts in this jurisdiction have without exception limited it to the statutory rate provided in D.C. Code § 28-3302." *Pierce Assocs.*, 527 A.2d at 310. Here, the Subcontract specifies no rate of interest, therefore section 28-3302 applies. Under that statute, courts routinely award a 6% per annum rate under the statute's first clause. *See* D.C. Code § 28-3302(a) ("The rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6% per annum."); *Pierce Assocs.*, 527 A.2d at 310–11; *Cobell ex rel. Cobell v. Jewell*, 260 F. Supp. 3d 1, 9 (D.D.C. 2017). This court will do the same. Accordingly, the court finds that a prejudgment interest award at the rate of 6% per annum will fairly compensate ACC for the delay in the receipt of payment.

Finally, there remains the question of from what date should prejudgment interest accrue. Once more, looking to District of Columbia law, section 15-109 affords courts "discretionary equitable power" to fix the effective date of accrual. *See Gen. Ry. Signal Co.*, 875 F.2d at 328 (quoting *Pierce Assocs.*, 527 A.2d at 310). Exercising such discretion here, the court looks to the Subcontract, which stipulates by when Hirani was required to pay ACC. Subcontract ¶ 3.2. Section 3.2 of the agreement provides (including the parties' deletions and interlineations):

> The Subcontractor shall accept the credit worthiness of the Owner,
> if the cause of the nonpayment relates to the obligation or

> responsibilities of [Hirani] then the Subcontractor shall be entitled
> to receive payment for its work within 30 days of approval of the
> work. In any event, "Progress Payments" shall not become due and
> payable prior to the 30th of the following month or five (5) days
> after [Hirani] receives payment from the Owner on account of the
> Subcontractor's work.

The court finds this provision to be confusing. It is unclear whether the first sentence sets the payment date in this instance ("within 30 days of approval of the work"), or whether the second sentence that starts with "[i]n any event," is controlling. The best the court can tell from the structure of the "Price and Payments" provision is that the parties contemplated that ACC would receive payment *after* the USACE approved the work and paid Hirani. Using that understanding as a measure, and to simplify the prejudgment interest calculation, the court sets June 1, 2013— 30 days after the last day of compensable work ACC performed on the site—as the date on which prejudgment interest began to accrue.

### B. Attorney's Fees and Costs

At last, the court arrives at ACC's demand for attorney's fees and costs. The Miller Act does not expressly authorize the award of attorney's fees to a successful plaintiff. The Supreme Court, however, has filled the statutory void. It has held that whether attorney's fees are available on a Miller Act claim is a matter of federal common law. *See F.D. Rich*, 417 U.S. at 127 (noting the lack of "any evidence of congressional intent to incorporate state law to govern such an important element of Miller Act litigation as liability for attorneys' fees"). Thus, the "American Rule" applies, *see id.* at 127–31, which provides that attorney's fees "are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor," *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967). Consistent with this approach, multiple circuit courts have held that fees are available under the Miller Act when the relevant contract so provides. *See GE Supply v. C & G Enters., Inc.*, 212 F.3d 14, 19 (1st Cir. 2000) (citing cases).

Additionally, under the "bad faith" exception, the American Rule permits a court to award attorney's fees when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich*, 417 U.S. at 129. Courts have recognized that the exception is applicable in Miller Act cases. *See id.*; *accord Towerridge*, 111 F.3d at 765 (collecting cases).

ACC asserts that an attorney's fees award is compelled both by contract and by Defendants' bad faith conduct. The court disagrees.

### 1.     *Contractual Obligation to Pay Attorney's Fees*

The Subcontract contains no attorney's fees provision. ACC therefore points the court to a letter agreement between the company and Hirani dated April 4, 2011, the same day the parties entered into the Subcontract. Subcontract at 16. That agreement provides in relevant part that "Hirani agrees to indemnify and hold harmless [ACC] against any and all claims, suits, damages, liabilities, costs, and expenses, including attorney's fees . . . arising out of the Project or Subcontractor's acceptance or performance of this Subcontract." *Id.*

ACC's reliance on this letter agreement suffers from two fatal problems. First, it is not in evidence. When Plaintiff presented its Exhibit 54, the court admitted only the pages comprising the actual Subcontract, and not any extraneous pages contained therein, including the letter agreement. *See* Day 1 A.M. Tr. at 68:23–70:5. The court invited ACC to lay the foundation as to these extraneous pages, but it never did so. *See id.* Therefore, the letter agreement is not evidence in this case.

Second, even if it were evidence, the letter agreement does not have the legal effect ACC ascribes to it. Properly understood, the letter agreement is no more than an indemnification agreement as to third-party claims against ACC. It is not a fee-shifting provision as to claims between ACC and Hirani that might arise out of the Project. *See Hensel Phelps*, 861 F.3d at 275

(requiring that there be "clear and unequivocal intent to include first-party claims . . . on the face of the instrument"); *see also James G. Davis Constr. Corp. v. HRGM*, 147 A.3d 332, 340–41 (D.C. 2016). The letter agreement therefore provides no basis for an award of fees.

### 2. *Bad Faith*

ACC's fees demand based on bad faith likewise fails. ACC claims that Defendants acted in bad faith by not promptly paying ACC for the work it performed. As evidence, ACC points to the non-payment of Payment Requisition No. 19, even though the USACE had approved it and remitted money to Colonial. *See* Pl.'s FOF & COL at 74–75 ¶ 46.

The D.C. Circuit has strictly construed the bad-faith exception to the American Rule. "Bad faith in conduct giving rise to the lawsuit may be found where 'a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights.'" *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 220 (D.C. Cir. 1991) (citation omitted). Because the "underlying rationale of fee-shifting upon a showing of bad faith is punishment of the wrongdoer rather than compensation of the victim," such an award is reserved "only when extraordinary circumstances or dominating reasons of fairness so demand." *Nepera Chem., Inc. v. Sea-Land Serv., Inc.*, 794 F.2d 688, 702 (D.C. Cir. 1986). A "finding of bad faith must be supported by clear and convincing evidence." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 187 F.3d 655, 660 (D.C. Cir. 1999) (citation and internal quotation marks omitted).

ACC comes nowhere close to satisfying these stringent standards. Although the court finds that ACC is entitled to be compensated for the work it performed, Defendants' refusal to make such payment is not so extraordinary as to distinguish this matter from run-of-the-mill Miller Act disputes. ACC believed it was owed money for the work it had done; Defendants thought they

were relieved of their obligation to pay because ACC had failed to perform. Such disputes are commonplace in the construction business. Therefore, ACC is not entitled to attorney's fees on the ground Defendants acted in bad faith.

## CONCLUSION

To summarize, the court finds that ACC has carried its burden of proof by a preponderance of the evidence as to its Miller Act claim against Colonial and its breach of contract claim against Hirani. Colonial, on the other hand, did not carry its burden of proof as to its counterclaims.

To facilitate entry of a final judgment, no later than December 7, 2018, ACC shall submit to the court a revised damages calculation, including prejudgment interest, as to both its Miller Act and breach of contract claims that is consistent with these Findings of Fact and Conclusions of Law.[13] Thereafter, no later than December 17, 2018, Defendants may lodge objections to ACC's renewed calculation on grounds other than those already addressed by the court. Finally, ACC may file a reply by December 21, 2018.

Dated: November 28, 2018

Amit P. Mehta
United States District Judge

---

[13] ACC does not distinguish between the *quantum meruit* award it seeks from Colonial under the Miller Act and the damages it demands from Hirani for breach of contract. ACC's submission shall distinguish between these two theories of compensation.