UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of AMERICAN CIVIL CONSTRUCTION, LLC, ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. 14-cv-00745 (APM) |
| HIRANI ENGINEERING & LAND SURVEYING, P.C., et al., ) ) ) | |
| Defendants. ) ) | |

**MEMORANDUM OPINION**

This court did not anticipate that it would need to draft another memorandum opinion in this case—not after issuing a 69-page Findings of Fact and Conclusions of Law ("FFCL"). All that remained after the FFCL was for the parties to submit their respective positions as to a final damages award "consistent with" the FFCL. *See* FFCL, ECF No. 91, at 69. But apparently by giving the parties an inch, they have decided to take a mile. Instead of relatively straightforward position statements on a final damages calculation, the court received more than 40 pages of detailed legal briefing, with citations to dozens of cases and to Plaintiff's counsel's scholarship. The court already has rejected most of the arguments. Others were not raised until now. The court will not dwell on these arguments for long. But to ensure that the D.C. Circuit fully understands the final award in this case, the court will address the parties' various contentions one last time.

I.

A.

In the FFCL, the court asked Plaintiff American Civil Construction LLC ("ACC") to determine whether any sums sought in Exhibits 32, 33, and 34, involved costs incurred before April 4, 2011. *See* FFCL, ECF No. 91, at 49 n.10. ACC confirms that "none of the invoices included [in those exhibits] are for work done or material supplied prior to April 4, 2011." Pl.'s Reply to Defs.' Objections, ECF No. 95 [hereinafter Pl.'s Reply], at 2; *see also* Pl.'s Corrected Revised Damages Calculations, ECF No. 93 [hereinafter Pl.'s Cals.], at 3–4. The court likewise has reviewed the exhibits in question, and based on ACC's explanation, agrees that no pre-April 4, 2011 costs are included. Accordingly, the court will not reduce the award amount for costs that predate the parties' subcontract ("Subcontract").

Defendants Hirani Engineering & Land Surveying, P.C. and Colonial Surety Company take the opportunity to dissect the damages sought in Exhibits 32, 33, and 34, and ask the court to do the same. *See* Defs.' Objections, ECF No. 94 [hereinafter Defs.' Objs.]. The court declines to do so. *See* FFCL at 56 (stating that quantum meruit damages "embrace[] a rough calculation") (citation omitted). At this juncture, the court will not flyspeck a million-dollar-plus award to determine whether the costs of items such as water and Gatorade are compensable. In any event, the costs that Defendants find objectionable—including basic provisions for field personnel— reasonably qualify as "labor or material in carrying out work provided for in" the Subcontract under the Miller Act. 40 U.S.C. § 3133(b)(1).

B.

Defendants object to ACC's asserted amount for field labor, claiming that over $1 million in costs for on-site personnel for 25 months is not reasonable. *See* Defs.' Objs. at 3–4. Defendants

ask the court to reduce that component of the award by 33%. *See id.* This contention, however, goes beyond the court's limited direction to the parties following the FFCL. Moreover, although Defendants generally objected to "the necessity or reasonableness of having eight on-site personnel," Defs.' Rebuttal, ECF No. 86, ¶ 257, they neither made the specific contentions they do now nor demanded a percentage reduction in recoverable labor costs. Defendants arguments thus come too late.

In any event, the court is satisfied based on the certified payroll records, the testimony of Irene Stephen, and ACC's Daily Reports that ACC did substantiate its requested labor costs. The certified payroll records can be found at ACC's Exhibit 35. For each such record, Ms. Stephen attested to the accuracy of the information contained therein and the amounts sought by ACC. Ms. Stephen acknowledged that a false statement on the certified payroll could subject "the contractor or subcontractor to civil or criminal prosecution [under] section 1001 of Title 18 and Section 231 of title 31 of the United States [Code]." *See, e.g.,* Pl.'s Ex. 35 at 32, 56, 78, 142. Additionally, at trial, Ms. Stephen testified that the amounts sought as labor costs comprised salary, taxes, and insurance for on-field personnel, and that the amounts billed were for "productive work." *See* Day 3 A.M. at 79:18–82:23. The court found Ms. Stephen to be credible. *See* FFCL ¶ 126. Finally, both the certified payroll and ACC's Daily Reports show that ACC did not use eight workers on the site each work day. Take, for example, October 4, 2011. Payroll records show that only two men worked that day, and ACC's Daily Report shows that other crew members were assigned to another job on that date. *See* Pl.'s Ex. 35 at 53; Pl.'s Ex. 31 at 540 (showing workers assigned to "Otis Str" project). Such records are consistent with Ms. Stephen's testimony that ACC assigned personnel to the Project worksite when productive work was available but would assign workers to other jobs when there was down time. *See* Day 3 A.M. at 81:5–82:6

(noting "Otis Street near Catholic University" as another job to which ACC assigned its workers); *see also* Ex. 31 at 424–25 (showing all personnel assigned to "Ft Lincln" or "Otis Str" projects on July 28, 2011; "ACC Crew #1 NOT ON SITE today; No productive work available at site"); Ex. 35 at 33–35 (claiming no payroll for July 28, 2011). In short, the court is satisfied that ACC carried its burden of showing compensable labor-related expenses of $1,024,019.23.

C.

Next, Defendants assert that ACC should receive $0 for standby equipment costs, as such "costs are not recoverable as a matter of law." Defs.' Objs. at 5. The court extensively addressed this issue already in the FFCL. *See* FFCL at 53–57. Defendants offer nothing that would warrant the court's reconsideration of its prior decision.

D.

Defendants also object to the court awarding a 35% markup on the reasonable value of ACC's services. *See* Defs.' Objs. at 5–6. Defendants challenge both the legal and factual basis for the court's ruling. The court rejects both contentions.

First, federal appeals courts have recognized that when, as here, a subcontractor fully performs its obligations but is not paid by the prime contractor, a subcontractor may recover reasonable profits from sureties. *See generally U.S. for Use & Benefit of Eastern Waterproofing & Restoration Co., Inc. v. Berkley Regional Ins. Co.*, 986 F. Supp. 2d 660, 665 (D. Md. 2013) (summarizing authorities and explaining that profits are recoverable under the Miller Act when the subcontractor fully performs but is not paid). The Fourth Circuit has said: "[T]he surety is obligated to pay the compensation to which the parties have agreed, although this amount exceeds the costs of labor, materials, and overhead." *U.S. for Use & Benefit of Woodington Elec. Co., Inc. v. United Pac. Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir. 1976). Similarly, the Fifth Circuit has

explained: "If the [subcontractor] has to sue the surety company, the amount of his recovery is measured by the contract sum, and of course the contract sum includes the contractor's profit. If such a contractor cannot include a profit, he would not be in business." *Price v. H.L. Coble Const. Co.*, 317 F.2d 312, 317 (5th Cir. 1963). Here, Ms. Stephen testified that, consistent with industry practice, ACC used a 35% markup on the bid that Hirani accepted. *See* Day 2 PM at 88:24–86:22.[1] The surety therefore is on the hook for that markup.

Defendants rely on a single decision to support their position, *W.F. Magann Corp. v. Diamond Manufacturing Co., Inc.*, *see* Defs.' Objs. at 5, but misleadingly cherry pick a quotation from the case and omit adjacent language that directly contradicts their position. True, the Fourth Circuit in *W.F. Magann* did say, as Defendants quote, that "profits per se have no place in a *quantum meruit* recovery." 775 F.2d 1202, 1208 (4th Cir. 1985). But, as ACC points out, in the very next sentence the court said: "[Profits] may be considered, however, to the extent that they may have a bearing upon assessing the reasonable value of the aggrieved party's performance." *Id.* The Fourth Circuit remanded the case to the district court to explain whether its "award of lost profit acted merely as enhancement of the damages or whether it was a consideration in fixing the overall reasonableness of the value of the materials and services furnished by [the subcontractor]." *Id.* On remand, the district court found that, "because [the] bid price includes profit, this court finds that the profit included in the bid price is necessary in fixing the overall reasonableness of the services furnished by" the subcontractor to the prime contractor. *See W.F. Magann Corp. v. Diamond Mfg. Co.*, 678 F. Supp. 1197, 1203 (D.S.C. 1988). The same is true here. As noted, Ms. Stephen testified that a reasonable markup was part of the bid that Hirani accepted. Thus, that markup is "necessary in fixing the overall reasonableness of the services furnished" by ACC. *Id.*

---

[1] To be clear, the markup is not pure profit. Rather, it also reflects ACC's overhead expenses and the costs of insurance. *See* Day 2 PM at 81:12–82:12. The actual profit component of ACC's markup was 13%. *See id.*

Second, Defendants wish to relitigate the court's finding that a 35% markup is reasonable and in line with industry practice, and they ask the court to reduce the markup to no more than 19%. *See* Defs.' Objs. at 6. But the court already ruled on this issue and will not revisit it. *See* FFCL at 52–53. The court found Ms. Stephen's expert testimony regarding the industry's practice on markups to be supported and credible, and the record portions that Defendants now cite do not change the court's finding. Accordingly, the final award will reflect a 35% markup on direct expenses.

E.

Based on the foregoing, the court will award *quantum meruit* damages in favor of ACC against Colonial Surety Company in the amount of $1,544,957.29. *See* Pl.'s Cals. at 2. The total award on the Miller Act claim is as follows:

1.   *Quantum meruit* damages:                                  $ 1,544,957.29
2.   Prejudgment interest (6% per annum, as of 01/10/19)[2]:    $   520,100.35
3.   Total award against Colonial Surety:                       $ 2,065,057.64

II.

Having addressed Defendants' objections to the final award, the court turns to ACC's contentions concerning recovery on its breach of contract claim against Hirani. In the FFCL, the court observed that ACC had not distinguished "between the *quantum meruit* award it seeks from Colonial under the Miller Act and the damages it demands from Hirani for breach of contract." FFCL at 69 n.13. The court thus asked ACC to "distinguish between these two theories of compensation." *Id.* In its response, ACC asserts a *quantum merit* theory of recovery on its *contract*

---

[2] For the interest calculations in this opinion, the court accepted the parties' representation that 33.5% should be applied in interest. *See* Pl.'s Cals. at 2; *see also* Defs.' Objs. at 7. The calculation also includes 10 additional days of interest, because the parties' calculations ended on December 31, 2018. *See id.*

6

claim and seeks, in addition to the sum awarded under its Miller Act claim, to recoup the amounts that the court held were not recoverable. Pl.'s Cals. 5–14. For their part, Defendants argue that damages measured in *quantum meruit* are not available as a matter of law when, as here, there exists an express agreement between the parties. *See* Defs.' Objs. at 8. Defendants also argue that none of the amounts excluded under the Miller Act are recoverable on the breach of contract claim, *see id.* at 10, and that any award for contract damages should be reduced by the costs incurred to repair ACC's work and complete the project, *id.* at 11.

In its Memorandum Opinion denying Defendants' motion for summary judgment, this court recognized that, under District of Columbia law, "a non-breaching plaintiff who is a party to a[n express] contract may seek relief for the reasonable value of the services rendered rather than for contract damages." Mem. Op., ECF No. 54 [hereinafter Mem. Op.], at 27–28; *see also Lee v. Foote*, 481 A.2d 484, 485 (D.C. 1984) (per curiam); *Harrington v. Trotman*, 983 A.2d 342, 346–48 (D.C. 2009).[3] Although ACC uses the term *quantum meruit* to seek the reasonable value of its services on its contract claim, technically speaking, that is not what it demands, at least under District of Columbia law. What ACC really requests is restitution, because its claimed damages arise from a written agreement, not an implied agreement or quasi-contract. *See Lee*, 481 A.2d at 486 n.4 ("Although the phrases restitution and *quantum meruit* are sometimes used interchangeably in regard to the measure of recovery, since both refer to unjust enrichment, restitution is properly limited to recovery where there is an express contract," whereas *quantum meruit* refers to compensation arising from services rendered under an implied contractual or quasi-contractual duty.).

---

[3] In its summary judgment ruling, the court held that District of Columbia law applied to ACC's breach of contract claim against Hirani. *See* Mem. Op. at 27 n.8. Neither party disputes that ruling here. Therefore, the court applies District of Columbia law to determine ACC's damages for its breach of contract claim.

7

Having determined that restitution is an available remedy for Hirani's breach, the court must now decide how much to award. As to that inquiry, the court has found no case from the D.C. Court of Appeals or the D.C. Circuit addressing how to calculate restitution as an alternative to contract damages. The Restatement (Third) of Restitution and Unjust Enrichment ("Restatement"), however, contains an extensive discussion on that remedy, which is sometimes referred to as "restitution for breach of contract." *Cf. Mazor v. Farrell*, 186 A.3d 829, 834 (D.C. 2018) (citing the Restatement as authority). Referring to such recovery as "performance-based damages," Section 38 of the Restatement provides that such damages can be measured by either (a) "uncompensated expenditures made in reasonable reliance on the contract, including expenditures made in preparation for performance or in performance, less any loss the defendant can prove with reasonable certainty the plaintiff would have suffered had the contract been performed," or (b) "the market value of the plaintiff's uncompensated contractual performance, not exceeding the price of such performance as determined by reference to the parties' agreement." Restatement § 38(2)(a), (b). Performance-based damages are not unlimited, however. Rather, because they "are a substitute for damages based on expectancy," "they are limited by expectancy at most points where expectancy can be established." *See id.* § 38, cmt. c. This means that, in calculating an award, the court must "respect the price terms and the risk allocations established by the parties' agreement." *Id.*

The Restatement's Illustration 11 is most helpful in showing how to calculate damages in a case such as this one.

> A promises B to build a barn for $60,000. A is wrongfully discharged after completing part of the work and receiving $20,000 in progress payments. The court finds that the cost reasonably incurred by A in partial performance has been $30,000, and that the reasonable cost of completion (by A or anyone else) will be $45,000. On this basis the court calculates that A has performed 40 percent of

8

the work covered by the contract; the price of this work at the contract rate is $24,000. A's claim to damages by the rule of § 38(2)(b) is $4000 (representing the ratable portion of the contract price less $20,000 already paid).

Restatement, Ill. 11. As the illustration demonstrates, the court's task in calculating performance damages is not simply to award all costs that the plaintiff incurred in providing services less the amounts paid. This is ACC's preferred approach. *See* Pl.'s Cals. at 7; Pl.'s Reply at 14. The court also must take into consideration (1) the percentage of work completed on the contract and (2) the costs to complete the contract, so that the plaintiff is not awarded a sum greater than expectancy, i.e., the contract price for the work done.[4]

Bearing the foregoing principles in mind, the court calculates ACC's performance damages on its breach of contract claim against Hirani as follows:

1. Percentage of work under the Subcontract completed by ACC: 85%

   a. ACC's expenditures before termination: $ 4,060,000 (Pl.'s Cals. at 2)[5]

   b. Reasonable cost of completion: + $ 723,049 (Defs.' Objs. at 11)

   c. Total value of work: $ 4,783,049

   d. Percentage of work ACC completed: $ 4,060,000/$4,783,049 = .85

2. Subcontract amount (Option 1 included): $ 3,459,250 (Defs.' Objs. at 10)

---

[4] Illustration 17 also provides helpful guidance, as it involves a subcontractor's breach of contract claim against a prime contractor. Its utility is limited here, however, because the court does not have before it factual findings as to two key inputs considered in Illustration 17: (a) a percentage estimate of the overall work that ACC actually completed, and (b) the reasonable value of ACC's work (this data point is distinct from the costs actually incurred). The court, therefore, uses the simpler Illustration 11 as its guide.

[5] The court excludes from this sum the amounts that ACC seeks to add back in, namely, (1) deducted standby costs, (2) the reasonable value of Ed Hollander's services, and (3) the reasonable value of Janeiro's work. The Subcontract provides that the contract price "includes all labor, services, materials, equipment or other items acquired, performed, furnished or used with respect to the Work," plus applicable taxes. Pl.'s Ex. 54 ¶ 3.1. As the court has ruled, standby equipment that stood idle for extended periods of time was not "furnished" or "used" with respect to the Work. *See* FFCL at 53–57. Moreover, nothing in the Subcontract contemplates compensating for Ed Hollander's services beyond the labor already covered by its terms. And, finally, ACC produced no evidence that it paid Janeiro a dime or that it has promised Janeiro payment for its services in the event of recovery. *See* FFCL at 60–63.

3. Ratable portion of the Subcontract amount: $ 2,940,362.50

   a. $3,459,250 x .85 = $ 2,940,362.50

4. Amount already paid to ACC: $ 2,515,043 (Pl.'s Cals. at 2; Defs.' Objs. at 7)

5. Total contract damages: $ 425,319.50

   a. Ratable portion of the Subcontract: $2,940,362.50

   b. Amount already paid to ACC: - $2,515,043.00

   c. Total: $ 425,319.50

6. Prejudgment interest (6% per annum, as of 01/10/19): $143,181.00

7. Total award against Hirani: $ 568,500.50

### III.

Based on the foregoing, the court awards ACC (1) $2,065,057.64 against Colonial Surety and (2) $568,500.50 against Hirani. A final order entering judgment in favor of ACC accompanies this Memorandum Opinion.

Dated: January 10, 2019

Amit P. Mehta
United States District Judge