UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of AMERICAN CIVIL CONSTRUCTION, LLC, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) Case No. 14-cv-00745 (APM) |
| HIRANI ENGINEERING & LAND SURVEYING, P.C., et al., | ) ) ) ) |
| Defendants. | ) ) |

SUPPLEMENTAL FINDINGS OF FACT
AND CONCLUSIONS OF LAW

This matter is on remand from the D.C. Circuit for additional fact-finding on Plaintiff American Civil Construction, LLC's Miller Act claim against Defendant Colonial Surety Company and Colonial's statute-of-limitations defense to that claim. The Circuit directed this court "to make findings of fact as to when the Prime Contract was terminated and whether ACC performed labor or supplied material on April 29 and/or April 30." *United States ex rel. Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 962 F.3d 587, 594 (D.C. Cir. 2020) ("*Hirani II*"). On remand, the court invited the parties to address these issues in supplemental filings. *See* Pl.'s Supplemental Proposed Findings of Fact and Conclusions of Law, ECF No. 106 [hereinafter Pl.'s Suppl.]; Defs.' Supplemental Proposed Findings of Fact and Conclusions of Law, ECF No. 107 [hereinafter Defs.' Suppl.]. Having considered the parties' submissions, and the entire trial record, the court makes the following supplemental findings of fact and conclusions of law.

*When the Prime Contract was Terminated*

1. In a letter dated Friday, April 26, 2013, Contracting Officer Jerome T. Rifkin of the U.S. Army Corps of Engineers ("USACE") terminated the Prime Contract between the USACE and Hirani Engineering and Land Surveying, P.C. ("Termination Letter"). Pl.'s Ex. 150; Def.'s Ex. 77. According to the letter, the "termination [was] effective immediately." *Id.*

2. The Termination Letter appears twice in the trial record: Plaintiff's Exhibit 150 and Defendants' Exhibit 77. The first two pages of each exhibit are the same, consisting of the text of the correspondence. The face of the Termination Letter indicates it was sent from the USACE in Baltimore, Maryland, via "CERTIFIED MAIL-RETURN RECEIPT REQUESTED," to Jitendra Hirani, President of Hirani Engineering and Land Surveying, P.C., at Hirani's office in Jericho, New York. Defs.' Ex. 77 at 1; Pl.'s Ex. 150 at 1. The record contains no return receipt card indicating the date of delivery, signed by Mr. Hirani or any other company representative.

3. Defendants' Exhibit 77 contains a third page titled "ACKNOWLEDGMENT OF RECEIPT." Defs.' Ex. 77 at 3. This third page requests that an "Authorized Representative" of Hirani "sign and return this notice in the enclosed envelope." *Id.* Apparently, no authorized representative of Hirani formally acknowledged receipt, as the date and signature blocks are blank. *Id.*

4. Neither party presented any testimonial evidence as to the actual date on which the USACE sent the Termination Letter, the actual means of transmittal (e.g., certified mail, email, or fax), or the actual date on which Hirani received the Termination Letter.

5. In a letter dated April 30, 2013, Jitrendra Hirani responded to the Termination Letter. Pl.'s Ex. 151. As pertinent here, Mr. Hirani wrote: "On April 29, 2013, *about 20 minutes*

*before the issuance of the default termination*, the USACE *called Hirani to communicate, via telephone*, that an interim unsatisfactory performance evaluation, among other things, was generated by the USACE's computer mailing system in late March 2013 (allowing for 30 days to respond or cure) that was never received by Hirani Engineering." *Id.* (emphasis added). There was no testimony about a call between the USACE and Mr. Hirani on April 29, 2013; nor did Mr. Hirani explain what he meant by receipt of a call from the USACE "about 20 minutes before the issuance of the default termination."

6. Nearly a year later, Hirani alleged in a complaint filed in the Court of Federal Claims on April 25, 2014, that it had received the Termination Letter on Monday, April 29, 2013. Pl.'s Ex. 168 at 9; *see also* Trial Tr., Mar. 5, 2018, PM Sess., at 32–33. There was no trial testimony as to how Hirani determined it had received the Termination Letter on that date when drafting the complaint. Absent such testimony, the complaint is weak proof of the actual date of receipt.

7. In consideration of the foregoing evidence, the court finds that Hirani received the Termination Letter no earlier than Tuesday, April 30, 2013, the date that Mr. Hirani issued the company's response letter. Defendants have not carried their burden of establishing an earlier date of receipt. *See Hirani II*, 962 F.3d at 593 (stating that, as proponents of the statute of limitations defense, Defendants "will bear the burden of showing that Hirani received the termination letter before Monday, April 29"). Accordingly, the "effective date of the termination" of the Prime Contract, per the Federal Acquisition Regulations, is no earlier than Tuesday, April 30, 2013. *See Hirani II*, 962 F.3d at 593 (citing 48 C.F.R. § 2.101) (providing that "[i]f the contractor receives the termination notice after the date fixed for termination, then the effective date of termination means the date the contractor receives the notice").

8. Defendants do not assert that Hirani actually received the Termination Letter on Sunday, April 28, 2013, or earlier. *See generally* Defs.' Suppl. at 2–3 & n.3 (asserting that the record evidence supports receipt of the Termination Letter on Monday, April 29, 2013).[1] Instead, they urge the court to find that the "record evidence reveals that ACC, at trial, conceded that the Corps' termination of Hirani was effective prior to April 29, 2013." *Id.* at 1. ACC made no such concession. Defendants cite to statements made by ACC at the summary judgment stage that the USACE "terminated" the Prime Contract on April 26, 2013, *see id.* at 2 (citing ECF No. 46 at 9; ECF No. 46-2 at 7, ¶ 27; ECF No. 46-3 at 8, ¶ 31), but each of those statements simply recites the fact of the date of Termination Letter. The same is true of Defendants' citation to ACC's Pre-Trial Statement, *see* Defs.' Suppl. at 3 (citing ECF No. 65 at 10), and ACC's opening statement at trial, *see id.* (citing Trial Tr., Mar. 5, 2018, AM Sess., at 8). None of those statements constitute a *legal* concession about the effective date of the Prime Contract's termination for statute of limitations purposes. *See* 32 C.J.S. Evidence § 542 ("A judicial admission, to be binding, must be one of fact and not a conclusion of law . . . or statements of legal theories or conceptions."); *McNamara v. Picken*, 950 F. Supp. 2d 125, 129 (D.D.C. 2013) (observing that "[i]t is well established that judicial admissions on questions of law have no legal effect") (citation omitted).

<u>Whether ACC Performed Labor or Supplied Materials on April 29 and/or April 30</u>

9. ACC's Project crew performed no work on April 29, 2013. ACC's daily report for that date states in relevant part: "No work today; Rained Out Today; No possibility of work today; talked to crews at 05:45 Hours AM; No sense coming in today here; Work called due to heavy

---

[1] In footnote 3, Defendants cite three items of evidence to support Hirani's receipt of the Termination Letter on Monday, April 29, 2013. The court already has discussed why two of those items—Hirani's Court of Federal Claims complaint and the April 30 letter response from Hirani—do not support such a conclusion. *See* ¶¶ 5, 6, *supra.* The third item is even less probative. Defendants point to ACC's daily report for Tuesday, April 30, 2013, which indicates that on that day a representative of the National Park Service (not the USACE) told ACC that "Hirani was terminated yesterday [Monday, April 29, 2013] for default." Pl.'s Ex. 31 at 930. An oral statement from a National Park Service representative is of no probative value in ascertaining when Hirani physically received the Termination Letter.

4

rains and such[.]" Pl.'s Ex. 31 at 928.  The same report shows zero "total hours" for each person on the eight-man crew.  *Id.* at 927.

10. ACC's Project crew likewise performed no work on April 30, 2013.  ACC's daily report for that date states in relevant part:  "No work today; Rained out and drizzled out; Heavy rain in morning; Lightening up in afternoon; Talked to crews in AM and jointly decided to stay home at least in AM to see what happens here; Rained out for the day completely[.]"  *Id.* at 930. The same report shows zero "total hours" for each person on the eight-man crew.  *Id.* at 929.

11. Ed Hollander, ACC's field superintendent for the Project, worked on April 29 and 30, 2013.  According to ACC's daily reports, Hollander worked 10 hours and 11 hours, respectively, on those days.  *See id.* at 927, 929.  On both days, Hollander spent the day "in the field office on paperwork" and change orders.  *See id.* at 928, 930.  The court previously held that all of Hollander's work—including on April 29 and 30—is not compensable under the Miller Act. *See United States for Use & Benefit of Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, P.C.*, 345 F. Supp. 3d 11, 50 (D.D.C. 2018) ("*Hirani I*") ("In this case, ACC did not muster sufficient evidence to establish that Hollander's time constituted 'labor' under the Miller Act."). The court reaffirms that holding here.

12. ACC "supplied material" to the Project on April 29 and 30, 2013.  *Hirani II*, 962 F.3d at 594.  This finding follows from the court's previous ruling that ACC was entitled to some compensation under the Miller Act for "standby time," that is, periods of time that ACC's owned equipment was on the Project site but not in use.  *See Hirani I*, 345 F. Supp. 3d at 47–48.  The court incorporates its prior rationale here, but also notes that its conclusion is supported by the plain text of the Miller Act and case law.  The Miller Act provides a cause of action for "[e]very person that has *furnished* labor or material in carrying out work provided for in a contract for which

5

a payment bond is furnished" under the statute. 40 U.S.C. § 3133(b)(1) (emphasis added). The Miller Act does not define the term "furnish," so its plain meaning applies. "Furnish" means "to provide what is needed" or "supply, give."[2] As discussed in the next paragraph, ACC provided or supplied equipment on April 29 and 30 that was needed to perform scheduled work. Additionally, *U.S. ex rel. Pippin v. J.R. Youngdale Constr. Co.*, 923 F.2d 146 (9th Cir. 1991), which the D.C. Circuit cited on appeal, *see Hirani II*, 962 F.3d at 594, confirms that onsite equipment, even if idle, is "supplied" for purposes of the Miller Act's statute of limitations. In *Pippin*, the Ninth Circuit held that a claimant had "supplied" material "for the period that the equipment is on the project site and available for use by the subcontractor to fulfill its obligations under its contract with the prime contractor"; the equipment need not have been in physical use to qualify as "supplied." *Id.* at 150. The court further stated that "[t]he equipment is no longer available for the subcontractor's use on the particular project when the subcontractor's relationship with the project is ended by the subcontractor abandoning the project or by the prime contractor terminating its contract with the subcontractor." *Id.* By the logic of *Pippin*, ACC "supplied" its own equipment for the Project on April 29 and 30, because it was "available for use" to fulfill ACC's obligations under the ACC-Hirani subcontract, even if the equipment was not in actual use on those dates.[3]

13.     ACC's heavy grading equipment, among others, was onsite on April 29 and 30 in preparation for the backfilling of the east side grade beam, which occurred on Wednesday, May 1.

---

[2] *Furnish*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/furnish (last visited Aug. 24, 2020).

[3] By granting ACC an award of quantum meruit that included some standby time, the court did not expand ACC's Miller Act remedy beyond the scope of the subcontract. *See United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 781 (11th Cir. 1990) ("[I]t was not the intention of Congress to extend or enlarge the liability of the surety [under a Miller Act bond] beyond the contractual or quasi-contractual obligations of the contractor who remains primarily liable."). The ACC-Hirani subcontract provided that ACC would be paid a fixed amount for "all labor, services, materials, equipment or other items acquired, performed, furnished or used with respect to the Work." Pl.'s Ex. 54 (Art. III, § 3.1). Thus, materials and equipment "furnished" by ACC were compensable items under the subcontract.

That equipment included a CAT 236B steer loader, a CAT 299D track loader, a CAT 303.5 compact excavator, and a CAT 430E loader backhoe. *Compare* Pl.'s Ex. 31 at 927, 929 (showing listed equipment on standby on April 29 and 30) *with id.* at 931 (showing listed equipment in use on May 1). *See also* Pl.'s Ex. 30 at 911–13 (Hirani Daily Quality Control Reports showing equipment on standby on April 29 and 30 and in use on May 1); Pl.'s Ex. 36 (Plaintiff's summary chart upon which the court relied in determining compensable standby time).

14.    Defendants do not genuinely dispute that ACC supplied equipment on April 29 and 30. *See generally* Defs.' Suppl. at 6–9. Instead, they urge the court to "reject any attempt by ACC to raise new arguments beyond those that this Court expressly declined to address." *Id.* at 6. Citing the law of the case and invited error doctrines, Defendants contend that the court's findings on remand as to work performed or material supplied on April 29 and 30 should be limited to the sole theory of timeliness that ACC advanced at trial and in its post-trial submissions with respect to those dates, namely, that Ed Hollander performed compensable work on April 29 and 30. *See id.* at 8 (citing ECF No. 82 at 28, ¶¶ 113–14 and 61–62, ¶ 8). The court rejects Defendants' effort to cabin the court's fact-finding on remand for multiple reasons. First, and most importantly, the D.C. Circuit's remand order is not as circumscribed as Defendants assert. The Circuit "remand[ed] the case to the district court for additional fact-finding on ACC's Miller Act claim against Colonial," *Hirani II*, 962 F.3d at 595, and specifically "to make findings of fact as to . . . whether ACC performed labor or supplied material on April 29 and/or April 30," *id.* at 594. The Circuit did not limit the remand to findings on whether Ed Hollander performed compensable work on those dates; indeed, the court already had determined in its discussion on damages that he had not. *See Hirani I*, 345 F. Supp. 3d at 49–50. It would make little sense for the Circuit to have remanded for fact-finding that the court already had undertaken. Second, broader fact-finding accomplishes

7

the Circuit's rationale for remand: to avoid, if possible, having to resolve "a novel issue of statutory interpretation" concerning when the limitations period commenced. *Hirani II*, 962 F.3d at 593. Defendants' proposed narrowed scope of fact-finding would not further the Circuit's stated purpose for the remand. Finally, the fact-finding the court makes here with respect to equipment furnished on April 29 and 30 is not, strictly speaking, a finding of new facts. The court already had concluded that ACC was entitled to quantum meruit damages for equipment standby time on those dates. *See id.* at 48–49. The court therefore is doing no more than placing facts it previously found in the context that the Circuit requested, i.e., whether ACC supplied material on April 29 and/or 30 for statute of limitations purposes. Neither the law of the case doctrine nor the invited error doctrine forecloses such a result.

15.     Finally, the court rejects ACC's attempt to introduce new facts on remand to establish that its crew performed work on April 29 and 30. ACC puts before the court a sworn declaration from Irene Stephen, co-founder and owner of the company, who attests that, notwithstanding rainy conditions that prevented work on the Project itself on April 29 and 30, ACC's crew still showed up and maintained safety on the site by "checking traffic control signals and cones on 17th Street," "checking and maintaining site safety fencing," and "checking the plywood covering the east side grade beam cutting holes." Decl. of Irene Stephen, ECF No. 106-1, ¶ 7. Ms. Stephen claims that ACC's certified payroll records, which reflect hours worked by the crew on April 29 and 30, support her recollection. *See id.* ¶ 6 (citing Pl.'s Ex. 35 at 213). The court declines to make the findings ACC requests based on Ms. Stephen's declaration. For one, the court did not permit the parties to supplement the trial record, *see* Hr'g Tr. (draft), July 31, 2020, and ACC never moved the court to do so. Additionally, Ms. Stephen's declaration is inconsistent with ACC's daily reports for April 29 and 30, which, as discussed, state that no crew

were at the Project site on those days. Pl.'s Ex. 31 at 927, 929. Hirani's Quality Control Reports are to the same effect. Pl.'s Ex. 30 at 911–12 (recording only Ed Hollander's hours). Finally, ACC's payroll records are not determinative that work was in fact performed on those days and, in any event, ACC's daily reports and Hirani's Quality Control Reports are the best evidence on that question.

The foregoing constitutes the court's supplemental findings and fact and conclusions of law requested by the D.C. Circuit.

Dated: August 26, 2020

Amit P. Mehta
United States District Court Judge